No. 24-13895

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

United Faculty of Saint Leo, National
Education Association Florida
Education Association, American
Federation of Teachers, AFL-CIO
*Petitioner*,

v.

National Labor Relations Board,
*Respondent*,

*and*

Saint Leo Univerity, Inc.,
*Intervenor-Respondent.*

Petition for Review from the Decision and Order of the
National Labor Relations Board entered on September 30, 2024

No.'s 12-CA-275612, 12-CA-284360, 12-CA-275645, 12-CA-275644,
12-CA-275641, 12-CA-275641, 12-CA-275642, 12-CA-275640,
12-CA-275617 and 12-CA-275639

## APPELLANT'S CORRECTED OPENING BRIEF

Richard Siwica, Esq.
EGAN, LEV & SIWICA, P.A
Post Office Box 2231
Orlando, Florida 32802
Telephone: (407) 422-1400

*Attorneys for Appellant*
United Faculty of Saint Leo, et al

**No. 24-13895**
**United Faculty of Saint Leo et al v. NLRB, et al**

**Certificate of Interested Persons**
**and**
**Corporate Disclosure**
**Statement**

1.     Pursuant to 11th Cir. R. 26.1-3(b), counsel certifies that no publicly traded corporations have an interest in this proceeding.

2.     Pursuant to Federal Rule of Appellate Procedure 26.1(a), Petitioner, United Faculty of Saint Leo, et al, certifies that it is not publicly traded, and that it does not have any parent corporations, and that no corporate entity owns 10% or more if its stock.

1. Abruzzo, Jennifer A. (counsel for Respondent)

2. Akerman, LLP (counsel for Intervenor-Respondent)

3. American Federation of Labor-Congress of Industrial Organizations (AFL-CIO) – (Affiliated with United Faculty of Saint Leo)

4. American Federation of Teachers – (Affiliated with United Faculty of Saint Leo)

5. Annexy, Beatriz (counsel for Petitioner)

6. Barclay, Steven (counsel for Respondent)

7. Becket Fund for Religious Liberty (counsel for Intervenor-Respondent)

8. Burdick, Ruth E. (counsel for Respondent)

9. Board, NLRB – Kaplan, Marvin E.

10. Board, NLRB – McFerran, Lauren M.

11. Board, NLRB – Prouty, David M.

12. Board, NLRB – Wilcox, Gwynne A.

13. Chen, Daniel L. (counsel for Intervenor-Respondent)

14. Cohen, David (counsel for Respondent)

15. Egan, Joseph, Jr. (counsel for Petitioner)

16. Egan, Lev, & Siwica, P.A. (counsel for Petitioner)

17. Fleshman, Benjamin A. (counsel for Intervenor-Respondent)

18. Gaylord, Amy Moor (counsel for Intervenor-Respondent)

19. Goodrich, Luke W. (counsel for Intervenor-Respondent)

20. Habenstreit, David (counsel for Respondent)

21. Heaney, Elizabeth Ann (counsel for Respondent)

22. Hill, Kelly (counsel for Intervenor-Respondent)

23. Isbell, Kellie (counsel for Respondent)

24. Jason, Meredith (counsel for Respondent)

25. Judge, NLRB – Giannasi, Robert

26. Judge, NLRB – Sandron, Ira

27. Lev, Tobe (counsel for Petitioner)

28. National Education Association Florida Education – Affiliated with United Faculty of Saint Leo

29. National Labor Relations Board (Respondent)

30. Ohr, Peter Sung (counsel for Respondent)

31. Parker, Heidi (counsel for Petitioner)

32. Plympton, John W. (counsel for Respondent)

33. Rassbach, Eric C. (counsel for Intervenor-Respondent)

34. Saint Leo University, Inc. (Intervenor-Respondent)

35. Shelley, Staci Rhodes (counsel for Intervenor-Respondent)

36. Silverman, Scott T. (counsel for Intervenor-Respondent)

37. Siwica, Richard (counsel for Petitioner)

38. United Faculty of Saint Leo, National Education Association Florida Education, American Federation of Teachers, AFL–CIO (Petitioner)

39. Varberg, Jordan, T., Saint Leo, Inc. (counsel for Intervenor-Respondent)

40. Zerby, Christopher (counsel for Respondent)

**Statement Regarding Oral Argument**

Petitioner requests that oral argument be heard. This case involves the differing interpretations and applications of opinions from several Circuit Courts of Appeal, as well as the United States Supreme Court. Oral argument will facilitate the Court's understanding of the various opinions and dissents in these cases.

**Table Of Contents**

                                                                            **Page**

Certificate of Interested Persons and Corporate Disclosure Statement .............. C-1

Statement Regarding Oral Argument ...................................................... i

Table of Contents ........................................................................... ii

Table of Citations ......................................................................... iv

Jurisdictional Statement ................................................................. vi

Statement of the Issues ................................................................... 1

I.      Statement of the Case ........................................................... 1

        A.      Course of Proceedings ............................................... 1

        B.      Statement of the Facts ............................................... 5

                1.      Respondent's history and longstanding bargaining
                        relationship ................................................... 5

                2.      The Withdrawal of Recognition and Subsequent Events,
                        Including Direct Dealing, Unilateral Changes and Mid-Contract
                        Modifications ................................................. 9

                3.      Standard of Review ....................................... 17

II.     Summary of the Argument ....................................................... 17

III.    Argument ........................................................................ 19

        A.      Introduction ........................................................... 20

        B.      The Board should return to the Pacific Lutheran standard ............... 24

        C.      Should the Court reinstate Pacific Lutheran and apply it rather than
                remanding it to the Board, it should find that  neither prong of the

Pacific Lutheran test was be satisfied, and the Board has jurisdiction over Respondent ................................................................................ 33

D.    Should the Court Apply the Bethany College Standard, it should Nevertheless Reverse the Board's Refusal to Find Jurisdiction ................................................................................ 37

Conclusion ........................................................................................................ 38

Certificate Of Compliance ................................................................................ 39

Certificate Of Service ....................................................................................... 40

## CASES

*Allen v. Morton,
495 F.2d 65 (D.C. Cir. 1973 ............................................................ 26

*Bethany College,
369 NLRB
No. 98 (2020) ....................... 1, 3, 9, 11, 18, 19, 24, 25, 26, 33, 37, 38

Carroll College, Inc. v. NLRB,
558 F.3d 568 (D.C. Cir. 2009) ....................................................... 29

Catholic Bishop of Chicago,
440 U.S. 490 (1979) .......................................................................... 20

Denver Post of the Nat'l Society of the Volunteers of Am. v. NLRB,
732 F.2d 769, 772 (10th Cir. 1984) .................................................. 28

Duquesne Univ. of the Holy Spirit v. NLRB,
947 F.3d 824 (2020) ................................................. 24, 25, 27, 31, 32

EEOC v. Miss. Coll.,
626 F.2d 477 (5th Cir. 1980), cert. denied.
453 U.S. 912 (1981) ....................................................................... 31

EEOC v. Townley Eng. & Mfg. Co.,
859 F.2d 610 (9th Cir. 1988), cert. denied,
489 U.S. 1077 (1989) ...................................................................... 30

Hosanna -Tabor Evangelical Lutheran Church and
Sch. v. EEOC 565 U.S. 171 (2012) ................................................. 29

Lemon v. Kurtzman,
403 U.S. 602 (1901) ....................................................................... 25

Loper Bright v. Raimondo,
144 S. Ct. 2244, 2262 (2024) ......................................................... 17

*NLRB v. Salvation Army of Mass. Dorchester Day Care Ctr.*,
    763 F.2d 1 (1st Cir. 1985) ........................................................ 28, 29

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    140 S.Ct. 2049 (2020) ......................................................... 29, 30, 33

*\*Pacific Lutheran University*, 361 NLRB
    1404 (2014) .1, 4, 18, 19, 21, 24, 27, 28, 31, 32, 33, 34, 35, 36, 37, 38

*Tilton v. Richardson*,
    403 U.S. 672 (1971) .......................................................... 26

*\*University of Great Falls v. NLRB*,
    278 F.3d 1335 (D.C. Cir. 2002) ................. 2, 3, 18, 20, 21, 24, 25, 29

*Volunteers of Am., L.A. v. NLRB*,
    777 F.2d 1386 (9th Cir. 1985) .......................................... 28

*Volunteers of Am.-Minnesota-Bar None Boys Ranch v. NLRB*,
    752 F.2d 345, 348-49 (8th Cir. 1985) ................................. 28

## *OTHERS*

*\*National Labor Relations Act .......... 2, 3, 4, 5, 17, 18, 19, 22, 29, 32, 34, 38

## Jurisdictional Statement

This is a petition for review of a final order issued by Respondent, National Labor Relations Board, in NLRB Case No. 12-CA-275612, 12-CA-284360, 12-CA-275645, 12-CA-275644, 12-CA-275641, 12-CA-275641, 12-CA-275642, 12-CA-275640, 12-CA-275617 and 12-CA-275639, entered on September 30, 2024 and published at 373 NLRB No. 121. This petition is brought pursuant to Rule 15(a) of the Federal Rules of Appellate Procedure and 29 U.S.C. Section 160(f).

**Statement of the Issue**

Whether the Board erred by not abandoning *Bethany College* and returning to its prior standard articulated in *Pacific Lutheran* when determining whether the Board will exercise jurisdiction over Respondent and other religious colleges or universities?

**I.      Statement of the Case**

**A.      Course of Proceedings**

For over forty years, Saint Leo University (Respondent) and United Faculty of Saint Leo University (the Union or Petitioner) were parties to a productive collective-bargaining relationship. This ended on October 23, 2020, when Respondent communicated to employees that it would no longer recognize the Union as the exclusive bargaining representative of University Campus based faculty and librarians. Respondent followed this announcement, by in fact, withdrawing recognition from the Union, relying on the Board's then recent decision in *Bethany College*, 369 NLRB No. 98 (June 10, 2020), which overturned *Pacific Lutheran University*, 361 NLRB 1404 (2014),[1] and adopted the three-prong test

---

[1] Under The *Pacific Lutheran University* test, the Board focused on whether students, faculty members and the community understood that *the faculty members' "role* was to create or maintain the religious purpose or mission." 361 NLRB at 1411.

1

articulated by the U.S, Court of appeals for the District of Columbia Circuit in *University of Great Falls v. NLRB*, 278 F.3d 1335 (D.C. Cir. 2002).[2]

It is undisputed that almost immediately after Respondent withdrew recognition, Respondent bypassed the Union and began dealing directly with bargaining unit employees regarding terms and conditions of employment. This resulted in the creation and distribution of a new employee handbook. The new employee handbook imposed unilateral changes to employees' terms and conditions of employment and made mid-contract modifications to the parties' collectively bargained agreement that had been in effect at the time Respondent withdrew recognition. Furthermore, Respondent maintained certain policies that were unlawfully broad.

On August 11, 2022, the Regional Director of Region 12 issued a Consolidated Complaint and Notice of Hearing (the Complaint) regarding these alleged violations of the Act. In its Answer to the Consolidated Complaint (Answer), Respondent admitted many of the allegations, but claimed it was a religious

_____

[2] In *Bethany College*, the *Pacific Lutheran University* standard was replaced with the requirement that an institution is covered by the Act where (1) it holds itself out to "students, faculty and the community as providing a religious educational environment"; (2) "is organized as a nonprofit"; *and* (3) be "affiliated with, or owned operated or controlled, directly or indirectly, by a recognized religious organization, or with an entity, membership of which is determined, at least in part, with reference to religion." *Id.*

institution of higher learning outside the jurisdiction of the Act under *Bethany College (*adopting the three prong *Great Falls* test).

The trial before the ALJ[3] began on October 26, 2022, and continued on November 2 – 4 and 29 – 30, and December 1, 2022.  The ALJ found that all three prongs of *Bethany College* applied, but because the parties had also litigated the unfair labor practice charges on the merits, he went on to correctly conclude that Respondent's rules were overly broad and that Respondent withdrew recognition from the Union and bypassed the Union.  The ALJ also found that Respondent implemented unilateral changes to employees' terms and conditions of employment without giving the Union notice and an opportunity to bargain, and without bargaining to impasse on an overall successor contract and made mid-term contract modifications without the Union's consent.  And that, if there was jurisdiction, these actions by Respondent would be unlawful under the Act.

However, because the ALJ believed *Bethany College* applied, he dismissed the Complaint based on his erroneous conclusion that Respondent was a religious institution under *Bethany College.*  In response to the Exceptions filed by the General Counsel, the Board affirmed the ALJ's rulings, findings and conclusions

---

[3] In this Brief, the Administrative Law Judge will be referred to as the "ALJ," the decision of the ALJ will be referred to as the "ALJD," the National Labor Relations Board will be referred to as the "Board" or the "NLRB," and the National Labor Relations Act will be referred to as the "Act."

and adopted the recommended order. 373 NLRB No. 121 at 1.[4] The Board specifically declined the General Counsel's request that the Board overrule *Bethany College.* See 373 NLRB No. 121 at n.2.

In essence, "but for" the Board's ostensible lack of jurisdiction, it appears the ALJ would have found that Respondent committed the violations alleged in the Complaint. For example, the ALJ's findings (adopted by the Board) included the following:

- "The Respondent admits that . . . it bypassed the Union and dealt directly with full-time faculty . . . this would be a violation of Section 8(a)(5) and (1) should the Board exercise jurisdiction.

- "[I]f the Respondent unlawfully withdrew recognition, such changes ['alleged in paragraphs 11 and 12 of the complaint'] constituted violations of Section 8(a)(5) and (1)." 373 NLRB No. 121 (ALJD)

The Court should vacate the Board's decision, and direct restoration of the *Pacific Lutheran* standard. At that point, this Court could either (1) apply *Pacific Lutheran* based on the ample facts in the record, or direct the Board to conduct the jurisdiction analysis. The substantive violations of the Act have already been

---

[4] Because the Board adopted the ALJ's findings of fact, Petitioner will herein reference the Administrative Law Judge's Decision ("ALJD"), the Board's Final Order ("Order") regarding the facts, in this case, and the Transcript ("Tr.") regarding facts in the record.

decided by the ALJ and the Board. Because Respondent violated Section 8(a)(1) and (5) of the Act, Respondent should be required to remedy its unlawful actions, including its unlawful communications with employees, the unlawful withdrawal of recognition, direct dealing, unilateral changes, mid-contract modifications, and maintaining overly broad work rules.

## B.    Statement of the Facts

What follows is a review of the parties 'relationship and the context in which the violations occurred.  The ALJ's findings that Respondent acted unlawfully were adopted by the Board. The only issue is the matter of jurisdiction.

### 1.    Respondent's history and longstanding bargaining relationship

Respondent is a not-for-profit Catholic-founded private liberal arts university that offers associate, bachelor, masters, and doctoral degrees. [ROA: 3465-3467, 1225].   Respondent is a member of the Association of Catholic Colleges and Universities, membership in which is determined at least in part, with reference to religion. [ROA: 3470, 3471; ROA, V.I, pp. 12, 36].  Respondent is also a member of the Association of American Colleges and Universities, which does not have any apparent religious screening process. [ROA, V.I, pp. 1025].

The Saint Leo Abbey (the Abbey) sits on Respondent's campus and is not owned by Respondent, thus remaining the property of the Order of Saint Benedict.

[ROA, V.I, pp. 474, 476, 610, 612].  Respondent's Board of Trustees remains the final authority on all matters related to Respondent's operations. [ROA: 3479, 3480; ROA, V.I, pp. 47, 393, 535].  No diocese or entity affiliated with the Catholic Church exerts control over Respondent's operations or its Board of Trustees. [ROA, V.I, pp. 535].  Similarly, the appointment of Board of Trustee members is not controlled by any religious institution or body. [ROA, V.I, pp. 535].

Approximately thirty individuals make up the Respondent's Board of Trustees. [ROA 3482; ROA; V.I, pp. 47, 534].  At all relevant times, only three trustees held religious titles, including the Bishop for the Diocese of Saint Petersburg, the Abbot of the Saint Leo Monastery, and the Prioress of the Holy Name Monastery. [ROA, V.I, pp. 49, 539, 540].

Respondent has approximately 9,000 enrolled students, including about 2,000 students who attend on-the-ground classes at Respondent's University Campus in Saint Leo, Florida. [ROA: 3468; ROA, V.I, p. 43].  Approximately 6,000 students attend exclusively via on-line learning, and the remaining students attend "in person" at one of Respondent's dozen or so "centers" located in Florida, Georgia, and Texas. [ROA: 3468; ROA, V.I, p. 43].

In 1973, the Respondent began to offer distance learning for military members and is now one of the top ten higher education institutions for military servicewomen and men, both at its University Campus and at its education centers on military

bases. Respondent has also focused on attracting distance-learning students, with most of its enrolled students attending exclusively online. [ROA, V.I, p. 43]. Respondent was one of the first schools to offer online programs when it launched its Center for Online Learning in 1998. [ROA, V.I, p. 55].

Administratively, Respondent maintains four colleges and one school on its University Campus, including, the College of Arts and Sciences, the College of Business, the College of Education and Social Services, the College of Health Professions, and the School for Computing, Artificial Intelligence, Robotics, and Data Sciences. [ROA, V.I, pp. 44, 923]. Generally, the approximately 130 full-time faculty in those colleges and schools report to a department chair who in turn reports to the college or school's dean or director. [ROA: 3468; ROA, V.I, p. 44]. The deans report to Dr. Mary Spoto, Respondent's Vice President of Academic Affairs (VPAA). [ROA: 3468; ROA, V.I, p. 41]. Dr. Spoto has held the VPAA position for about four years. [ROA, V.I, p. 41]. Dr. Spoto reports to University President Dr. Ed Dadez, who assumed the presidency in 2022 and replaced Dr. Jeffrey Senese. [ROA, V.I, p. 46]. Relevant to this matter, Dr. Senese was Respondent's president in 2020, when the majority of the material events relevant here transpired. [ROA, V.I p. 46]. The University President reports to Respondent's Board of Trustees. [ROA: 3468, 15; ROA, V.I, p. 47].

The full-time faculty and librarians based at Respondent's University Campus (the Unit) have been represented by the Union since 1976. [ROA: 3468; ROA V.I pp. 455, 696-697, 1114]. All faculty in the Unit teach courses at the Respondent's University Campus, but some also teach classes at Respondent's educational centers and online. [ROA: 3468; ROA,VI pp. 60, 694]. Campus- based faculty consistently testified that they teach online courses regularly. [ROA,VI, 694]. Dr. Valerie Wright testified without contradiction that online students are not required to visit campus and that she had not seen any of her current online students on campus during the semester that was in session at the time of the hearing. [ROA,VI, 694].

Respondent and the Union have been parties to a series of collective-bargaining agreements (CBAs) that outline terms and conditions of employment for the Unit. [ROA: 3469, 2; ROA,VI, 127]. The most recent CBA was effective by its terms from June 2012 through August 2016. [ROA: 3469; 2683-3460, ROA,VI, pp. 128, 698]. Following the expiration of the 2012-2016 contract, the parties agreed to maintain the terms of the expired agreement until a successor contract could be negotiated. [ROA: 3469]. The parties' intent to maintain the terms of the expired agreement is undisputed and was memorialized by the parties in a 2019 memorandum of understanding related to wage increases for the Unit. [ROA: 3469]. Until October 23, 2020, Respondent followed the terms and conditions outlined in the expired CBA. [ROA:3469; ROA,VI, p. 128].

The evidence shows that the parties met for at least eighty-four bargaining sessions between 2016 and 2020 and were making progress toward reaching a successor agreement prior to Respondent withdrawing recognition of the Union. [ROA,VI, p. 128]. Faculty had been notified of the status of negotiations through a series of updates sent by Respondent, and as late as April 2020, Respondent told faculty that it hoped to wrap up negotiations with Union during that same spring. By July 2020, the parties had reached tentative agreements on almost all subjects of a successor contract. [ROA,VI, p. 789]. In June or July 2020, the Union sent a settlement package to Respondent in an attempt to finalize the CBA. [ROA,VI, p. 809]. At that time, Respondent told the Union that it would get back to the Union with a response to the Union's offer. [ROA,VI, pp. 809, 810].

2. The Withdrawal of Recognition and Subsequent Events, Including Direct Dealing, Unilateral Changes and Mid-Contract Modifications

On October 23, 2020, before a final agreement on a successor CBA could be reached, Respondent's Board of Trustees met and voted to withdraw recognition from the Union as the exclusive bargaining representative of the Unit. [ROA: 3469]. In its resolution memorializing the vote, the Board of Trustees cited the National Labor Relations Board's June 2022 decision in *Bethany College* to justify its decision to no longer recognize the Union. [ROA: 3469]. Furthermore, on that same date, the Board of Trustees authorized the President to oversee the development of

a new model of shared governance to replace the existing University Senate. [ROA: 3469]. Further, The Board of Trustees authorized the President to oversee the development of a faulty handbook to replace the CBA. At the same meeting, the Board of Trustees also voted to implement the communication plan found in the resolution materials; the communication plan and resolution materials included a scheme for implementing the Board of Trustees' decision to withdraw recognition from the Union. For example, the resolution materials highlighted key messages that Respondent wanted to convey regarding its decision. Those messages included relaying that the decision to withdraw recognition was made in the spirit of helping innovation and a desire to be "more nimble and responsive" and "more agile in the fast-moving world of higher education."

The communication plan included talking points for Respondent's officials which highlight the aforementioned reasons for its decision; letters that would be sent out to faculty, staff, and the community from various Respondent officials; news releases; and planned social media posts announcing the withdrawal of recognition. Nowhere in the communication plan or resolution materials is there any explanation of how recognizing the Union infringed on Respondent's First Amendment rights as a religious institution or how withdrawing recognition would strengthen Respondent's Catholic identity. Further, Dr. Spoto admits there was no discussion at meetings regarding Respondent's freedom of religion rights being infringed upon

because of Respondent's obligation to recognize the Union. [ROA,VI, pp. 141, 142].

The Union learned about Respondent's decision to withdraw recognition on October 23, 2020. [ROA,VI, p. 709]. Prior to that date, the Union had no knowledge Respondent was contemplating withdrawing recognition. [ROA,VI, p. 709]. The Union was notified of the Board of Trustees' decision in an email from Respondent's former general counsel Kelly De Hill to Union President Valerie Wright and Union representative Graham Picklesimer. [ROA,VI, p. 701]. The email from De Hill cited the NLRB's decision in *Bethany College* as the basis for the Board of Trustees concluding that the NLRB did not have jurisdiction over Respondent. In her email, De Hill mentioned that it was in the best interest of Respondent to foster "an exceptional religious educational environment for students" but did not explain how its decision to withdraw recognition would accomplish that.

That same day, faculty received emails from the then chairman of the Board of Trustees, Respondent's then-President Senese, and VPAA Spoto, announcing the Board of Trustees' decision. [ROA, VIII, p. 3469]. Those emails highlighted the talking points directed in Respondent's communication plan, citing "flexibility," being "nimble," the ability to "pivot swiftly," and "be[ing] more agile" as the reason for the Board's decision.

Additionally, in her letter to faculty, VPAA Dr. Spoto explained that the decision made by the Board of Trustees was also made in order to "hold true" to Respondent's Benedictine Catholic core values – but VPAA Spoto did not explain how this action furthered that objective. VPAA Spoto's email also announced that Respondent would be creating a new "shared governance," under which a new faculty handbook would be created. [ROA: 3469]. As of the dates of the ALJ's hearing in this matter, a new shared governance model had not been implemented. [ROA: 3469; ROA,VI, p. 1089].

On October 28, 2020, VPAA Spoto met with faculty and explained that she would be setting up a transition team that included full-time faculty to craft and review a new employee handbook to replace the expired CBA. [ROA,VI, p. 156]. The transition team ultimately offered comments on handbook provisions related to terms and conditions of employment. [ROA,VI, p. 157]. Respondent admits it sought the input of faculty regarding the handbook without giving the Union the opportunity to bargain over handbook provisions. [ROA: 3469; ROA,VI, pp. 157, 159].

On December 18, 2020, VPAA Spoto sent an email to faculty with a copy of an interim handbook attached. [ROA: 3469; ROA,VI, pp. 158, 159]. The interim handbook indicated on its face that it would be effective on January 15, 2021. The VPAA's email highlighted new and modified provisions in the handbook that were

different than what appeared in the expired collective bargaining agreement. [ROA: 3469; ROA,VI, p. 159]. Those highlighted changes included, but were not limited to, changes to tenure, workload, evaluations, and other terms and conditions of employment. [ROA: 3469].

In April 2021, Respondent issued a final version of the handbook which was substantially similar to the interim version that it had drafted and promulgated in December 2020. [ROA: 3469-70; ROA,VI, pp. 185, 711]. As before, Respondent did not seek the input of the Union before distributing the April 2021 final version. [ROA 3469 and 3470; ROA,VI, p. 712]. The final version of the handbook was approved by the Board of Trustees but was not presented to the faculty to be voted upon; rather, it was simply implemented by Respondent. [ROA,VI, p. 712]. The April 2021 version of the handbook remains in effect. [ROA,VI, p. 186]. Both the interim and final versions of the faculty handbook contained numerous unilateral changes and mid-term contract modifications. [ROA: 3481]. For example, the interim handbook tied salaries to evaluations, and the final version of the handbook contains the same provision. In contrast, the expired collective bargaining agreement did not contain language permitting evaluations to impact salaries. [ROA: 2683-3460; ROA,VI, p. 715]. This unilateral change impacts unit employees because now, salary increases are individually determined based on the results of subjective

evaluations instead of the objective criteria established by the expired CBA. [ROA,VI, p. 715].

Under the expired contract, faculty were allowed to work up to 20 hours of outside employment per week. The interim and final versions of the handbook state that faculty may not engage in outside employment for more than 10 hours per week without approval from the administration. Moreover, Respondent admitted in its Second Amended Answer that it made the unilateral changes and midterm contract modifications as alleged in paragraphs 10(a)(i) through (vi), 11(a)(i) through (iii), 11(a)(v) through (viii), 11(a)(xii), 11(a)(xiv) through (xxi), 11(a)(xxiii) through (xxvi), and 11(a)(xxviii) and (xxix) of the Consolidated Complaint.

The expired CBA did not have a provision discussing furloughs, but the interim and final version of the handbook unilaterally imposed a furlough policy. [ROA,VI, pp. 157, 159, 712].

The expired CBA included an arbitration provision that Respondent unilaterally rescinded. The interim and final versions of the handbook include a revised grievance procedure that eliminates the ability of faculty to grieve matters such as denial of tenure and promotion.

The expired agreement also gave preference to full-time faculty (over non-unit part-time, adjunct, or visiting faculty) to teach alternate format classes. One faculty member, Dr. Valarie Wright testified that alternate formats are any classes

that are not taught "on the ground" at the University Campus; alternate formats include online courses as well as in-person evening and weekend courses. Dr. Wright testified this is of importance to full time campus-based faculty because classes are not taught on campus in the summer, so if campus-based faculty want to teach during the summer, they need to teach an alternative format class. [ROA,VI, p. 721].

In contrast to the expired CBA, the interim and final versions of the handbook do not include a preference for full-time faculty to teach summer assignments. The expired collective bargaining agreement required the electronic recording of the deliberations of the promotion and tenure committee and specified that such recordings be kept for seven years. Neither the interim nor final versions of the handbook call for the electronic recording of deliberations, nor retention of such recordings even if made. This change impacts faculty because a faculty member would need this information if they wanted to file a grievance over a denial of promotion or tenure – if such grievances were still permitted. [ROA,VI, pp. 724, 729].

Finally, the definitions of several key terms changed in the interim and final handbooks from those previously in use in the expired agreement. The definition of "visiting faculty" changed from including a five-year limit on how long an individual could continue as visiting faculty and now includes no limit. This impacts faculty

as the removal of the time limit on visiting faculty could result in the loss of tenure opportunities because Respondent could classify an instructor as visiting faculty in perpetuity, something they were not permitted to do before. [ROA,VI, p. 732]. Therefore, under the terms of the expired CBA, non-unit visiting faculty would automatically become part of the bargaining unit if they worked full-time for five or more years, and gain access to the rights and privileges afforded to unit employees by the CBA.

Likewise, limitations on the definition of "academic year" previously included in the expired CBA were removed from the interim and final handbooks. Specifically, under the expired agreement, specific dates were assigned to the academic year and the overall academic year was limited to nine (9) months. Faculty are materially impacted by this change as they are unable to plan for summer – a time when no in-person classes have typically been offered on Respondent's campus, but for which faculty must now commit to being available. [ROA,VI, p. 736].

The interim and final handbook introduced a definition for "faculty academic year" which was absent from the expired collective agreement. [ROA,VI, p. 136]. This new provision sets out the dates that faculty are required to be at work or available for work. Similar to the change in the definition of "academic year," the addition of the term "faculty academic year" impacts faculty because the uncertainty

of what constitutes a faculty academic year makes it difficult for faculty to create personal schedules, including summer vacations. [ROA,VI, p. 737].

As discussed above, Respondent admits the bulk of the alleged unilateral changes and midterm contract modification allegations; to the extent it denied certain allegations, the ALJ and the Board (via adoption of the ALJD) correctly concluded that the alleged unilateral changes and midterm contract modifications were made, and that these actions violated Section 8(a)(5) of the Act, contingent only upon the issue of whether the Board had jurisdiction.

### 3. <u>Standard of Review</u>

On review, the court exercises independent judgment in deciding whether an agency acted within its statutory authority. *Loper Bright v. Raimondo*, 144 S. Ct. 2244, 2262 (2024).

## II. **Summary of the Argument**

For over forty years, Saint Leo University (Respondent) and United Faculty of Saint Leo University (the Union or Petitioner) were parties to a productive collective-bargaining relationship. This ended on October 23, 2020, when Respondent communicated to employees that it would no longer recognize the Union as the exclusive bargaining representative of University Campus based faculty and librarians. Respondent followed this announcement, by in fact,

withdrawing recognition from the Union, relying on the Board's then recent decision in *Bethany College*, 369 NLRB No. 98 (June 10, 2020), which overturned *Pacific Lutheran University*, 361 NLRB 1404 (2014), and adopted the three-prong test articulated by the U.S, Court of appeals for the District of Columbia Circuit in *University of Great Falls v. NLRB*, 278 F.3d 1335 (D.C. Cir. 2002).

Respondent admits the bulk of the alleged unilateral changes and midterm contract modification allegations; to the extent it denied certain allegations, the ALJ and the Board (via adoption of the ALJD) correctly concluded that the changes and contract modifications were made, and that these actions violated Section 8(a)(5) of the Act, contingent only upon the issue of whether the Board had jurisdiction. The crux of the case, then, is whether Respondent is exempt from coverage under the Act.

The previous *Pacific Lutheran* standard focuses on whether faculty members – the persons whose right to unionize is at stake – requires proof that *faculty members perform a specific role* in creating or maintaining the school's religious educational environment. By contrast, under the current *Bethany College* test, employees are essentially barred from unionizing if the university merely holds itself out as a providing a "religious educational environment." What faculty members actually do is not determinative.

Petitioner requests that the Court vacate the Board's decision and direct the Board to revert to the *Pacific Lutheran* standard. It is further requested that the Court

direct the Board to apply the *Pacific Lutheran* standard to the facts already developed by the parties or, alternatively, apply *Pacific Lutheran* on the record brought to the Court in connection with this appeal; and, because the Board has already determined that, should it have jurisdiction, the Respondent has violated the Act, direct the Board to issue appropriate remedies.

### III.    Argument

**The Board erred by not considering or finding that it should abandon the *Bethany College* standard and revert to its previous standard set forth in *Pacific Lutheran* to determine whether it should exert jurisdiction over a religiously affiliated institution of higher learning.**

For the reasons set forth below, the Court should (1) direct the Board to abandon the *Bethany College* standard and return to the *Pacific Lutheran* standard, and then *either* (2) remand the case with directions that the Board to resolve the jurisdiction issue under the *Pacific Lutheran* standard based on the facts in the record; *or alternatively* (3) and because there are ample facts in the record, the Court can itself apply the *Pacific Lutheran* standard.   Regarding the merits of the case, the Board has already adopted the ALJ's findings that, should there be a finding of jurisdiction, Respondent has violated the Act in myriad ways.

## A.    Introduction

There is extensive jurisprudence around the criteria to determine if a university should be exempted from Board jurisdiction because of its putative status as a religious institution.  In *Catholic Bishop of Chicago*, 440 U.S. 490 (1979), the Supreme Court concluded that there is "significant risk that the First Amendment will be infringed" if the Board had jurisdiction over church-operated schools and their teachers with a "substantial religious character." *Id* at 501-503. This risk would exist even where teachers are teaching purely secular material. *Id.*  As such, the Supreme Court declined to permit the Board to exercise jurisdiction over church-operated schools with a "substantial religious character." *Id* at 503.[5]

In *Great Falls*, the NLRB determined that the university there did not have "substantial religious character," within the meaning of *Catholic Bishop*, where the "propagation of a religious faith is not the primary purpose," and instead its functions were "primarily secular" 278 F.3d at 1338, 1340 (quoting *University of Great Falls*, 331 NLRB 1663, 1665 (2000)). On review, the D.C. Circuit rejected the Board's criteria, and instead adopted a three-pronged analysis under which it concluded that the Board could not exercise jurisdiction over the university.  *Univ.*

---

[5] Importantly, he employers in *Catholic Bishop* were primary and secondary schools, and not universities.

*of Great Falls v. NLRB*, 278 F.3d 1335, 1343 (D.C. Cir. 2002). The test adopted by the D.C. Circuit Court of Appeals in *Great Falls* is whether the institution: merely (a) "holds itself out to students, faculty, and community as providing a religious educational environment"; (b) is "organized as a nonprofit"; and (c) is "affiliated with, or owned, operated, or controlled, directly or indirectly, by a recognized religious organization, or with an entity, membership of which is determined, at least in part, with reference to religion." *Id.* The Court reasoned that this would allow the Board to determine jurisdiction without wading through religious doctrine or motive, while still ensuring that it is a bona fide religious institution. *Id* at 1334 – 1335.

However, in *Pacific Lutheran University,* 361 NLRB 1404 (2014), the Board adopted a two-prong test to determine whether the Board will exercise jurisdiction over a religious institution of *higher learning*. The test created by the Board incorporated the first prong of the D.C. Circuit's *Great Falls* test, wherein an employer must demonstrate that it "holds itself out to students, faculty, and community as providing a religious educational environment." *Id* at 1409. An analysis of that factor would include a review of the employer's "… handbooks, mission statements, corporate documents, course catalogs and documents published on a school's website. Press releases or other public statements by … officials could also be relevant. A university's contemporary presentation of itself is likely to be more probative than its founding documents and historical tradition." *Id.* At 1409.

The Board noted that relying on these types of documents avoided the intrusive inquiry *Catholic Bishop* prohibited, as the employer freely provides this information to its students and the public. *Id* at 1410.

Importantly, to meet the second prong of the test set forth by the Board in *Pacific Lutheran*, an employer must demonstrate that its *faculty members perform a specific role* in creating or maintaining the school's religious educational environment. *Id* at 1409. The Board held that *the focus should be on the faculty members themselves* – the employees to be granted or denied the protections of the Act – rather than on the nature of the university as a whole. *Id* at 1410. The Board went on to explain that it would extend a "holding out" principle wherein it would examine the university's "communications to current or potential students and faculty members and the community at large," to determine if the faculty member's role was to create or maintain the religious purpose or mission." *Id* at 1411. This requirement allows the Board to dismiss claims from self-purported religious institutions which are made "solely in an attempt to avoid the Board's jurisdiction." *Id* at 1410. The Board cautioned that it would, "err on the side of being over-inclusive and not excluding universities because they are not 'religious enough.'" *Id* at 1410.

The Board further reasoned that general statements that faculty support the school's mission would be inadequate. *Id.* It explained that:

Appropriate evidence to assess this requirement could include, but would not be limited to, job descriptions, employment contracts, faculty handbooks, statements to accrediting bodies, and statements to prospective and current faculty and students. We will not seek to look behind these documents to determine what specific role petitioned-for faculty actually play in fulfilling the religious mission of a school or to inspect the university's actual practice with respect to faculty members. Nor will we examine the specific actions of any individual teacher. Rather, we rely on the institution's own statements about whether its teachers are obligated to perform a religious function, without questioning the institution's good faith or otherwise second-guessing those statements. ***If the evidence shows that faculty members are required to serve a religious function, such as integrating the institution's religious teachings into coursework, serving as religious advisors to students, propagating religious tenets, or engaging in religious indoctrination or religious training, we will decline jurisdiction.*** *Likewise, if the college or university holds itself out as requiring its faculty to conform to its religious doctrine or to particular religious tenets or beliefs in a manner that is specifically linked to their duties as a faculty member, we will decline jurisdiction.*

*Id*. at 1409 (emphasis supplied)

The Board included the public "holding out" elements as a "market check" to dissuade institutions from claiming to be religious in order to escape the Board's jurisdiction. *Id.* at 1412. The Board reasoned that an employer would not falsely hold itself out as providing a religious educational environment because it could lose the business of individuals who did not want to attend a religious school. *Id.* Further, not only does a university run the risk of losing students, but some faculty may not be willing to work at an institution that holds itself out as providing a religious educational environment.

The *Pacific Lutheran* test remained in effect under existing Board law until June 2020, when the Board issued its decision in *Bethany College.* 369 NLRB No. 98 (2020). In *Bethany College*, the ALJ applied the *Pacific Lutheran University* test, and determined that the Board had jurisdiction. *Id.,* slip. op. at 1. In exceptions to the Board, the General Counsel argued that the Board adopt the test set forth by the D.C. Circuit in *University of Great Falls*. The Board agreed with the D.C. Circuit that an inquiry into a teacher's role in performing the religious education environment "impermissibly present[s] a significant risk that the protections set forth in the Religion Clauses of the First Amendment of the Constitution would be infringed." *Id* slip. op. at 3. The *Bethany College* Board adopted the D.C. Circuit's three-prong test outlined in *University of Great Falls*. *Id.* That is the standard at issue in this case.

### B.     The Board should return to the *Pacific Lutheran* standard.

*Bethany College* test erroneously extended *Catholic Bishop* to institutions of higher education. While the D.C. Circuit has rejected the Board's *Pacific Lutheran* test in *Duquesne University of the Holy Spirit v. NLRB*, 947 F.3d 824 (D.C. Cir. 2020) (*Duquesne I*), and the Board subsequently adopted the D.C. Circuit's *Great Falls* test in *Bethany College* in light of *Duquesne*, the Board should nonetheless return to the *Pacific Lutheran* standard. It is respectfully submitted that, for the reasons urged by D.C. Circuit Judge Pillard in her call for reconsideration of the

*Great Falls* test in *Duquesne II,* the circuit court erred in its decision in *Duquesne I. See Duquesne Univ. of the Holy Spirit v. NLRB*, 975 F.3d 13, 14-19 (D.C. Cir. 2020) (*Duquesne II*) (Pillard, J., concurring in denial of rehearing en banc for other reasons).

The *Bethany College* test, having been adopted from the D.C. Circuit's analysis in *Great Falls*, proceeds from a flawed interpretation of Supreme Court precedent regarding First Amendment religious freedoms. The fundamental case of *NLRB v. Catholic Bishop* highlighted the risk of government entanglement in religious affairs if the Board were permitted to exercise jurisdiction over faculty at two Catholic *high schools*. The Supreme Court has never applied its *Catholic Bishop* decision to institutions of higher education. *Duquesne II,* 975 F.3d at 16 (Pillard, J., concurring). And, in fact, as Judge Pillard recently pointed out, the D.C. Circuit is the *only* appellate court to have done so in a majority opinion. *Id.* Crucially, the *Catholic Bishop* decision was made in the context of parochial high schools, in which teachers participated in the school's mission of religious propagation to its students and where "[r]eligious authority necessarily pervades the school system." *NLRB v. Catholic Bishop*, 440 U.S. 490, 501-03 (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 617 (1971)).

However, there are "generally significant differences between the religious aspects of church-related institutions of higher learning and parochial elementary

and secondary schools," as the Supreme Court explained in *Tilton v. Richardson*, 403 U.S. 672, 685 (1971). Most institutions of higher education simply do not "operate to indoctrinate" as parochial schools do. In higher education, there is substantially less risk of government entanglement because nationally- accredited undergraduate programs "limit the opportunities for sectarian influence by virtue of their own internal disciplines," and faculty are afforded more academic freedom. *Id.* at 686. This strong Supreme Court precedent suggests that the different contexts in which parochial schools and higher education institutions exist necessitate different constitutional analyses regarding religious freedom. *Allen v. Morton*, 495 F.2d 65, 71 (D.C. Cir. 1973) (noting that the Supreme Court has explained there is "a very real distinction between the degree of permeation that exists in parochial elementary and secondary schools as compared to Church-related institutions of higher learning"). Thus, the *Great Falls*/*Bethany College* jurisdictional test mistakenly extends *Catholic Bishop*'s holding – readily applicable to lower-level parochial schools – to colleges and universities – and enshrines a faulty assumption: that the effective point of being a religiously- affiliated school at *any* education level is to provide a religious education environment. Yet this precise assumption has already been soundly rejected by the highest court in this nation. *Tilton v. Richardson*, 403 U.S. at 685-686.

The timing is ripe for a revisitation of this issue. Recently, D.C. Circuit Judge Pillard, in her *Duquesne I* dissent, and then concurrence on the denial of rehearing on other grounds, welcomed an opportunity to examine the jurisdictional standard. See *Duquesne II*, 975 F.3d at 15 (Pillard, J. concurring); *see also Bayamon*, 793 F.2d at 401 (Breyer, J.) ("Whether this kind of institution of higher education falls within the strictures of *Catholic Bishop* is, in our view, an important, likely recurring, question that calls for Supreme Court guidance"). As Pillard explained, the D.C. Circuit's caselaw extending *Catholic Bishop* to the higher education context is "unmoored and increasingly untenable" and should be revisited when the issue is raised by parties. See *Duquesne I*, 947 F.3d at 846 (Pillard, J., dissenting), 849; *Duquesne II.*, 975 F.3d at 15 (Pillard, J., concurring). Judge Pillard pointed out that "no court has understood *Catholic Bishop* to exempt all staff of any religious institution or school from the NLRA," and listed cases where the Board retained jurisdiction over religiously affiliated institutions. See *Duquesne I.*, 947 F.3d at 846 (Pillard, J., dissenting). In support of the Board's *Pacific Lutheran* standard, Judge Pillard asserted that the test, in focusing on whether the school "holds out" its faculty as performing religious roles or duties, actually "went beyond what the First Amendment requires" to avoid entanglement issues. *Duquesne II.*, 975 F.3d at 14 (Pillard, J., concurring).

Moreover, other circuit court decisions have interpreted *Catholic Bishop* to not preclude an examination of the role of employees in a religious institution's purpose or mission.[6] In determining Board jurisdiction, the circuit courts have often looked at whether the employees carried out religious programming. While such decisions were in the context of non-school institutions or organizations, a deferential review of employee functions in the higher education setting under *Pacific Lutheran* is in line with general circuit court analysis and in keeping with *Catholic Bishop*'s original outcome, shielding parochial schools at the elementary

---

[6] *Volunteers of Am., L.A. v. NLRB*, 777 F.2d 1386, 1390 (9th Cir. 1985) (finding that the employer's alcohol treatment centers are "expressive of a religious philosophy but are carried out in a secular fashion," and that "[r]egardless of how the VOA views its religious mission, that view is not imposed upon the employees"); *NLRB v. Salvation Army of Mass. Dorchester Day Care Ctr.*, 763 F.2d 1, 6 (1st Cir. 1985) (allowing Board jurisdiction over day care employees because "[a]lthough the teachers are aware of the religious purpose of the Salvation Army, there is not that intertwining of religious doctrine and secular teaching which created the risks present in *Catholic Bishop*"); *Volunteers of Am.-Minnesota-Bar None Boys Ranch v. NLRB*, 752 F.2d 345, 348-49 (8th Cir. 1985), *cert. denied*, 472 U.S. 1028 (1985) (differentiating the Ranch from the parochial school in *Catholic Bishop* because "its employees perform essentially secular functions" and were not "mandated to propagate sectarian doctrines," eliminating a risk of entanglement); *Denver Post of the Nat'l Society of the Volunteers of Am. v. NLRB*, 732 F.2d 769, 772 (10th Cir. 1984) (that the employer's social programs were not infused with religious philosophy and that the employees were a "far cry from that of the parochial schoolteachers in *Catholic Bishop*," in part because employees testified that religious beliefs did not have a part in their work, that they were not told about the employer's religious mission upon hire, and that they were unaware of the religious mission until the contemporaneous labor dispute).

and secondary level from government entanglement. Indeed, as stated by one circuit court:

> By articulating some religious affiliation and mission, no matter how little effect it might have on the social programs' functions or operations, providers of care could easily avoid the Board's jurisdiction even though the work settings involved would be suitable for collective bargaining. Nothing in *Catholic Bishop* suggests that such a result is desirable or was sought by Congress in enacting the National Labor Relations Act.

*Salvation Army of Mass. Dorchester Day Care Ctr.,* 763 F.2d 1, 7 (1st Cir. 1985).

Recent Supreme Court decisions regarding the ministerial exception under employment antidiscrimination laws also "call into question the reasoning that underlies *Great Falls* and *Carroll College*." *Duquesne II*, 975 F.3d at 17 (Pillard, J., concurring). In this regard, the Supreme Court has permitted courts to look beyond the face of faculty job descriptions in determining their "ministerial" status for purposes of workplace discrimination suits under laws other than the Act. In such cases, the "ministerial exception" prevents government intrusion in the free exercise of religion by allowing a religious institution general autonomy over its employment relationship with only certain key employees – those serving in an inherent religious capacity. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2069 (2020). See also *see Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 188 (2012) ("[w]hen a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith,

judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow.")  If those employees provide "vital religious duties," then the discrimination claim will fail. *Morrissey-Berru* 140 S.Ct. at 2066.

The employee-focused inquiry used with approval in *Our Lady of Guadalupe School* is similar to *Pacific Lutheran*'s emphasis on looking at the actual duties of employees in the bargaining unit, rather than at the religious identity of the employer as a whole and goes further than the Board attempted to in *Pacific Lutheran*.  In *Our Lady of Guadalupe School*, the Supreme Court upheld the ministerial exception and clarified that "[w]hat matters, at bottom, is what an employee does." *Morrissey-Berru* 140 S.Ct. at 2064, 2069.  Thus, courts (and the Board) have effective permission to look beyond the representations or titles given by the employer to an employee and look at their actual performance before accepting the ministerial defense. *Id. a*t 2063-64 ("[s]imply giving an employee the title of 'minister' is not enough to justify the exception"). Even before *Morrissey-Berru*, when dealing with religious exemption status under Title VII, courts have weighed the factual considerations, including "[a]ll significant religious and secular characteristics…to determine whether the corporation's purpose and character are primarily religious." *EEOC v. Townley Eng. & Mfg. Co.*, 859 F.2d 610, 618 (9th Cir. 1988), *cert. denied*,

489 U.S. 1077 (1989); *see also EEOC v. Miss. Coll.*, 626 F.2d 477, 485 (5th Cir. 1980), *cert. denied.* 453 U.S. 912 (1981).

The *Pacific Lutheran* test crafted by the Board is *less* intrusive and presents *less* danger of government entanglement with religious affairs than the ministerial defense as it was tested in *Our Lady of Guadalupe,* since it limits the Board and the courts to considering only how the employee is "held out" to the public and students, i.e., through the publicly available documents on its website and other documents (or, presumably, any other media) generally made available to students and faculty. *Pacific Lutheran*, 361 NLRB at 1409. Thus, *Pacific Lutheran* focuses on the individual employees at issue, just as the ministerial exception does, but in doing so, is substantially more deferential to First Amendment religious freedoms. Further, Judge Pillard has correctly noted that the D.C. Circuit cases "seem to hold *any* inquiry behind a religious school's public representations to be necessarily out of bounds." *Duquesne II*, 975 F.3d at 17 (Pillard, J., concurring). D.C. Circuit court precedent has refused to allow the Board to look behind a school's public representations as to its religiosity overall and as to the religious role of its faculty in order to avoid First Amendment violations, which is contrary to the Supreme Court's approach permitting a review of actual faculty duties.

Under *Pacific Lutheran*, a school need not disavow all secular aims and goals to be able to claim religious exemption. Rather, the "holding out" inquiry in the

second prong suggests that the higher education institution claiming exemption from the Act has the onus to publicly draw a clear connection between its potentially generic or secular values and the religious role of the faculty to its religious mission. Despite the D.C. Circuit's concern with language in the Board's *Pacific Lutheran* decision,[7] the expectation that faculty advance or comply with secular norms, such as "diversity and academic freedom," does not necessarily dictate that faculty do not play religious roles. *Pacific Lutheran*, 361 NLRB at 1411-12 & n. 16. However, employees and applicants must be made aware of how their job duties are intertwined with the connection. This is similar to the Board's requirement in *Pacific Lutheran* that "general or aspirational statements" of the employer be supported with evidence linking those claims to faculty's actual job functions, such that "a reasonable prospective applicant [for a faculty position] would conclude that performance of their faculty responsibilities would require furtherance of the college or university's religious mission." *Id.* at 1412 (emphasis added).

---

[7] "This commitment to academic freedom does not become 'any less religious' simply because secular schools share the same commitment, nor because it advances the school's religious mission in an 'open-minded' manner as opposed to 'hard-nosed proselytizing.' . . . Yet rather than accepting at face value that academic freedom serves a religious function, the Board sees academic freedom as the opposite: a sign that 'religion has no bearing on faculty members' job duties.' . . . The Board may not 'second-guess' or 'minimize the legitimacy of the beliefs expressed by a religious entity' in this way." *Duquesne Univ.*, 947 F.3d at 836 (quoting *Great Falls*, 278 F.3d at 1346) (citations omitted).

A return to *Pacific Lutheran* would adequately address and protect First Amendment religious freedoms. Supreme Court precedent does not dictate that the *Bethany* test is the appropriate test for religious exemption for higher education institutions. Rather, the precedent allows for the *Pacific Lutheran* test in a similar manner that it allows for the "ministerial exception" under antidiscrimination statutes. There is no good rationale for denying faculty NLRA protections when they are not even held out as performing religious functions. The Board's "holding out" analysis is even more deferential than the religious exemption outlined in *Our Lady of Guadalupe School.*

Should the Court reinstate *Pacific Lutheran,* it might remand the case to the Board and have it determine the jurisdiction issue under the proper standard based on the evidence in the record. Or, because the parties thoroughly litigated the jurisdiction issue under both the *Bethany College* and the *Pacific Lutheran* tests, the Court can itself resolve the jurisdiction issue, under either standard.

**C.    Should the Court reinstate *Pacific Lutheran* and apply it rather than remanding it to the Board, it should find that neither prong of the *Pacific Lutheran* test was be satisfied, and the Board has jurisdiction over Respondent.**

Under *Pacific Lutheran,* the Board would decline jurisdiction over the faculty at an institution of higher education only if the school could show, first, that it held "itself out as providing a religious educational environment," and, second, that it held out its faculty as "performing a specific role in creating or maintaining the

university's religious educational environment." *Id.* at 1404. Regarding the second prong, the Board specifically stated that a school must hold out the faculty it claims as exempt from the Act "as performing a *specific religious function.*" *Pacific Lutheran*, 361 NLRB at 1411 (emphasis original). "Requiring faculty members to comply with norms shared by both a religion and by wider society does not support a finding that faculty members are held out as performing any specific religious role." *Id*. at 1411-1412. The faculty duties at the institution seeking the exemption must extend beyond those "that they would be expected to fill at virtually all universities." *Id.* at 1412.

Respondent cannot meet the first prong of the *Pacific Lutheran* test for the same reasons that it cannot meet the related first prong of *Bethany College*. Respondent's website, television commercials, and promotional videos publicly "hold out" Respondent as a virtually secular institution of higher learning, with only passing references – in only some of these materials – to its foundation by the Benedictine Order. These representations should be given great weight in a comprehensive first prong analysis, along with lack of evidence generally that the school holds out the faculty as contributing to a religious educational environment.

As for the second prong, a review of faculty and administrative job postings, appointment letters, evaluations and annual plans indicate that faculty are not held out as providing a religious educational environment in the classroom. [ROA: 1399

- 1434, 1437, 1440, 1536, 1546, 1556, 1564].  While some job postings generically state that applicants must be "committed to the educational mission and core values" [ROA: 1399 - 1434] the Board noted in *Pacific Lutheran* that "[g]eneralized statements the faculty members are expected to, for example, support the goals or mission of the university are not alone sufficient." *Id.*  As discussed above, there must be a publicly drawn connection between religious values and secular goals.

Taking the facts here into account, the only conclusion that can be reached is that Respondent fails to satisfy the second prong of *Pacific Lutheran* as Respondent's faculty are *not* held out as performing specific religious functions, nor in fact even expected to perform religious functions. [ROA: 2684 – 2765, 1440; 1477; 1590. To be sure, the April 2021 Faculty Handbook states that "[w]hile it is appropriate for Faculty to educate students by engaging in discussions of controversial matters that are relevant to their disciplines, it is not appropriate in the classroom to serve as advocates for positions that are contrary to the doctrine of the Catholic Church . . ." [ROA: 1427, p.7; 1590, p. 11], the Handbook does not place any affirmative religious duty on the faculty's roles in the classroom or as student advisors,[8] does not dictate discipline or termination for contradicting Catholic

---

[8] Compare with *Pacific Lutheran*, 361 NLRB at 1412: "If the evidence shows that faculty members are required to serve a religious function, such as integrating the institution's religious teachings into coursework, serving as religious advisors to students, propagating religious tenets, or engaging in religious indoctrination or religious training, we will decline jurisdiction."

doctrine,[9] and further does not link a general aspiration that faculty "respect, understand, and support the University's educational mission and values, which are founded and based on Roman Catholic belief and tradition" to their specific job duties.[10] [ROA: 1427, p. 7; 1590, p. 11.] Professors credibly testified that, contrary to the aspirational statements in the Faculty Handbook, they have not been told they may not say something in class that is contradictory to Catholic teaching or values, even after teaching texts that offer marked contrasts to Catholic viewpoints. Nor have they otherwise been directed to – or how to – perform a religious function in their classroom. [ROA,VI, pp. 193, 400, 424, 425, 748, 756].

Furthermore, the Board in *Pacific Lutheran* specifically noted that evidence in this regard would include not only faculty handbooks but job descriptions, and

---

[9] Compare with *Pacific Lutheran Univ.,* 361 NLRB 1404 at 1413, n. 19: "We will decline jurisdiction so long as the university's public representations make it clear that faculty members are subject to employment-related decisions that are based on religious considerations. For example, if faculty members are subject to dismissal for teaching a doctrine at odds with the religious faith of the institution, our new test would lead the Board to decline jurisdiction over disputes about those dismissals so long as the university's public representations indicated that faculty members were expected to comply with (or at least not openly contravene) certain tenets of a religion as a term and condition of employment." Here, the Handbook does not state that the teaching of contrary doctrine will lead to dismissal or other discipline

[10] Compare with *Pacific Lutheran Univ.*, 361 NLRB at 1412: "Likewise, if the college or university holds itself out as requiring its faculty to conform to its religious doctrine or to particular tenets or beliefs in a manner that is specifically linked to their duties as a faculty member, we will decline jurisdiction. However, general or aspirational statements, without specificity as to how the requirement affects actual job functions, will not suffice."

statements to prospective and current faculty. *See Pacific Lutheran* 361 NLRB at 1412. Here, the job descriptions included in faculty appointment and reappointment letters do not contain duties relating to a religious educational environment or performance of any religious function [ROA: 1437, 1440, 1754; ROA,VI, pp. 117, 459], and faculty orientation never mentioned a duty to ensure the education environment is religious. [ROA,VI, pp. 400, 424, 425, 748]. Faculty training does not include religious functions—neither an explanation of how Benedictine tradition would/should influence classroom teaching, nor instruction on a moral or religious obligation for professors on campus. [ROA,VI, pp. 193, 465, 466, 554, 749, 757]. Thus, Respondent fails to meet the second prong of *Pacific Lutheran*.

Accordingly, should the Court apply *Pacific Lutheran*, it should find that the record does not support an exemption from jurisdiction over the Respondent.

### D. Should the Court Apply the *Bethany College* Standard, it should Nevertheless Reverse the Board's Refusal to Find Jurisdiction

In the event the Court declines to direct a return to the *Pacific Lutheran* standard, the facts reviewed in Section C above plainly show that the Board erred by concluding that Respondent meets the test for a bona fide religious institution, even under the *Bethany College* standard. Hence, the Court should grant the Petition for Review and find that the Board maintains jurisdiction over Respondent pursuant to extant Board law.

**Conclusion**

Petitioner requests that the Court grant the Petition for Review and vacate the Board's decision and direct the Board to revert to the *Pacific Lutheran* standard. Should the Court reinstate *Pacific Lutheran,* it might remand the case to the Board and have it determine the jurisdiction issue under the proper standard based on the evidence in the record. Or, because the parties thoroughly litigated the jurisdiction issue under both the *Bethany College* and the *Pacific Lutheran* tests, the Court can itself resolve the jurisdiction issue, under either standard. And, because the Board has already determined that, should jurisdiction obtain, Respondent has violated the Act, it is requested that the Board be directed to issue a remedy, and, because the Board has already determined that, should it have jurisdiction the Respondent has violated the Act, direct the Board to issue appropriate remedies.

Date: March XX, 2025.          Respectfully submitted,

                     *s/ Richard Siwica*
                     Richard Siwica, Esq.
                     FL Bar No. 377341
                     EGAN, LEV & SIWICA, P.A
                     Post Office Box 2231
                     Orlando, Florida 32802
                     Telephone: (407) 422-1400
                     Facsimile: (407) 422-3658
                     Primary E-mail: rsiwica@eganlev.com
                     Secondary:  dvaughan@eganlev.com
                                      wstafford@eganlev.com


                     *Attorney for Petitioners*


## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(g) because it contains 9,049 words.

This document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

                     */s/ Richard Siwica*
                     Richard Siwica, Esq.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March XX, 2025, I caused to be filed the foregoing Brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. I further certify that all counsel of record are registered CM/ECF users and will be served through the CM/ECF system:

*s/ Richard Siwica*
Richard Siwica, Esq.