UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————————

UNITED FACULTY OF SAINT LEO,
NATIONAL EDUCATION ASSOCIATION
FLORIDA EDUCATION,
AMERICAN FEDERATION OF TEACHERS,
AFL-CIO,

Petitioner/Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD

Respondent/Cross-Petitioner

and

SAINT LEO UNIVERSITY, INCORPORATED,

Intervenor

———————————————

ON PETITION FOR REVIEW AND CROSS-APPLICATION
FOR ENFORCEMENT OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD

———————————————

BRIEF FOR
THE NATIONAL LABOR RELATIONS BOARD

———————————————

ELIZABETH HEANEY
*Supervisory Attorney*

MOLLY G. SYKES
*Attorney*

*National Labor Relations Board*
**1015 Half Street, SE**
**Washington, DC 20570**
**(202) 273-1743**
**(202) 273-1747**

WILLAM B. COWEN
*Acting General Counsel*
STEPHANIE CAHN
*Acting Deputy General Counsel*
PETER SUNG OHR
*Associate General Counsel*
RUTH E. BURDICK
*Deputy Associate General Counsel*
MEREDITH JASON
*Assistant General Counsel*

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

| | |
|---|---|
| **UNITED FACULTY OF SAINT LEO,** <br> **NATIONAL EDUCATION ASSOCIATION** <br> **FLORIDA EDUCATION, AMERICAN** <br> **FEDERATION OF TEACHERS, AFL-CIO,** <br><br> **Petitioner,** <br><br> **v.** <br><br> **NATIONAL LABOR RELATIONS BOARD,** <br><br> **Respondent,** <br><br> **and** <br><br> **SAINT LEO UNIVERSITY, INC.** <br><br> **Intervenor.** | **Case No. 24-13895** |

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Eleventh Circuit Rule 26.1, counsel for the National Labor Relations Board hereby certifies that the following persons and entities have or may have an interest in the outcome of this case:

1. Akerman, LLP (counsel for Intervenor-Respondent)

2. American Federation of Labor-Congress of Industrial Organizations (AFL-CIO) (affiliated with Petitioner)

3. American Federation of Teachers (affiliated with Petitioner)

4.  Annexy, Beatriz (counsel for Petitioner)

5.  Barclay, Steven (counsel for Petitioner)

6.  Becket Fund for Religious Liberty (counsel for Intervenor)

7.  Burdick, Ruth E. (counsel for Respondent)

8.  Cahn, Stephanie (Acting Deputy General Counsel, NLRB)

9.  Chen, Daniel L. (counsel for Intervenor)

10. Cohen, David (counsel for Respondent)

11. Cowen, William B. (Acting General Counsel, NLRB)

12. Egan, Joseph, Jr. (counsel for Petitioner)

13. Egan, Lev, & Siwica, P.A. (counsel for Petitioner)

14. Fleshman, Benjamin A. (counsel for Intervenor)

15. Gaylord, Amy Moor (counsel for Intervenor)

16. Giannasi, Robert (Chief Administrative Law Judge, NLRB)

17. Goodrich, Luke W. (counsel for Intervenor)

18. Heaney, Elizabeth Ann (counsel for Respondent)

19. Hill, Kelly (counsel for Intervenor)

20. Jason, Meredith (counsel for Respondent)

21. Kaplan, Marvin E. (Chairman, NLRB)

22. Lev, Tobe (counsel for Petitioner)

23. McFerran, Lauren M. (former Chair, NLRB)

24. National Education Association Florida Education (affiliated with Petitioner)

25. National Labor Relations Board (Respondent)

26. Ohr, Peter Sung (counsel for Respondent)

27. Parker, Heidi (counsel for Petitioner)

28. Plympton, John W. (counsel for Respondent)

29. Prouty, David M. (Board Member, NLRB)

30. Rassbach, Eric C. (counsel for Intervenor)

31. Saint Leo University, Inc. (Intervenor)

32. Sandron, Ira (Administrative Law Judge, NLRB)

33. Shelley, Staci Rhodes (counsel for Intervenor)

34. Silverman, Scott T. (counsel for Intervenor)

35. Siwica, Richard (counsel for Petitioner)

36. Sykes, Molly G. (counsel for Respondent)

37. United Faculty of Saint Leo, National Education Association Florida Education, American Federation of Teachers, AFL–CIO (Petitioner)

38. Varberg, Jordan T. (counsel for Intervenor)

39. Wilcox, Gwynne A. (former Board Member, NLRB)

40. Zerby, Christopher (counsel for Respondent)

Pursuant to 11th Cir. R. 26.1-3(b), counsel certifies that no publicly traded corporation has an interest in this proceeding.

s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC 20570-0001
(202) 273-2960

Dated at Washington, D.C.
this 13th day of May 2025

# TABLE OF CONTENTS

**Headings**                                                                                   **Page(s)**

Statement regarding oral argument… ..................................................................2

Statement of jurisdiction ...............................................................................2

Statement of the issues presented....................................................................3

Statement of the case......................................................................................3

    I.  The Board's findings of fact.........................................................4

        A.  Background .................................................................4

        B.  Saint Leo's religious educational environment…………………....5

            1.  Saint Leo's Catholic identity and mission statements link its educational approach to Catholic and Benedictine values……………………………………………………………...5

            2.  Additional religious messaging on Saint Leo's public website……………………………………………….……6

            3.  Religious symbols and observances are common on Saint Leo's campus……………………………………………7

            4.  Saint Leo's University Ministry provides religious services and faith-based activities for students………………………….9

        C.  Saint Leo's collective-bargaining relationship with the Union…...11

    II.  Procedural history……………………………………………………...12

    III.  The Board's conclusions and order……………………………………..13

Summary of argument ...................................................................................13

# TABLE OF CONTENTS (cont'd)

**Headings**                                                                                  **Page(s)**

Standard of review…………………………………………………………………..16

Argument...........................................................................................................18

I.    The Board appropriately dismissed the unfair-labor-practice complaint based on its finding that Saint Leo is a religious educational institution and therefore the Board lacked jurisdiction over Saint Leo's faculty……………………………………………………………….........18

    A.   *Catholic Bishop* prohibits the Board from exercising jurisdiction over teachers at religious schools…................................................. 18

    B.   The Board's unsuccessful, post-*Catholic Bishop* attempts to assert jurisdiction over teachers at religious colleges and universities…...20

    C.   The Board adopts *Bethany College*, a test consistent with *Catholic Bishop* and other circuit court precedent……………………………...24

    D.   Substantial evidence supports the Board's finding that Saint Leo holds itself out as a religious educational institution…………………26

    E.   The Court should reject the Union's request to overturn *Bethany College* and to remand the case for the Board to apply *Pacific Lutheran*………...…………………………………………..33

        1.  *Pacific Lutheran*'s examination of faculty members' religious functions risks unconstitutional government entanglement with religion……………………………………………………33

        2.  *Bethany College*'s application of *Catholic Bishop* to institutions of higher education is consistent with Supreme Court precedent……………………………………………...35

        3.  Supreme Court precedent does not require the Board to examine a teacher's duties or roles……………………………..39

4. The Board's assertion of jurisdiction over non-teaching employees at religious institutions does not require the Board to examine the job duties of Saint Leo's faculty………..42

5. This Court cannot apply *Pacific Lutheran* in the first instance on appeal……………………………………………………45

Conclusion ...........................................................................................................47

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
     522 U.S. 359 (1998) ............................................................16

*Bethany College,*
     369 NLRB No. 98 (2020) ................................ 3, 18, 24, 25, 26, 34, 35

*Boeing Co.,*
     365 NLRB 1494 (2017) .......................................................47

*Boy Scouts of America v. Dale,*
     530 U.S. 640 (2000) ..........................................................32

*Carroll College v. NLRB,*
     558 F.3d 568 (D.C. Cir. 2009) ....................................... 23, 24, 26, 27

*Catholic Social Services,*
     335 NLRB 929 (2010) .......................................................44

*Cowabunga, Inc. v. NLRB,*
     893 F.3d 1286 (11th Cir. 2018) ..............................................46

*Denver Post of the Nat. Soc. of the Volunteers of Am. v. NLRB,*
     732 F.2d 769 (10th Cir. 1984) ...............................................43

*Dist. 65, Distributive Workers of Am. v. NLRB,*
     593 F.2d 1155 (D.C. Cir. 1978) ..............................................16

*Duquesne University of the Holy Spirit v. NLRB,*
     947 F.3d 824 (2020) ................................. 18, 24, 25, 34, 36, 38, 41, 44

*Evans Servs., Inc. v. NLRB,*
     810 F.2d 1089 (11th Cir. 1987) ..............................................16

**Cases**                                                      **Page(s)**

*Hanna Boys Center,*
   284 NLRB 1080 (1987)*, enforced,*
   940 F.2d 1295 (9th Cir. 1991)……………………………......……………43

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,*
   565 U.S. 171 (2012) ............................................................... 40, 41, 42

*Loper Bright Enterprises v. Raimondo,*
   144 S. Ct. 2244 (2024) ...................................................................17

*NLRB v. Catholic Bishop of Chicago,*
   440 U.S. 490 (1979) ......................... 13, 19, 20, 32, 37, 38, 39, 40, 41, 42, 43, 44

*NLRB v. Salvation Army of Mass. Dorchester Day Care Ctr.,*
   763 F.2d 1 (1st Cir. 1985) ............................................................ 43, 44

*NLRB v. St. Louis Christian Home,*
   663 F.2d 60 (8th Cir. 1981) ...............................................................44

*NLRB v. World Evangelism, Inc.,*
   656 F.2d 1349 (9th Cir. 1981) ............................................................44

*Northport Health Servs., Inc. v. NLRB,*
   961 F.2d 1547 (11th Cir. 1992) ..........................................................46

*Ona Corp. v. NLRB,*
   729 F.2d 713 (11th Cir. 1984) ...........................................................16

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
   591 U.S. 732 (2020) ................................................................... 40, 41

*Pacific Lutheran University,*
   361 NLRB 1404 (2014) ............................................... 3, 23, 24, 35, 36

*Purolator Armored, Inc. v. NLRB,*
   764 F.2d 1423 (11th Cir. 1985) ..........................................................17

**Cases**                                                                 **Page(s)**

*S. Prairie Constr. Co. v. Local 627, Int'l Union of Operating Eng'rs*,
   425 U.S. 800 (1976).................................................................46

*Schumann v. Collier Anesthesia, P.A.*,
   803 F.3d 1199 (11th Cir. 2015) ...........................................17

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943)...............................................................46

*St. Xavier Univ.*,
   365 NLRB 566 (2017) ................................................... 42, 43

*Stericycle, Inc.*,
   372 NLRB No. 113 (2023) ...................................................47

*Teamsters Local Union No. 515 v. NLRB*,
   906 F.2d 719 (D.C. Cir. 1990)...........................................16

*Tilton v. Richardson*,
   403 U.S. 672 (1971)........................................................ 37, 38

*Tressler Lutheran Home for Children v. NLRB*,
   677 F.2d 302 (3d Cir. 1982)...............................................44

*Trustee of St. Joseph's College*,
   282 NLRB 65 (1986) ..........................................................35

*United Ass'n of Journeymen & Apprentices, Local 32 v. NLRB*,
   912 F.2d 1108 (9th Cir. 1990)...........................................45

*United States v. Woods*,
   684 F.3d 1045 (11th Cir. 2012) ..................................... 26, 27

**Cases**                                                                                     **Page(s)**

*Univ. of Great Falls v. NLRB,*
    278 F.3d 1335 (D.C. Cir. 2002) .................... 17, 22, 23, 25, 26, 28, 29, 30, 32, 34

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951) ............................................................................17

*Universidad Central de Bayamon v. NLRB,*
    793 F.2d 383 (1985) ........................................................ 21, 22, 32, 36

*University of Great Falls,*
    331 NLRB 1663 (2000) ......................................................................21

*Visiting Nurse Health Sys., Inc. v. NLRB,*
    108 F.3d 1358 (11th Cir. 1997) .........................................................17

*Volunteers of Am., L.A. v. NLRB,*
    777 F.2d 1386 (9th Cir. 1985) ...........................................................43

*Volunteers of Am.-Minnesota-Bar None Boys Ranch v. NLRB,*
    752 F.2d 345 (8th Cir. 1985) .............................................................43

**Statutes**                                                                               **Page(s)**

National Labor Relations Act, as amended
    (29 U.S.C. § 151 et seq.)

Section 8(a)(1) (29 U.S.C. § 158(a)(1)) ....................................................12

Section 8(a)(1), (5) (29 U.S.C. § 158(a)(1) and (5)) ..................................12

Section 10(a) (29 U.S.C. § 160(a)) ..........................................................2

Section 10(e) (29 U.S.C. § 160(e)) ..........................................................16

Section 10(f) (29 U.S.C. § 160(f)) ............................................................2

# <u>TABLE OF AUTHORITIES (cont'd)</u>

**Rules**                                                                       **Page(s)**

Fed. R. App. P. 28(a)(8)(A) ........................................................................27

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT
_____

### No. 24-13895
_____

### UNITED FACULTY OF SAINT LEO, NATIONAL EDUCATION ASSOCIATION FLORIDA EDUCATION, AMERICAN FEDERATION OF TEACHERS, AFL-CIO

**Petitioner**

**v.**

### NATIONAL LABOR RELATIONS BOARD

**Respondent**

**and**

### SAINT LEO UNIVERSITY, INC.,

**Intervenor**
_____

### ON PETITION FOR REVIEW OF AN ORDER OF
### THE NATIONAL LABOR RELATIONS BOARD
_____

### BRIEF FOR
### THE NATIONAL LABOR RELATIONS BOARD
_____

## STATEMENT REGARDING ORAL ARGUMENT

The Board believes that oral argument will aid the Court in deciding the issues presented in this case.

## STATEMENT OF JURISDICTION

This case is before the Court on the petition of the United Faculty of Saint Leo, National Education Association Florida Education, AFL-CIO ("the Union") to review the Board's Order issued on September 30, 2024, and reported at 373 NLRB No. 121. (ROA 3623-35.)[1]  In that Order, the Board dismissed an unfair-labor-practice complaint against Saint Leo University, Inc. ("Saint Leo" or "the University").  The Board had jurisdiction under Section 10(a) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 160(a).  The Court has jurisdiction, and venue is proper, under Section 10(f) of the Act (29 U.S.C. § 160(f)) because the Board's Order is final and addresses alleged unfair-labor-practices that occurred in this Circuit.  The Union's petition is timely, as the Act provides no time limits for such filings.  Saint Leo intervened in support of the Board.

---

[1] Record references in this brief are to the consecutively paginated Administrative Agency Record on Appeal ("ROA") filed with the Court on January 17, 2025. References preceding a semicolon are to the Board's findings; those following are to the supporting evidence.  "Br." references are to the Union's opening brief.

## STATEMENT OF THE ISSUE PRESENTED

Whether the Board appropriately dismissed the unfair-labor-practice complaint because Saint Leo is a religious educational institution, and the Board thus lacks jurisdiction over its faculty.

## STATEMENT OF THE CASE

While negotiations for a successor collective-bargaining agreement were ongoing, Saint Leo withdrew recognition from the Union. Saint Leo then made several changes to employees' terms and conditions of employment, including to its policy manual, and bypassed the Union to deal directly with employees. Saint Leo defended these actions on the grounds that it is a religious educational institution and its faculty is exempt from the Board's jurisdiction. The Board agreed and dismissed the complaint. In doing so, the Board applied *Bethany College*, 369 NLRB No. 98 (2020), which sets forth the test for determining whether the Board has jurisdiction over faculty at a religious university. It rejected the Union's request to overturn *Bethany College* and to apply a previous iteration of the Board's jurisdictional test set forth in *Pacific Lutheran University*, 361 NLRB 1404 (2014). Before the Court, the Union challenges *Bethany College*, and the Board's application of that standard to find that it has no jurisdiction over Saint Leo's faculty.

# I. THE BOARD'S FINDINGS OF FACT

## A. Background

Saint Leo is a 501(c)(3) nonprofit corporation that operates a private Catholic university in St. Leo, Florida. (ROA 3623, 3627; 34-35.) It is one of the oldest Catholic universities in Florida, tracing its roots to 1889, when the Florida legislature authorized monks of the Order of Saint Benedict to establish a Catholic educational institution in the Tampa Bay area. (ROA 3623; 1811-14, 1850-52, 2797.) Today, Saint Leo has over 9000 students, with around 2000 students attending in-person classes on campus, approximately 6000 students attending exclusively online, and the remainder attending in-person classes at the dozen or so satellite campuses in Florida, Georgia, and Texas. (ROA 3627; 40-42.) Approximately 130 full-time faculty are based at Saint Leo's campus, and many teach both in-person and online classes. (ROA 3627; 42.)

Saint Leo maintains an ongoing relationship with Saint Leo Abbey, located at the center of campus, as well as the Holy Name Monastery, a nearby Benedictine convent. (ROA 3625; 3628.) Saint Leo's bylaws require that its Board of Trustees include representatives from both Saint Leo Abbey and the Benedictine Sisters. (ROA 3625.) Bishop Gregory Parkes of the St. Petersburg Diocese also maintains a seat on the Board of Trustees. (ROA 3468; 921-22.) Saint Leo is a member of the Association of Catholic Colleges and Universities

and the Association of Benedictine Colleges and Universities.  (ROA 3625, 3627; 34-35, 1928.)

## B. Saint Leo's Religious Educational Environment

There are four ways that Saint Leo demonstrates its religious educational environment:  (1) its Catholic identity and mission statements, (2) the content on its public website, (3) on-campus religious symbols and observances, and (4) the activities planned and sponsored year-round by its University Ministry program.

### 1. Saint Leo's Catholic identity and mission statements link its educational approach to Catholic and Benedictine values

Saint Leo's Catholic identity and mission statements identify the University as a Catholic institution of higher learning with an educational philosophy rooted in the Benedictine tradition.  The Catholic identity statement, located on Saint Leo's public website, describes the University as "a community rooted in the Catholic faith and in the spirit of our Benedictine founders."  (ROA 3624; 1818.) Explicitly identifying itself as "a Catholic institution of higher learning," Saint Leo's Catholic identity statement embraces "what *Ex Corde Ecclesiae* terms the four essential characteristics" of a Catholic university:  Christian inspiration, faith reflection, fidelity to the Christian mission, and service to church and humanity. (ROA 3624; 1818-21.)[2]

---

[2] *Ex Corde Ecclesiae* is a document promulgated by Pope John Paul II that speaks to the nature of a Catholic University.  (ROA 3624, n.3.)

Saint Leo's mission statement similarly identifies the University as "a Catholic, liberal-arts based university serving people of all faiths" that is "[r]ooted in the 1500-year-old Benedictine tradition" and "seeks balanced growth in mind, body and spirit for all members of the community . . . ."  (ROA 3624.)  This mission statement is included in both the parties' collective-bargaining agreement and the 2008 Policy Manual Governance and Administration, as well as in substantially similar form on Saint Leo's public website.  (ROA 3624; 1938, 2689-90, 2804.)

## 2. Additional religious messaging on Saint Leo's public website

Saint Leo's public website also displays other material evidencing its Catholic and Benedictine educational traditions.  The "About Saint Leo" webpage describes Saint Leo as "one of the oldest Catholic universities in Florida," where "faith has remained a constant since 1889."  (ROA 1850.)  This page lists numerous opportunities for students to engage with faith and spirituality on campus, including:  eucharistic adoration, Sunday and weekday Mass, and confession; "Voice of Christ," a student choir and band; "Imago Dei," a pro-life group; the Rite of Christian Initiations for Adults, which provides instruction on Catholic faith and practice in a scripture- and community-based setting; and the Peer Ministry program, which allows students to serve as spiritual partners for their campus peers.  (ROA 3624; 1852.)

The Saint Leo website also displays the University's Benedictine core values: excellence, community, integrity, respect, personal development, and responsible stewardship. (ROA 3471; 1938, 1944-47, 2011-13.) The descriptions of these core values contain clear religious references. For example, the value of community discusses the development of "hospitable Christian learning communities," the value of respect is described as "[a]nimated by the spirit of Jesus Christ," and the value of responsible stewardship refers to the blessings of "[o]ur creator." (ROA 3471; 1938, 1944-47, 2011-13.)

### 3. Religious symbols and observances are common on Saint Leo's campus

Religiously associated buildings, symbols, and statues serve as conspicuous reminders to visitors, faculty, and students that Saint Leo presents itself as a Catholic university founded by the Benedictine Order. The Saint Leo Abbey, which includes the monastery church and residences and offices for the Abbey's Benedictine monks, is prominently located near the center of Saint Leo's campus. (ROA 3470; 926-27.) There are no physical demarcations that separate the Saint Leo campus from the Abbey. (3470; 645-46, 934.) In addition, the Holy Name Monastery, home to the Benedictine Sisters, and a cemetery for deceased monks and Sisters are both located near the campus. (ROA 3470.)

Saint Leo's on-campus facilities also bear names, symbols, and iconography derived from the Catholic and Benedictine faith. The administration building on

campus, St. Francis Hall, is named after Saint Francis of Assisi, and the student chapel is named after Saint Jude. (ROA 3470; 245.) St. Francis Hall contains a stained-glass window of St. Francis and a statue of the Blessed Mother, a representation of the Virgin Mary which holds a special role in Catholicism. (ROA 3470; 926-30.) The campus also has a second statue of the Blessed Mother located in front of Saint Edward Hall. (ROA 3470; 1026.) The clock tower of the student activities building bears a Benedictine cross and many classrooms have crucifixes above or near their doors. (ROA 3470; 250, 595-96.) Saint Leo's core values, based on the Rule of Saint Benedict, are posted in various places on campus such as classroom buildings and the student resident hall. (ROA 3470; 254-58.)

Additionally, Catholic religious observances regularly take place on campus. The University offers daily masses for students as well as special University-wide masses, or liturgical celebrations, for special religious occasions. (ROA 3624, 3472; 855-56.) These include: the Special Mass of the Holy Spirit, ushering in the beginning of the new academic year; the Baccalaureate mass, which ends the academic year; the Feast of Saint Leo; and the Patron Feast Day, which honors one of the University's namesakes, Pope Leo I. (ROA 3624; 856-58, 1011.) Saint Leo alters class schedules to accommodate these liturgical celebrations and allow students greater opportunity to participate in them. (ROA 3624; 856-58.) These

celebrations occur in the Abbey, the student chapel, or the campus gymnasium, with around 200 students attending on campus and others participating online. (ROA 3624; 858-60.)

Prayer is also a regular occurrence on Saint Leo's campus. On new student weekends, the University Chaplain welcomes newly admitted students and their parents with an opening prayer. (ROA 3472; 870.) The Chaplain also offers prayers before other campus events, such as athletic competitions. (ROA 3624, 3472; 865-66, 870.) The University Senate begins meetings with an opening prayer, (ROA 3624; 868-69), and some professors begin classes with prayer. (ROA 3624; 868.) During their public swearing-in ceremony, the President of Saint Leo takes the Catholic Oath of Fidelity and gives the Catholic Profession of Faith. (ROA 3624; 1815-17, 498, 954-56.)

### 4. Saint Leo's University Ministry provides religious services and faith-based activities for students

Saint Leo's University Ministry program organizes numerous Catholic religious services and projects for students on a year-round basis. During orientation, the University Ministry holds events welcoming new and incoming students to Saint Leo. (ROA 3624; 2017-26, 882.) Throughout the academic year, the University Ministry provides the sacrament of confession for students twice a week and by appointment and, on Tuesday nights, arranges a eucharistic hour featuring spiritual music and praise. (ROA 3624; 862-63.) During the summer,

9

the University Ministry sponsors students' participation in religious activities such as the Fellowship of Catholic University Students, a live-in faith emergent program, and opportunities for students to serve as camp staff at high school confirmation retreats.  (ROA 878-89.)

The University Ministry also organizes recreational activities for students that include faith-based elements.  (ROA 3624.)  For example, the University Ministry organizes kayaking trips that begin with prayer and connect student experiences to the Catholic tradition of viewing nature through the lens of divine creativity.  (ROA 3624; 2664, 864-67.)  The University Ministry also sponsors a speaker series where students can explore religious topics such as the interplay between faith and dating.  (ROA 864-65, 871-73, 2661).  Students are invited to participate in the University Ministry's Students Engaged in Rewarding Volunteer Experiences (SERVE) program, where they go on volunteer service trips with a faith-based component.  (ROA 3624; 2653-54.)

Through the University Ministry, students can also organize and lead their own religious events.  For example, the University Ministry sponsors weekly meetings of men's and women's groups, which are student-directed, faith-based fellowship meetings where students themselves decide what religious topics to discuss.  (ROA 880-81, 2662.)  Students can also lead, direct, and promote faith-based Catholic events in collaboration with the University Ministry.  (ROA 877,

2655-56.)  For students who take part in Catholic summer study abroad programs, such as the Catholic Worldview Fellowship, the University Ministry organizes events where they can give presentations on their summer faith experiences.  (ROA 2657-58, 878.)

### C. Saint Leo's Collective-Bargaining Relationship with the Union

In 1976, the Union was certified as the collective-bargaining representative of a unit of Saint Leo's full-time faculty members.  (ROA 3623; 1704.)  The last collective-bargaining agreement between the parties was effective from June 6, 2013, through August 15, 2016.  (ROA 3627; 126, 2684-2765.)  Despite meeting numerous times for negotiations, Saint Leo and the Union were unable to reach a new agreement.  (ROA 3628; 126, 277-78.)  On October 23, 2020, Saint Leo's Board of Trustees passed a resolution to withdraw recognition from the Union. (ROA 3623, 3628; 1443.)  On the same day, Saint Leo announced the withdrawal of recognition to faculty members and the Union through emails from various officials.  (ROA 3628; 1709-20.)

Saint Leo also announced a new shared governance model, the creation of a new faculty senate, and a forthcoming faculty handbook.  (ROA 3623, 3628; 1714-16.)  Saint Leo soon began soliciting employees directly for input on the faculty handbook, bypassing the Union as their representative.  (ROA 3628.)  On December 18, 2020, Saint Leo introduced an interim faculty handbook.  (ROA

3628; 1472-1533.)  This interim handbook contained several new and modified

provisions in relation to the collective-bargaining agreement, including changes to

tenure, evaluations, and workloads.  (ROA 3628; 1477-1533.)  Saint Leo did not

give the Union an opportunity to bargain over these changes.  (ROA 3628.)  In

April 2021, Saint Leo issued its finalized faculty handbook, which contained

substantially the same provisions as the interim handbook.  (ROA 3628; 1590-

1658.)  Again, Saint Leo did not provide notice or an opportunity to bargain with

the Union.  (ROA 3628.)

## II.    PROCEDURAL HISTORY

Pursuant to a charge filed by the Union, the Board's General Counsel issued

a complaint alleging that Saint Leo violated Section 8(a)(5) and (1) of the Act, 29

U.S.C. § 158(a)(1) and (5), by withdrawing recognition, unilaterally changing unit

employees' terms and conditions of employment, and bypassing the Union by

dealing directly with employees.  (ROA 3623.)  The complaint further alleged that

Saint Leo violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by

maintaining three facially unlawful work rules in its policy manual.  (ROA 3623.)

Following a hearing, an administrative law judge found that Saint Leo was

exempt from the Board's jurisdiction as a religious institution.  In the event the

Board determined it had jurisdiction, the judge made alternative contingent

findings that the full-time faculty were statutory employees and that Saint Leo

violated the Act as alleged.  (ROA 3465-85.)

## III.    THE BOARD'S CONCLUSIONS AND ORDER

In its Decision and Order, the Board (Chairman McFerran and Members

Kaplan and Prouty) dismissed the complaint, agreeing with the administrative law

judge that it lacked jurisdiction.  (ROA 3623.)  In doing so, the Board declined the

General Counsel's request to overrule *Bethany College* and return to the standard

set forth in *Pacific Lutheran*.  (3623 & n.2.)  The Board stated that given its

jurisdictional finding, it did not need to pass on the administrative law judge's

alternative, contingent findings.  (ROA 3626 n.8.)

## SUMMARY OF ARGUMENT

In *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979), the Supreme

Court determined that the Act did not give the Board jurisdiction over teachers at

church-operated schools, reasoning that the exercise of such jurisdiction presented

a significant risk of infringement upon First Amendment rights.  The Court,

however, offered no test for the Board to use in determining whether it had

jurisdiction.  After several of its jurisdictional tests were met with judicial

criticism, the Board settled upon a framework in *Bethany College*.  This

framework, first promulgated by the D.C. Circuit Court of Appeals, avoids the

intrusive inquiry into schools' religious mission and ensuing risk to First

Amendment rights that characterized the Board's earlier tests. Under *Bethany College*, the Board inquires only whether an institution (1) holds itself out to the public as providing a religious educational environment, (2) is nonprofit, and (3) is religiously affiliated.

Here, applying its *Bethany College* framework, the Board found that Saint Leo is a religious educational institution and, accordingly, the Board lacked jurisdiction over its faculty. It is undisputed that Saint Leo is a nonprofit and is religiously affiliated, and substantial evidence supports the Board's finding that Saint Leo holds itself out as providing a religious educational environment. Saint Leo's Catholic identity and mission statements, religious content on its public website, religious symbols and observances on campus, and faith-based activities organized by its University Ministry program amply demonstrate its religious mission to the public. The Union argues that evidence of Saint Leo's secular nature outweighs its religious nature. But this argument would require the Court to examine the sincerity of Saint Leo's religious mission, the very type of entangling inquiry that *Catholic Bishop* sought to avoid. Accordingly, because substantial evidence shows that Saint Leo is a religious institution, the Board properly determined that it lacked jurisdiction over Saint Leo's faculty and dismissed the complaint.

Unable to counter the ample evidence that Saint Leo publicly portrays itself as a religious university, the Union argues that the Board should overturn *Bethany College* and return to a previous standard that examined whether a university held out its faculty as performing a specific role in creating or maintaining the university's religious educational environment. But this standard has already been rejected by a circuit court and, in *Bethany College*, the Board detailed its concerns with this prior standard, noting that the inquiry into a faculty member's duties and responsibilities created an impermissible risk of infringing on First Amendment rights. In any event, the Union's claim that its preferred standard is the better standard misunderstands the inquiry. The question is not whether the Board's *Bethany College* test is the better framework; rather, this Court need only determine if it is permissible.

The Union's attempts to undercut the *Bethany College* test also lack merit. Contrary to the Union's claims, *Catholic Bishop* did not limit its holding to parochial schools, and the Board, well before *Bethany College* and with no disagreement from circuit courts, has consistently applied *Catholic Bishop* in the context of higher education. The Union also relies on inapposite precedent in arguing that the Board can and should examine a teacher's duties and responsibilities in determining whether the Board can exercise jurisdiction.

Finally, the Union's request that the Court reject the *Bethany College* framework, apply its preferred framework, conclude that Saint Leo violated the Act, and order appropriate relief, lacks legal support. The Board did not pass on the administrative law judge's findings that, if jurisdiction existed, Saint Leo violated the Act. Under well-established precedent, if the Court disagrees with *Bethany College* or the Board's application of its standard, remanding the case to the Board is the appropriate course.

## STANDARD OF REVIEW

Where the Board concludes that there has been no violation of the Act, the Court must uphold that determination unless it "has no rational basis." *Ona Corp. v. NLRB*, 729 F.2d 713, 724-25 (11th Cir. 1984) (quoting *Dist. 65, Distributive Workers of Am. v. NLRB,* 593 F.2d 1155, 1164 (D.C. Cir. 1978)) (internal quotation marks omitted); *see also Teamsters Local Union No. 515 v. NLRB*, 906 F.2d 719, 727 (D.C. Cir. 1990) ("We must uphold the Board's determination that there has been no violation of the Act unless it has no rational basis.").

This Court will sustain the Board's factual findings if they are supported by substantial evidence in the record as a whole. 29 U.S.C. § 160(e); *Evans Servs., Inc. v. NLRB*, 810 F.2d 1089, 1092 (11th Cir. 1987). The "substantial evidence" test requires the degree of evidence that could satisfy a reasonable factfinder. *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 377 (1998). Under

this test, a reviewing court may not "displace the Board's choice between two fairly conflicting views, even though the court [may] justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Purolator Armored, Inc. v. NLRB*, 764 F.2d 1423, 1428 (11th Cir. 1985).

On review, this Court affords "considerable deference to the Board's expertise in applying the . . . Act to the labor controversies that come before it." *Visiting Nurse Health Sys., Inc. v. NLRB*, 108 F.3d 1358, 1360 (11th Cir. 1997). However, because agencies have "no more expertise" than courts in interpreting judicial decisions, the Court will not defer to an agency's interpretation of Supreme Court precedent that it does "not find [] persuasive." *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1203, 1209 (11th Cir. 2015). *Accord Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1341 (D.C. Cir. 2002) (courts are not "obligated to defer to an agency's interpretation of Supreme Court precedent").[3]

---

[3] The Union erroneously asserts that *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), provides the appropriate standard of review in this case. In *Loper Bright*, the Supreme Court overruled *Chevron*, which had held that courts were obligated to adopt permissible agency interpretations of ambiguous statutory language—a form of "binding deference" that "courts had never before applied." 603 U.S. at 390-93 & nn.3-4. Here, the Court must address whether substantial evidence supports the Board's finding that Saint Leo publicly holds itself out as providing a religious educational environment. To the extent that the Union challenges the jurisdictional test, that issue turns on interpretation of Supreme Court precedent. *See Great Falls*, 278 F.3d at 1341.

## ARGUMENT

## I.  THE BOARD APPROPRIATELY DISMISSED THE UNFAIR-LABOR-PRACTICE COMPLAINT BASED ON ITS FINDING THAT SAINT LEO IS A RELIGIOUS EDUCATIONAL INSTITUTION AND THEREFORE THE BOARD LACKED JURISDICTION OVER SAINT LEO'S FACULTY

The Board acted properly in applying *Bethany College* to find it lacked jurisdiction over Saint Leo's faculty and in dismissing the complaint.  As discussed below, because *Bethany College* is consistent with Supreme Court and circuit court precedent, the Board was not required to overturn it and to instead adopt the Union's preferred test.  That test, set forth in *Pacific Lutheran University*, had recently been rejected by the D.C. Circuit, *Duquesne University of the Holy Spirit v. NLRB*, 947 F.3d 824 (2020), *reh'g denied*, 975 F.3d 13 (2020), and overruled by the Board in *Bethany College*, 369 NLRB No. 98 (2020).  Applying *Bethany College*, substantial evidence supports the Board's finding that Saint Leo publicly holds itself out as providing a religious educational environment and, accordingly, that the Board does not have jurisdiction over its faculty.

### A. *Catholic Bishop* Prohibits the Board from Exercising Jurisdiction over Teachers at Religious Schools

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  This provision contains two clauses—the Establishment Clause and the Free Exercise

Clause—known collectively as the Religion Clauses. *Bethany Coll.*, 369 NLRB slip op. at 1, n.3. The Religion Clauses limit government involvement in affairs of religious groups and safeguard the freedom to practice religion whether as an individual or part of a group. The Supreme Court, engaging in a constitutional-avoidance analysis to reduce the risk of violating the Religion Clauses, has held that the Act does not authorize the Board to exercise jurisdiction over teachers in a church-operated school. *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979). Specifically, in *Catholic Bishop*, the Court explained that teachers play a "critical and unique role . . . in fulfilling the mission of a church-operated school," regardless of whether they provided instruction on religious or secular subjects. *Id.* at 501-02. Given this vital role, exercising jurisdiction over teachers at church-operated schools presented "a significant risk that the First Amendment will be infringed." *Id.* at 502.

The Court identified two areas where the Board—by asserting jurisdiction over teachers—could become unconstitutionally entangled with the school's religious mission. First, the Board's resolution of unfair-labor-practice charges would necessarily "involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission." *Id.* at 502. For example, the teacher might claim that rules, regulations, promotions, hirings and firings reflected an "anti-union animus," while administrators might

claim their actions were based upon religious reasons.  *Id.* at 503.  Thus, not only the Board's conclusions, but "the very process of [the] inquiry" itself, could "impinge on rights guaranteed by the Religion Clauses."  *Id.* at 502.  Second, the Board would "be called upon to decide what are 'terms and conditions of employment' and therefore mandatory subjects of bargaining."  *Id.* at 502-03.  As the Court explained, "nearly everything that goes on in schools affects teachers and is therefore arguably a 'condition of employment.'"  *Id.* at 503 (citation omitted).  This would inevitably "implicate sensitive issues that open the door to conflicts between clergy-administrators and the Board," or conflicts with union negotiators.  *Id.*

Seeing "no escape from conflicts flowing from the Board's exercise of jurisdiction over teachers in church-operated schools and the consequent serious First Amendment questions that would follow," the Supreme Court held that the Act does not authorize the Board to regulate the employment relationship between church-operated schools and their teachers.  *Id.* at 504, 507.  The Court, however, offered no test for determining in the future if a petitioned-for group of university faculty members is exempt from the Board's jurisdiction.

## B. The Board's Unsuccessful, Post-*Catholic Bishop* Attempts To Assert Jurisdiction over Teachers at Religious Colleges and Universities

In the wake of *Catholic Bishop*, and before settling upon its test in *Bethany College*, the Board sought to develop a framework for deciding whether to exercise

jurisdiction over university faculty members. Initially, the Board, on a case-by-case basis, determined whether a religiously affiliated school had a "substantial religious character" and whether exercising jurisdiction would present a significant risk of infringing on that school's First Amendment rights. In making this inquiry, the Board considered such factors as the involvement of the religious institution in the school's daily operation, the degree to which the school has a religious mission and curriculum, and whether religious criteria are used for faculty appointments and evaluations. *See, e.g., University of Great Falls*, 331 NLRB 1663, 1664-65 (2000). This test was not met with success in the circuit courts.

In *Universidad Central de Bayamon v. NLRB*, 793 F.2d 383 (1985), the First Circuit examined the Board's assertion of jurisdiction over a church-operated college. Then-Judge Breyer, writing for an equally divided en-banc court, criticized the Board's "substantial religious character" framework. Judge Breyer explained that the Board's "ad hoc efforts, the application of which will themselves involve significant entanglement, are precisely what the Supreme Court in *Catholic Bishop* sought to avoid." *Id*. at 402-03. Judge Breyer concluded that for the Board to exercise jurisdiction over an educational institution where "the inculcation of religious values is at least *one* purpose of the institution" and "to promise that courts in the future will control the Board's efforts to examine religious matters[] is to tread the path that *Catholic Bishop* forecloses." *Id.* at 402.

The Board's "substantial religious character" framework fared no better in *University of Great Falls v. NLRB*, 278 F.3d 1335 (D.C. Cir. 2002). There the D.C. Circuit criticized that test as impermissibly intrusive because it allowed the Board to "troll[] through the beliefs of the [u]niversity, making determinations about its religious mission." 278 F.3d at 1341-43. Attempting to avoid "the pitfalls" of the Board's test, the court, drawing partially from the reasoning in *Bayamon*, crafted a different approach to determining the Board's jurisdiction. *Id.* at 1343. Under its new three-part test, a university is exempt from the Board's jurisdiction if it (1) "holds itself out to students, faculty, and community" as providing a religious educational environment; (2) is organized as a non-profit; and (3) "is affiliated with, or owned, operated, or controlled, directly or indirectly, by a recognized religious organization, or with an entity, membership of which is determined, at least in part, with reference to religion." *Id.* (citing *Bayamon*, 793 F.2d at 399-400, 403). By applying this bright-line test, the Court explained, the Board could determine whether it had jurisdiction "without delving into matters of religious doctrine or motive, and without coercing an educational institution into altering its religious mission to meet regulatory demands." *Id.* at 1345. At the same time, the *Great Falls* test would provide "reasonable assurance that the *Catholic Bishop* exemption will not be abused." *Id.* Requiring an institution show that it publicly represents itself as providing a religious educational environment

"serve[s] as a market check" because while "public religious identification will no doubt attract some students and faculty to the institution, it will dissuade others." *Id.* at 1344. As the court explained, "[s]uch market responses will act as a check on institutions that falsely identify themselves as religious merely to obtain exemptions from the [Act]." *Id.*

In *Carroll College v. NLRB*, 558 F.3d 568, 574 (D.C. Cir. 2009), the D.C. Circuit continued its criticism of the Board's jurisdictional test, explaining that in light of the Supreme Court's "command" in *Catholic Bishop*, the Board may not "question[] the sincerity of the school's public representations about the significance of its religious affiliation," or conduct a "skeptical inquiry" into whether an affiliated church exerts influence over the school. *Id.* at 572-74. Rather, the Board can permissibly examine the school's "public representations as to its religious educational environment." *Id.* at 572-73. Anything more, "neither the Board nor [the court] may do." *Id.* at 573.

In *Pacific Lutheran*, the Board abandoned its "substantial religious character" framework and adopted a new two-prong analysis for asserting jurisdiction over teachers at religious schools. That analysis incorporated the first prong of the *Great Falls* framework and examined whether the school held itself out as providing a religious environment. 361 NLRB at 1404, 1407-10. The second prong examined whether a school held out faculty members as performing

23

a specific role in creating or maintaining its religious educational environment. *Id.*
at 1410. Both inquiries focused solely on the university's public representations.
In *Duquesne University*, however, the D.C. Circuit rejected this new test,
explaining that an examination of whether a religious school 'holds out' faculty
members as "playing a specific religious role," "still require[s] the Board to define
what counts as a 'religious role' or a 'religious function.'" 947 F.3d at 834-35.
Such an examination of whether faculty members played sufficiently religious
roles "impermissibly intrudes into religious matters" in a manner inconsistent with
*Catholic Bishop*, and is "far outside the competence of Board members and
judges." *Id.* at 834-35. The court further explained that the Board may not "'dig
deeper' by examining whether faculty members play religious or non-religious
roles, for '[d]oing so would only risk infringing upon the guarantees of the First
Amendment's Religion Clauses.'" *Id.* at 833 (quoting *Carroll Coll.*, 558 F.3d at
572).

### C. The Board Adopts *Bethany College*, a Test Consistent with *Catholic Bishop* and Other Circuit Court Precedent

In *Bethany College*, the Board recognized the need to reexamine its
precedent interpreting *Catholic Bishop* in light of the judicial criticism expressed
by the circuit courts. 369 NLRB No. 98, slip op. at 1-4. The Board therefore
overruled *Pacific Lutheran*, eschewing that framework's examination of how a
university holds out its faculty, and adopted the bright-line test promulgated in

*Great Falls*, 278 F.3d at 1343, and reaffirmed in *Duquesne University*, 947 F.3d at 832. *Bethany Coll.*, 369 NLRB No. 98, slip op. at 5. Under the *Bethany College* test, the Board inquires only whether the institution (1) holds itself out to the public as a religious educational institution, (2) is nonprofit, and (3) is religiously affiliated. *Id.* at 1.

The Board reasonably concluded that this new framework is consistent with the admonition by both *Catholic Bishop* and the circuit courts to avoid the inevitable excessive entanglement that comes with an intrusive inquiry into a school's religious tenets, and the substantial risk to First Amendment rights that such an inquiry causes. *Id.* By limiting its examination to these three prongs, the Board avoids impermissibly "'delving into matters of religious doctrine or motive.'" *Id.* at 3 (quoting *Great Falls*, 278 F.3d at 1345). It also ensures that the Board bases its determination of whether it has jurisdiction on objective evidence rather than "subjective judgments" about the religious nature of a university's activities or those of its faculty. *Bethany Coll.*, 369 NLRB No. 98, slip op. at 5.

At the same time, the Board's approach in *Bethany College* protects the rights of employees under the Act by providing a sound mechanism for determining "when self-identified religious schools are not, in fact, *bona fide* religious institutions." *Id.* As recognized in *Great Falls*, requiring a self-identified religious institution to demonstrate that it holds itself out to the public as

maintaining a religious educational environment serves as an effective market check that discourages secular institutions from falsely claiming to be religious. 278 F.3d at 1344. A university's public representations of faith are likely to deter students seeking to further their education in a non-religious setting. Faculty, too, will pursue other job opportunities if they do not want to teach at a school that touts its religious educational environment. Publicly identifying with religion, the Board reasoned, comes with costs that would discourage secular universities from attempting to leverage the *Bethany College* test to secure an exemption from the Act. *Bethany Coll.*, 369 NLRB No. 98, slip op. at 5; *see also Carroll Coll.*, 558 F.3d at 573 ("Not all students and faculty are attracted to overtly religious environments, so public representations of religious ties come at a cost to the school claiming a *Catholic Bishop* exemption.").

## D. Substantial Evidence Supports the Board's Finding that Saint Leo Holds Itself Out as a Religious Educational Institution

Applying *Bethany College*, the Board properly found it lacked jurisdiction and dismissed the unfair-labor-practice complaint. Here, it is undisputed that Saint Leo is organized as a nonprofit and is religiously affiliated.[4] Thus, the only issue is

---

[4] The Board found that there was "no dispute that, . . . [Saint Leo] is a 501(c)(3) not for profit corporation." (ROA 3625). Additionally, the Board noted that the General Counsel "effectively conced[ed] on brief" that Saint Leo also met the third prong of the *Bethany College* framework. The Union has waived any challenges to these findings by failing to raise them in its opening brief. *See United States v.*

whether Saint Leo holds itself out to students, faculty, and the public as providing a religious educational environment. Substantial evidence supports the Board's finding that it does, and the Union offers no persuasive rebuttal to this finding.

As the Board recognized, Saint Leo's "religious messaging is substantial." (ROA 3625.) Saint Leo holds itself out publicly as providing a religious educational environment in four central ways: its Catholic identity and mission statements, content on its public website, on-campus religious symbols and observances, and through the religious services and activities organized by its University Ministry program.

When a member of the public looks at "About Saint Leo" on the University's website, they find its Catholic identity statement and mission statement, which both present the University as a Catholic and Benedictine educational institution. Indeed, the Catholic identity statement endorses *Ex Corde Ecclesiae* and its four essential characteristics of a Catholic university, linking Saint Leo's educational approach to Christian inspiration, faith reflection, fidelity to the Christian mission, and service to church and humanity. (ROA 3624; 1818-21.) *See Carroll Coll.*, 558 F.3d at 572 (college's "Statement of Christian

---

*Woods*, 684 F.3d 1045, 1064 n.23 (11th Cir. 2012) (party abandons an issue "by failing to develop any argument on it in his opening brief"); Fed. R. App. P. 28(a)(8)(A) (argument section of initial brief must include "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies").

Purpose" declared its "mission to provide 'a learning environment devoted to academic excellence and congenial to Christian witness'"). The "About Saint Leo" webpage also directs users to the University's mission statement, which identifies Saint Leo as a Catholic university, "[r]ooted in the 1500-year-old Benedictine tradition," that seeks balanced growth for members of its community in not only mind and body, but in spirit. (ROA 3624.) *See Great Falls*, 278 F.3d at 1345 (university presented "an overtly religious, Catholic environment" through mission statement "'offer[ing] students a foundation for actively implementing Gospel values and the teachings of Jesus within the Catholic tradition'"). This webpage also presents students with opportunities to engage with Saint Leo's Catholic faith, whether by participating in mass, confession, and eucharistic adoration, performing in the "Voice of Christ" student choir and band, joining the campus pro-life group "Imago Dei," taking the Rite of Christian Initiation for Adults, or serving as a spiritual partner in the Peer Ministry Program. (ROA 3624; 1852.)

Saint Leo's website also describes the Benedictine Core values that inform its educational philosophy: excellence, community, integrity, respect, personal development, and responsible stewardship. (ROA 3471; 1938, 1944-47, 2011-13.) These values, while susceptible to a secular interpretation, are explicitly tied to Saint Leo's Catholic and Benedictine faith. As the Board explained, a visitor to

Saint Leo's website will see that the University's concept of respect is "[a]nimated by the spirit of Jesus Christ," that its definition of community encompasses developing "hospitable Christian learning communities," and that the need for responsible stewardship naturally flows from acknowledging the blessings bestowed by "[o]ur creator."  (ROA 3471; 1938, 1944-47, 2011-13.)  *See Great Falls*, 278 F.3d at 1346 (university called upon faculty to join with students to develop "character . . . competence . . . [and] commitment," defining character as students' "recognition and acceptance of personal accountability . . . to themselves, to society, and to God").

Just as viewing Saint Leo's website clearly informs an online visitor that the University has a religious nature, a visitor to campus will see numerous representations of its Catholic faith and Benedictine traditions.  The Saint Leo Abbey serves as a prominent focal point on campus, with no physical demarcations between where students walk to class and where the Abbey's Benedictine monks walk to the monastery.  (ROA 3470; 645-46, 926-27, 934.)  Just off campus, a visitor will see the Holy Name Monastery that is the home of the Benedictine Sisters and the cemetery that serves as the final resting place for deceased monks and Sisters.  (ROA 3470.)

The campus facilities used daily by students and staff are also representative of Saint Leo's religious educational environment.  Saint Leo's administration

building is named after Saint Francis of Assisi and contains a stained-glass window of his likeness as well as a statue of the Blessed Mother. (ROA 3470; 926-30.) A Benedictine cross adorns the clock tower of the student activities center and crucifixes hang near the doors of many classrooms. (ROA 3470; 250, 595-96.) *See Great Falls*, 278 F.3d at 1345 (noting that university "fills its campus" with Catholic icons "not merely as art . . . [but] as an expression of faith"). Saint Leo's core values are posted in various places including the resident hall and classroom buildings. (ROA 3470; 254-58.)

In addition to the buildings and other physical infrastructure, Catholic religious observances and prayer are a regular part of daily campus life. In addition to daily mass, Saint Leo holds liturgical celebrations on campus for special occasions such as ushering in the school year with the Special Mass of the Holy Spirit and celebrating the University's namesake with the Feast of Saint Leo. (ROA 3624; 856-58.) Saint Leo alters its normal class schedules to give students the opportunity to participate in these celebrations. (ROA 3624; 858-60.) The University Chaplain welcomes newly admitted students and their parents with a prayer at orientation and gives blessings before campus events such as athletic competitions. (ROA 3472, 3624; 865-70.) The University Senate begins meetings with a prayer and the President of Saint Leo, during their public swearing-in ceremony, takes the Catholic Oath of Fidelity and gives the Catholic Profession of

Faith.  (ROA 3624; 1815-17, 498, 954-56.)  Some professors also open their classes with prayer.  (ROA 3624; 868.)

Finally, the numerous Catholic religious services and student activities organized through Saint Leo's University Ministry program provide significant evidence that Saint Leo holds itself out as providing a religious educational environment.  When incoming students arrive at orientation, the University Ministry holds events to welcome them to Saint Leo.  During the academic year, the University Ministry provides opportunities for students to take confession, attend eucharistic hours, discuss religious topics at weekly meetings for men's and women's groups, and attend presentations on religious topics such as the interplay between faith and dating.  (ROA 3624; 2017-26, 2661-62, 862-63, 871-73 879-89, 880-82.)  The University Ministry also organizes recreational activities and service projects with a faith-based component, and facilitates religious summer study abroad programs, such as the Catholic Worldview Fellowship.  (ROA 3624; 2653-58, 2664, 878, 864-67.)  Given this evidence, the Board's decision finding Saint Leo is a religious educational institution exempt from its jurisdiction is amply supported by the record.

The Union does not attempt to argue that this evidence is insubstantial.  Nor could it, given the abundant evidence showing Saint Leo holds itself out as providing a religious educational environment.  Rather, the Union argues that other

evidence, such as other portions of Saint Leo's website, its television commercials, and promotional videos, outweighs the evidence demonstrating Saint Leo's religious nature. The Union's assertion that this evidence reveals Saint Leo's true nature as "a virtually secular institution of higher learning" (Br. 33) invites the Board to make the very type of entangling inquiry that *Catholic Bishop* sought to avoid by rejecting the Board's prior distinction between "completely religious schools" and "merely religiously associated schools." 440 U.S. at 495; *see also Bayamon*, 793 F.2d at 402 (efforts by the Board to separate the religious from the secular "will themselves involve significant entanglement").

Here, the Board was correct to reject the Union's invitation to question the sincerity of Saint Leo's public representations. As it explained, it is not the Board's place to judge whether Saint Leo's "religious nature is outweighed by its secular nature," nor may the Board "question the sincerity of [Saint Leo's] representations regarding its religious character" or decide whether it is "*truly* a religious educational institution." (ROA 3625) (emphasis in original). The Court should likewise reject the Union's invitation to scrutinize the sincerity of Saint Leo's public representations, for to do so would be contrary to the principle that "[w]here a school, college, or university holds itself out publicly as a religious institution, '[w]e cannot doubt that [it] sincerely holds this view.'" *Great Falls*, 278 F.3d at 1344 (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000)).

### E. The Court Should Reject the Union's Request To Overturn *Bethany College* and To Remand the Case for the Board To Apply *Pacific Lutheran*

The Union asks the Court to overturn *Bethany College* and to remand the case so that the Board can apply *Pacific Lutheran*, the Union's preferred jurisdictional test. It further criticizes the Board's *Bethany College* test as being inconsistent with Supreme Court and Board precedent. The Union also boldly requests that this Court simply apply the *Pacific Lutheran* test, determine that the Board has jurisdiction over Saint Leo, and issue the appropriate remedies. These contentions lack merit, with the latter contention profoundly misreading the Board's decision and ignoring settled law.

### 1. *Pacific Lutheran*'s examination of faculty members' religious functions risks unconstitutional government entanglement with religion

In urging the Court to find that *Pacific Lutheran* is the better test, the Union fails to recognize that the issue in this case is not whether *Bethany College* is the "best" test, but whether the Board acted reasonably in adopting that test and whether it is consistent with Supreme Court precedent. As discussed above (pp. 24-26), because the *Bethany College* test is consistent with *Catholic Bishop* and avoids excessive entanglement with religion, the Board acted reasonably in adopting it. The Union's request that the Court require the Board to return to *Pacific Lutheran*'s two-prong inquiry and examine whether Saint Leo holds out its

faculty as creating or maintaining a religious educational environment fails to grapple with the recognized infirmities of that framework.

As the Board concluded in *Bethany College*, the second prong of the *Pacific Lutheran* test proved "irreconcilable with the holding, rationale, and purpose of *Catholic Bishop*." 369 NLRB No. 98, slip op. at 5. *Pacific Lutheran*'s required analysis of whether a school holds out its faculty members as playing a specific role in creating or maintaining the school's religious educational environment inevitably entailed "an impermissible inquiry into what does and what does not constitute a *religious function*." *Id.* at 4 (emphasis in original). As the D.C. Circuit explained in *Duquesne University*, this leads to just "the sort of intrusive inquiry that *Catholic Bishop* sought to avoid," with the Board "trolling through the beliefs" of religious schools and making determinations about their religious missions and whether certain faculty members contributed to that mission. 947 F.3d at 834-35 (citing *Great Falls*, 278 F.3d at 1341-42).

Indeed, *Bethany College* observed that *Pacific Lutheran*'s own description of its "holding out" standard demonstrated how an inquiry into faculty's religious roles leads to such impermissible line-drawing. *Bethany Coll.*, 369 NLRB No. 98, slip op. at 3-4. Requiring faculty to incorporate religion "into their teaching or research" or "imposing religious requirements on them," *Pacific Lutheran* suggested, would sufficiently show that they performed a religious function. *Id.*

But "[g]eneralized statements" that faculty are required to support religious goals or missions would not be enough to show that faculty played religious roles. *Id.* Such "second guessing" about what does and does not qualify as religious improperly creates the very risk of conflict with the Religion Clauses that *Catholic Bishop* tried to curtail. *Id.* at 4. By requiring a determination of what faculty roles and duties were religious versus non-religious, *Pacific Lutheran*'s second prong not only failed to "avoid First Amendment questions, but plow[ed] right into them at full tilt." *Id.* at 4 (quoting *Pacific Lutheran*, 361 NLRB at 1433 (Board Member Johnson, dissenting)).

Because *Bethany College*'s framework avoids the pitfalls associated with examining a faculty member's specific religious role—a pitfall that *Pacific Lutheran* did not avoid—the Court can feel comfortable embracing *Bethany College* in lieu of *Pacific Lutheran*.

### 2. *Bethany College*'s application of *Catholic Bishop* to institutions of higher education is consistent with Supreme Court precedent

The Union does not undermine *Bethany College* with its claim that the Board "erroneously extended" *Catholic Bishop* to colleges and universities. (Br. 24.) There is nothing novel or inappropriate about *Bethany College* applying *Catholic Bishop* in the context of higher education. The Board has done so for almost forty years. As the Board observed in *Trustee of St. Joseph's College*, 282 NLRB 65, 67-68 (1986), *Catholic Bishop* contained "no language" limiting its

35

holding to parochial schools and "generalizations about the difference between secondary and postsecondary education" do not justify concluding that Board jurisdiction over institutions of higher education "can never pose [a] risk to First Amendment freedom." Notably, *Pacific Lutheran* recognized and affirmed this holding. 361 NLRB at 1407 n.4.

Further, no circuit court has agreed with the Union's claim that the application of the Board's jurisdiction over teachers at religious colleges and universities, as opposed to primary schools, creates less risk of unconstitutional entanglement.[5] As *Bayamon* explained, the "language of *Catholic Bishop* itself does not distinguish colleges from primary and secondary schools," and the risk of government entanglement with religion "would seem as great in colleges as in secondary schools." 793 F.2d at 401. Unfair-labor-practice charges "would seem as likely," with the Board needing to exercise the same "intense" scrutiny to make "the necessary distinctions between religious and labor matters" and "'fence off' subjects of mandatory bargaining with a religious content" from purely secular subjects. *Id.* at 403; *see also Duquesne Univ.*, 947 F.3d at 830 (same).

---

[5] The Union claims (Br. 28, n.6) that other circuit courts have interpreted *Catholic Bishop* to not preclude an examination of an *employee's* role in a religious institution's purpose or mission. As discussed below (p. 42-45), these cases did not involve teachers.

*Tilton v. Richardson*, 403 U.S. 672 (1971), relied on by the Union, is inapposite and does not warrant a different conclusion. In *Tilton*, the Supreme Court upheld a federal law providing grant money for the construction of academic facilities at some universities which were "governed by Catholic religious organizations." 403 U.S. at 686. In deciding that such grants created little risk of unconstitutional entanglement, the Court observed that at "church-related colleges and universities, there is less likelihood than in primary and secondary schools that religion will permeate the area of secular education." *Id.* at 687. But this decision also rested on a bright line that the Court had drawn in prior precedent between "teachers" and "services, facilities, or materials." *Id.* Because teachers "are not necessarily religiously neutral," the Court explained, "greater governmental surveillance would be required to guarantee that state salary aid would not in fact subsidize religious instruction" than would be necessary where state aid funds construction. *Id.* at 687-88.

This distinction between teachers and services, facilities, or materials is particularly salient here, where teachers are the focus of the constitutional inquiry. The "impermissible risk of excessive governmental entanglement" identified in *Catholic Bishop* flowed directly from the unique role played by teachers at religious schools. 440 U.S. at 501. Further, the Court's decision in *Tilton* also rested on the fact that the aid at issue was "a one-time, single-purpose construction

grant," creating "no continuing financial relationships or dependencies" between the universities and the government. 403 U.S. at 688. The Board's exercise of jurisdiction over faculty at religious universities, on the other hand, would entail ongoing government oversight, increasing the risk of entanglement.

The Union's conclusory assertion (Br. 26) that colleges and universities, unlike parochial schools, do not "operate to indoctrinate" betrays its misunderstanding of the concerns expressed in *Catholic Bishop*, where the Supreme Court explained that a school's religious mission may be "intertwined" with even "secular instruction." 440 U.S. at 501. As the D.C. Circuit noted in rejecting an argument nearly identical to the Union's, "[n]o matter the subject taught, 'a teacher remains a teacher,' and 'a teacher's handling' of even secular subjects may implicate the school's religious mission." *Duquesne Univ.*, 947 F.3d at 834 (citing *Catholic Bishop*, 440 U.S. at 501). Thus, the type of school (secondary vs. college) and the type of teaching (religious vs. secular) are false dichotomies for the purpose of assessing Board jurisdiction over teachers at religious schools.

Indeed, this case illustrates how such entanglement can arise where the Board exercises jurisdiction over faculty at religious universities. As the Union acknowledges, Saint Leo's April 2021 Faculty Handbook cautions that "[w]hile it is appropriate for Faculty to educate students by engaging in discussions of

controversial matters that are relevant to their disciplines, it is not appropriate in the classroom to serve as advocates for positions that are contrary to the doctrine of the Catholic Church . . . ."  (ROA 1601.)  While the Union asserts that this language is essentially meaningless because the Handbook "does not dictate discipline or termination for contradicting Catholic doctrine," it ignores the fact that Saint Leo could issue such discipline or instruct a professor to adhere to Catholic Church doctrine pursuant to that language.  (Br. 34.)  The Board, if asked to resolve unfair-labor-practice charges concerning such discipline, would have to determine whether the "challenged actions were mandated" by Saint Leo's "religious creeds" or instead motivated by "an anti-union animus."  *Catholic Bishop*, 440 U.S. at 502-03.  Resolution of such charges would necessarily involve the Board in a constitutionally impermissible inquiry "into the good faith of the position asserted" by Saint Leo and "its relationship to [Saint Leo's] religious mission."  *Id.* at 502.

### 3. Supreme Court precedent does not require the Board to examine a teacher's duties or roles

The Union ignores the obvious different contexts with its assertion (Br. 29-31) that the ministerial exception in employment antidiscrimination cases undermines the rationale of *Great Falls*, and thus *Bethany College*, and supports a return to *Pacific Lutheran*'s inquiry into a teacher's role and function at a university.  The "ministerial exception" bars, on First Amendment grounds,

employment discrimination lawsuits brought on behalf of ministers against their religious institutions.  *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020); *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012).  In determining if the exception applies, the Supreme Court allows the examination of whether an employee performs vital religious duties; as the Court has explained, when applying the ministerial exception, "[w]hat matters, at bottom, is what an employee does."  *Our Lady of Guadalupe*, 591 U.S. at 753, 756-57 (detailing elementary school teachers' daily activities and job responsibilities in finding that teachers fell within ministerial exception); *Hosanna-Tabor*, 565 U.S. at 181, 192 (finding exception applied and observing that church "held [] out" employee "as a minister," and employee's "job duties reflected a role in conveying the Church's message and carrying out its mission").

The Supreme Court's more-searching review of employees' job duties in *Hosanna-Tabor* and *Our Lady of Guadalupe*, however, was performed in a different context than *Catholic Bishop*.  The *Catholic Bishop* exemption is jurisdictional, *see Catholic Bishop*, 440 U.S. at 504-07, while the ministerial exception is an "affirmative defense to an otherwise cognizable claim" that an employer may or may not choose to assert.  *Hosanna-Tabor*, 565 U.S. at 195 n.4. A more searching review makes sense when assessing whether a claim against an employer that would otherwise be cognizable is barred by an exception as opposed

40

to deciding whether jurisdiction over the employer exists at all. *Cf. Duquesne Univ.*, 947 F.3d at 846 (recognizing ministerial exception "is a waivable affirmative defense, not a jurisdictional bar") (Pillard, J., dissenting)). Thus, the Union cannot so easily pivot to the conclusion that if a searching inquiry is permissible in the Title VII arena, it should be equally allowable in a jurisdictional analysis.

If anything, the Board's *Bethany College* framework and the Supreme Court's ministerial exception jurisprudence share the principle that "[j]udicial review of the way in which religious schools discharge th[eir] [educational] responsibilities would undermine the independence of religious institutions in a way that the First Amendment does not tolerate." *Our Lady of Guadalupe*, 591 U.S. at 738. This shared rationale undergirds both decisions, demonstrating their common objective of avoiding the unconstitutional entanglement that accompanies an inquiry into religious views. The treatment of the inquiry in each situation, however, is not impermissibly inconsistent, given the singular purpose of each inquiry and the different statutes involved.

*Catholic Bishop* was also decided on the grounds of constitutional avoidance, 440 U.S. at 504-07, where the question was not whether government actions violated the First Amendment, *see Hosanna-Tabor*, 565 U.S. at 181, but whether government action presented even the risk of a First Amendment

41

violation.  It makes sense, then, that the Supreme Court allowed for a more searching review in *Hosanna-Tabor* and *Our Lady of Guadalupe*.

### 4.  The Board's assertion of jurisdiction over non-teaching employees at religious institutions does not require the Board to examine the job duties of Saint Leo's faculty

Contrary to the Union's assertion (Br. 27), *Bethany College*—and its refusal to permit examination of a teacher's duties—is not in tension with other cases where the Board, with court approval, has determined that *Catholic Bishop* does not prevent the Board from inquiring into non-teaching employee's duties to determine whether to exercise jurisdiction over those employees at religiously-affiliated organizations.  Specifically, the Union argues because the Board examines whether non-teaching employees perform religious duties in those cases, *Pacific Lutheran*'s "deferential review of employee functions in the higher education setting" is similarly appropriate and does not implicate First Amendment concerns.  (Br. 27.)

The Union's argument fails to recognize *Catholic Bishop*'s exclusive focus on teachers.  As the Board has explained when reaffirming the distinction between teaching and non-teaching employees, the Supreme Court's concerns in *Catholic Bishop* about creating an impermissible risk of excessive government entanglement and infringement of First Amendment rights "stemmed from '[t]he key role played by teachers' in creating and sustaining the religious educational environment."  *St.*

*Xavier Univ.*, 365 NLRB 566, 569 (2017) (quoting *Catholic Bishop*, 440 U.S. at

501).  Where non-teaching employees "do not play a similar role in carrying out

the religious mission" of a school, the same First Amendment concerns are not

implicated and "the process of inquiring into the actual duties and responsibilities

of such employees" does not risk impinging on the rights guaranteed by the

Religion Clauses.  *St. Xavier*, 365 at 569.  *See also Hanna Boys Center*, 284 NLRB

1080, 1083 (1987) (finding the "sensitive First Amendment issues surrounding the

assertion of jurisdiction over teachers" identified in *Catholic Bishop* did not apply

to child-care workers "clearly less involved" in "religious inculcation"), *enforced*

940 F.2d 1295 (9th Cir. 1991), *cert. denied* 504 U.S. 985 (1992).

Thus, it is not surprising that the cases relied on by the Union (Br. 28, n.6)

all have the same thing in common:  the petitioned-for unit of employees were not

teachers at religious schools.[6]  Of those cases, *Salvation Army of Massachusetts*

*Dorchester Day Care Center* presents the closest comparator to *Catholic Bishop*.

*Salvation Army of Mass. Dorchester Day Care Ctr.*, 763 F.2d at 1.  There, the First

---

[6] *Volunteers of Am., L.A. v. NLRB*, 777 F.2d 1386 (9th Cir. 1985) (employees at
alcohol detoxification center and resident recovery unit); *Volunteers of Am.-*
*Minnesota-Bar None Boys Ranch v. NLRB*, 752 F.2d 345 (8th Cir. 1985)
(maintenance, laundry, housekeeping, and child-care workers at a residential
treatment center); *NLRB v. Salvation Army of Mass. Dorchester Day Care Ctr.*,
763 F.2d 1 (1st Cir. 1985) (employees at day care centers); *Denver Post of the Nat.*
*Soc. of the Volunteers of Am. v. NLRB*, 732 F.2d 769 (10th Cir. 1984) (counselors
providing residential and out-patient social services), *overruled on other grounds*
*by Aramark Corp. v. NLRB*, 179 F.3d 872 (10th Cir. 1999).

Circuit agreed with the Board that its exercise of jurisdiction over teachers at a day care center did not present a significant risk to First Amendment rights and, therefore, *Catholic Bishop* did not apply. *Id.* at 4-7. The court found that the day care center provided "no religious instruction or activities for the children" and had "only an insignificant formal educational component." *Id.* at 2. Although the day care center "fulfill[ed] [the Salvation Army's] religious mission" of providing services to those in need, its function was nonetheless "primarily to provide care for the children, not education." *Id*. at 6. Those employees are thus unlike teachers at religious schools, who, as *Catholic Bishop* instructs, "no matter" what subject they teach, "may implicate the school's religious mission." *Duquesne Univ.*, 947 F.3d at 834 (citing *Catholic Bishop*, 440 U.S. at 501).

Both the Board and the courts have repeatedly relied on this distinction between educators and non-educators in determining whether the Board has properly asserted jurisdiction over employees of religiously-affiliated organizations.[7] When presented with employees who are teachers at religious educational institutions, the Board and the courts have consistently found that

---

[7] *See, e.g., Catholic Social Services*, 355 NLRB 929, 929 (2010) (residential child-care treatment specialists and aides); *Tressler Lutheran Home for Children v. NLRB*, 677 F.2d 302, 305 (3d Cir. 1982) (nurses, maintenance technicians, clerks, orderlies, and housekeeping and laundry employees); *NLRB v. World Evangelism, Inc.*, 656 F.2d 1349, 1353 (9th Cir. 1981) (engineers); *NLRB v. St. Louis Christian Home*, 663 F.2d 60, 64 (8th Cir. 1981) (child-care workers, maintenance workers, and storeroom clerks).

*Catholic Bishop* requires a different approach in order to avoid First Amendment concerns. The Union has not shown that *Bethany College*'s refusal to examine faculty's duties and responsibilities is inconsistent with this precedent.

**5. This Court cannot apply *Pacific Lutheran* in the first instance on appeal**

The Union urges that if the Court concludes that *Bethany College* provides the wrong jurisdictional test, then the Court should apply the *Pacific Lutheran* standard, find that the Board has jurisdiction over Saint Leo, and "direct the Board to issue appropriate remedies." The Union's arguments misread the Board's decision and lack legal support.

The Union misapprehends the Board's decision when it claims that "the Board has already determined that, should it have jurisdiction[,] the Respondent has violated the Act." (Br. 38.) The Board expressly stated that it did not pass on the administrative law judge's "alternative, contingent findings that, if jurisdiction were to exist . . . [Saint Leo] would have violated the Act as alleged in the complaint." (ROA 3626, n.8.) Thus, the Board did not find that Saint Leo's conduct was unlawful, and should the Court disagree with the Board's application of the *Bethany College* standard, the Court should remand the case to the Board for it to make any unfair labor practice findings. *See, e.g.*, *United Ass'n of Journeymen & Apprentices, Local 32 v. NLRB*, 912 F.2d 1108, 1109 (9th Cir. 1990) (declining union's request that court rule on administrative law judge's

unfair labor practice findings for which the Board "expressly declined" to pass).

*Accord S. Prairie Constr. Co. v. Local 627, Int'l Union of Operating Eng'rs*, 425

U.S. 800, 806 (1976) (appellate court erred in deciding "unit" question not passed

on by the Board).

The Union's further assertion that the Court can reject the *Bethany College*

framework, apply *Pacific Lutheran*, conclude that Saint Leo violated the Act, and

order appropriate relief, is contrary to well-settled precedent.  As this Court has

explained, courts cannot uphold administrative agency orders "unless the grounds

upon which the agency acted in exercising its powers were those upon which its

action can be sustained."  *Cowabunga, Inc. v. NLRB*, 893 F.3d 1286, 1289-90

(11th Cir. 2018) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943)); *see also*

*Northport Health Servs., Inc. v. NLRB*, 961 F.2d 1547, 1553 (11th Cir. 1992)

("This court may enforce the Board's order only on the basis of the reasoning

within that order.")  If the Court finds that the Board erred in adopting the *Bethany*

*College* test and applying it in this case, and that *Pacific Lutheran* is the more

appropriate jurisdictional test, then the Court should remand the case to the Board

to apply *Pacific Lutheran* in the first instance.[8]

---

[8] Indeed, even putting aside the jurisdiction question, other issues in this case show
why *Chenery* demands that the Court deny the Union's request.  When the
administrative law judge made their findings in this case, the Board's standard for
evaluating whether employer work rules were facially unlawful was outlined in

**CONCLUSION**

For the foregoing reasons, the Board respectfully requests that the Court

deny the Union's petition for review.

---

*Boeing Co.*, 365 NLRB 1494 (2017). However, when the Board issued its decision, *Stericycle, Inc*., 372 NLRB No. 113 (2023), had overruled *Boeing* and instituted a different standard. Accordingly, if the Court accepted Saint Leo's request, the Court would also need to determine whether Saint Leo's work rules violated Section 8(a)(1) under a test that neither the administrative law judge nor the Board applied here. Such a determination falls outside the Court's proper role under *Chenery*.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

| | |
|---|---|
| UNITED FACULTY OF SAINT LEO, NATIONAL EDUCATION ASSOCIATION FLORIDA EDUCATION, AMERICAN FEDERATION OF TEACHERS, AFL-CIO, | ) ) ) ) ) |
| Petitioner/Cross-Respondent | ) ) No. 24-13895 |
| v. | ) ) |
| NATIONAL LABOR RELATIONS BOARD | ) Board Case Nos. ) 12-CA-275612, *et al.* |
| Respondent/Cross-Petitioner | ) ) |
| And | ) ) |
| SAINT LEO UNIVERSITY, INC. | ) ) |
| Intervenor | ) |

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 27(d)(2), the Board certifies that the foregoing contains 10,493 words of proportionally-spaced, 14-point type, and the word processing system used was Microsoft Word 2016, and the PDF file submitted to the Court has been scanned for viruses using Microsoft Defender and is virus-free according to that program.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 13th day of May 2025

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

| | |
|---|---|
| UNITED FACULTY OF SAINT LEO, NATIONAL EDUCATION ASSOCIATION FLORIDA EDUCATION, AMERICAN FEDERATION OF TEACHERS, AFL-CIO, | ) ) ) ) ) |
| Petitioner/Cross-Respondent | ) ) No. 24-13895 |
| v. | ) ) |
| NATIONAL LABOR RELATIONS BOARD | ) Board Case Nos. ) 12-CA-275612, *et al.* |
| Respondent/Cross-Petitioner | ) ) |
| And | ) ) |
| SAINT LEO UNIVERSITY, INC. | ) ) |
| Intervenor | ) |

## CERTIFICATE OF SERVICE

I certify that on May 13, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. I further certify that I served this motion on all parties or their counsel of record through the CM/ECF system.

Respectfully submitted,

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 13th day of May 2025