No. 24-13895

# In the United States Court of Appeals for the Eleventh Circuit

UNITED FACULTY OF SAINT LEO, NATIONAL EDUCATION
ASSOCIATION FLORIDA EDUCATION, AMERICAN FEDERATION
OF TEACHERS, AFL-CIO,

*Petitioner,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent,*

SAINT LEO UNIVERSITY, INC.,

*Intervenor.*

On Petition for Review from the National Labor Relations Board,
Case Nos. 12-CA-275612, 12-CA-275617, 12-CA-275639,
12-CA-275640, 12-CA-275641, 12-CA-275642, 12-CA-1275644,
12-CA275645, and 12-CA-284360

## BRIEF OF INTERVENOR SAINT LEO UNIVERSITY

Scott T. Silverman
AKERMAN LLP
401 E. Jackson St.
 Suite 1700
Tampa, FL 33602

Amy Moor Gaylord
AKERMAN LLP
71 S. Wacker Dr.
 47th Floor
Chicago, IL 60606

Luke W. Goodrich
Eric C. Rassbach
Daniel L. Chen
Jordan T. Varberg
Benjamin A. Fleshman
THE BECKET FUND FOR
 RELIGIOUS LIBERTY
1919 Pennsylvania Ave, N.W.
 Suite 400
Washington, D.C. 20006
(202) 955-0095
lgoodrich@becketfund.org

*Counsel for Intervenor Saint Leo University*

Pursuant to Eleventh Circuit Rule 26.1, counsel for Intervenor hereby certifies that the following persons and entities have or may have an interest in the outcome of this case:

- Abruzzo, Jennifer A. (counsel for Respondent)
- Akerman, LLP (counsel for Intervenor)
- Annexy, Beatriz (counsel for Petitioner)
- Barclay, Steven (counsel for Respondent)
- Becket Fund for Religious Liberty (counsel for Intervenor)
- Burdick, Ruth E. (counsel for Respondent)
- Chen, Daniel L. (counsel for Intervenor)
- Cohen, David (counsel for Respondent)
- Cowen, William B. (Acting General Counsel, NLRB)
- Egan, Joseph, Jr. (counsel for Petitioner)
- Egan, Lev, & Siwica, P.A. (counsel for Petitioner)
- Fleshman, Benjamin A. (counsel for Intervenor)
- Gaylord, Amy Moor (counsel for Intervenor)
- Giannasi, Robert (Chief Administrative Law Judge, NLRB)
- Goodrich, Luke W. (counsel for Intervenor)
- Habenstreit, David (counsel for Respondent)
- Heaney, Elizabeth Ann (counsel for Respondent)
- Hill, Kelly (counsel for Intervenor)
- Isbell, Kellie (counsel for Respondent)
- Jason, Meredith (counsel for Respondent)

- Kaplan, Marvin E. (Chair, NLRB)
- Lev, Tobe (counsel for Petitioner)
- McFerran, Lauren M. (former Chair, NLRB)
- National Labor Relations Board (Respondent)
- Ohr, Peter Sung (counsel for Respondent)
- Parker, Heidi (counsel for Petitioner)
- Plympton, John W. (counsel for Respondent)
- Prouty, David M. (Board Member, NLRB)
- Rassbach, Eric C. (counsel for Intervenor)
- Saint Leo University, Inc. (Intervenor)
- Sandron, Ira (Administrative Law Judge, NLRB)
- Shelley, Staci Rhodes (counsel for Intervenor)
- Silverman, Scott T. (counsel for Intervenor)
- Siwica, Richard (counsel for Petitioner)
- Sykes, Molly G. (counsel for Respondent)
- United Faculty of Saint Leo, National Education Association Florida Education, American Federation of Teachers, AFL–CIO (Petitioner)
- Varberg, Jordan T. (counsel for Intervenor)
- Wilcox, Gwynne A. (former Board Member, NLRB)
- Zerby, Christopher (counsel for Respondent)

Pursuant to 11th Cir. R. 26.1-3(b), counsel certifies that no publicly traded corporation has an interest in this proceeding.

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Intervenor Saint Leo University, Inc. certifies that it is not publicly traded, that it does not have any parent corporations, and that as a nonprofit corporation it does not issue any stock.

Dated: May 13, 2025

Scott T. Silverman
AKERMAN LLP
401 E. Jackson St.
  Suite 1700
Tampa, FL 33602

Amy Moor Gaylord
AKERMAN LLP
71 S. Wacker Dr.
  47th Floor
Chicago, IL 60606

Respectfully submitted,

*/s/ Luke W. Goodrich*

Luke W. Goodrich
Eric C. Rassbach
Daniel L. Chen
Jordan T. Varberg
Benjamin A. Fleshman
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave, N.W.
  Suite 400
Washington, D.C. 20006
(202) 955-0095
lgoodrich@becketfund.org

*Counsel for Intervenor Saint Leo University*

**STATEMENT REGARDING ORAL ARGUMENT**

This case presents important questions about the Board's jurisdiction and religious freedom. Saint Leo therefore believes that oral argument would aid the Court in resolving this matter. Fed. R. App. P. 34.

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ....................................i

TABLE OF AUTHORITIES....................................................................iv

STATEMENT OF THE ISSUES.............................................................1

STATEMENT OF THE CASE ................................................................2

I. Introduction ....................................................................................2

II. Factual Background ........................................................................4

    A. Statutory Background.................................................................4

    B. The Board's Jurisdiction ...........................................................6

    C. Saint Leo University ..................................................................7

    D. Saint Leo's relationship with the Union.................................13

III. Proceedings Below ........................................................................14

IV. Standard of Review........................................................................16

SUMMARY OF ARGUMENT ..............................................................16

ARGUMENT .........................................................................................19

I. The Board correctly determined that it lacks jurisdiction. ...............19

    A. *Catholic Bishop* and its progeny limit the Board's
       jurisdiction over religious schools.................................................19

    B. The Board lacks jurisidiction under *Catholic Bishop*
       and *Great Falls*............................................................................26

    C. The Union has offered no grounds for departing from
       *Great Falls* and creating a circuit split.....................................29

II. Subjecting Saint Leo to the Board's jurisdiction would
   violate the Religion Clauses. ..............................................35

   A. Exercising Board jurisdiction would violate the
      church autonomy doctrine..............................................35

   B. Exercising Board jurisdiction would unconstitutionally
      entangle church and state..............................................40

   C. Exercising Board jurisdiction would violate the Free
      Exercise Clause under *Tandon* and *Fulton*...................45

III. Subjecting Saint Leo to the Board's jurisdiction would
    violate the Religious Freedom Restoration Act. ..............................50

CONCLUSION ..............................................53

CERTIFICATE OF COMPLIANCE..............................................54

CERTIFICATE OF SERVICE..............................................54

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Behrend v. San Francisco Zen Ctr., Inc.,*
    108 F.4th 765 (9th Cir. 2024) ............................................................ 32

*Bethany Coll.,*
    369 NLRB No. 98 (June 10, 2020) ............................................ *passim*

*Booth v. Pasco County,*
    757 F.3d 1198 (11th Cir. 2014) ........................................................ 16

*Bostock v. Clayton County,*
    590 U.S. 644 (2020) ........................................................................ 51

*Bryce v. Episcopal Church in Diocese of Colo.,*
    289 F.3d 648 (10th Cir. 2002) ..................................................... 36-37

*Carroll Coll., Inc. v. NLRB,*
    558 F.3d 568 (D.C. Cir. 2009) .................................................. *passim*

*Carson v. Makin,*
    596 U.S. 767 (2022) ........................................................................ 40

*Catholic Bishop of Chi. v. NLRB,*
    559 F.2d 1112 (7th Cir. 1977) .......................................................... 37

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ........................................................................ 49

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ........................................................................ 49

*Cont. Servs., Inc.,*
    202 NLRB 862 (1973) ..................................................................... 48

iv

*Corp. of Presiding Bishop v. Amos,*
    483 U.S. 327 (1987) ........................................................... 44-45

*Dean Witter Reynolds, Inc. v. Fernandez,*
    741 F.2d 355 (11th Cir. 1984) ........................................... 51

*Donawa v. U.S. Att'y Gen.,*
    735 F.3d 1275 (11th Cir. 2013) ......................................... 50

*Duquesne Univ. of Holy Spirit v. NLRB,*
    947 F.3d 824 (D.C. Cir. 2020) ................................... *passim*

*Duquesne Univ. of Holy Spirit v. NLRB,*
    975 F.3d 13 (D.C. Cir. 2020) .............................................. 35

*Eastex, Inc. v. NLRB,*
    437 U.S. 556 (1978) ............................................................. 5

*EEOC v. Catholic Univ. of Am.,*
    83 F.3d 455 (D.C. Cir. 1996) ............................................. 43

*Fellowship of Christian Athletes v. SJUSD,*
    82 F.4th 664 (9th Cir. 2023) ....................................... 46, 47

*Ford Motor Co. v. NLRB,*
    441 U.S. 488 (1979) ............................................................. 4

*Fowler v. Rhode Island,*
    345 U.S. 67 (1953) ............................................................. 44

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) ................................................... *passim*

*Gellington v. Christian Methodist Episcopal Church, Inc.,*
    203 F.3d 1299 (11th Cir. 2000) ......................................... 36

*Gonzales v. O Centro Espírita Beneficente União do Vegetal,*
    546 U.S. 418 (2006) ........................................................... 52

*Groff v. DeJoy*,
  600 U.S. 447 (2023) ................................................................ 41

*Hernandez v. CIR*,
  490 U.S. 680 (1989) ................................................................ 45

*Hi-Craft Clothing Co. v. NLRB*,
  660 F.2d 910 (3d Cir. 1981) ............................................... 33-34

*Hobby Lobby Stores, Inc. v. Sebelius*,
  723 F.3d 1114 (10th Cir. 2013) ............................................... 51

*Hosanna-Tabor Evangelical Lutheran Church
  & Sch. v. EEOC*,
  565 U.S. 171 (2012) ............................................................ 31-32

*Kedroff v. St. Nicholas Cathedral of Russian
  Orthodox Church in N. Am.*,
  344 U.S. 94 (1952) .............................................................. 35-36

*Korte v. Sebelius*,
  735 F.3d 654 (7th Cir. 2013) ................................................... 51

*Lemon v. Kurtzman*,
  403 U.S. 602 (1971) ................................................................ 41

*Little Sisters of the Poor Saints Peter &
  Paul Home v. Pennsylvania*,
  591 U.S. 657 (2020) ................................................................ 51

*Midrash Sephardi, Inc. v. Town of Surfside*,
  366 F.3d 1214 (11th Cir. 2004) ....................................... 46, 47, 52-53

*Mitchell v. Helms*,
  530 U.S. 793 (2000) ................................................................ 40

*New York v. Cathedral Acad.*,
434 U.S. 125 (1977) ............................................................... 44

*NLRB v. ArrMaz Prods. Inc.*,
123 F.4th 1295 (11th Cir. 2024) ....................................... 16

*NLRB v. Catholic Bishop of Chi.*,
440 U.S. 490 (1979) ................................................... *passim*

*NLRB v. Contemp. Cars, Inc.*,
667 F.3d 1364 (11th Cir. 2012) ......................................... 16

*NLRB v. Denver Bldg. & Constr. Trades Council*,
341 U.S. 675 (1951) ............................................................... 48

*NLRB v. Gissel Packing Co.*,
395 U.S. 575 (1969) ................................................................. 6

*NLRB v. Ins. Agents' Int'l Union*,
361 U.S. 477 (1960) ................................................................. 4

*NLRB v. Katz*,
369 U.S. 736 (1962) ................................................................. 4

*NLRB v. Washington Aluminum Co.*,
370 U.S. 9 (1962) ..................................................................... 5

*Nw. Univ.*,
362 NLRB 1350 (2015) ....................................................... 48

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
591 U.S. 732 (2020) ...................................................... 32, 36

*Pacific Lutheran Univ.*,
361 NLRB 1404 (2014) ............................................. *passim*

*Presbyterian Church in U.S. v. Mary Elizabeth*
    *Blue Hull Mem'l Presbyterian Church,*
    393 U.S. 440 (1969) ................................................................ 40

*Rayburn v. Gen. Conf. of Seventh-Day Adventists,*
    772 F.2d 1164 (4th Cir. 1985) ................................... 41, 45

*Serbian E. Orthodox Diocese for U.S. of Am.*
    *& Can. v. Milivojevich,*
    426 U.S. 696 (1976) .................................................. 36, 40

*State of Ga. Dep't of Med. Assistance v. Bowen,*
    846 F.2d 708 (11th Cir. 1988) ........................................ 34

*Sure-Tan, Inc. v. NLRB,*
    467 U.S. 883 (1984) ........................................................... 6

*Tandon v. Newsom,*
    593 U.S. 61 (2021) .................................................... 45, 46

*Temple Univ. Hosp., Inc. v. NLRB,*
    39 F.4th 743 (D.C. Cir. 2022) ................................... 48, 49

*Thai Meditation Ass'n of Ala., Inc. v. City of Mobile,*
    83 F.4th 922 (11th Cir. 2023) ................................... 46, 48

*Thomas v. Review Board,*
    450 U.S. 707 (1981) ....................................................... 40

*Tilton v. Richardson,*
    403 U.S. 672 (1971) ....................................................... 30

*Transit Connection, Inc. v. NLRB,*
    887 F.3d 1097 (11th Cir. 2018) ...................................... 16

*United Steelworkers of Am. v. Warrior &*
  *Gulf Navigation Co.,*
  363 U.S. 574 (1960) ........................................................... 5

*Univ. of Great Falls v. NLRB,*
  278 F.3d 1335 (D.C. Cir. 2002) ................................ *passim*

*Universidad Central de Bayamon v. NLRB,*
  793 F.2d 383 (1st Cir. 1985) .................................... *passim*

*Waldman v. Conway,*
  871 F.3d 1283 (11th Cir. 2017) ...................................... 50-51

*Walz v. Tax Comm'n,*
  397 U.S. 664 (1970) ......................................................... 41

*Ward v. Polite,*
  667 F.3d 727 (6th Cir. 2012) ......................................... 47

*Whole Woman's Health v. Smith,*
  896 F.3d 362 (5th Cir. 2018) .......................................... 40

*Widmar v. Vincent,*
  454 U.S. 263 (1981) ......................................................... 45

**Statutes**

29 U.S.C. § 151 ...................................................................... 4

29 U.S.C. § 152 ............................................................... 47, 49

29 U.S.C. § 153 ................................................................... 4, 5

29 U.S.C. § 157 ...................................................................... 4

29 U.S.C. § 158 ........................................................... 4, 5, 39

29 U.S.C. § 159 ................................................................... 4, 5

29 U.S.C. § 160 ........................................................... 5, 6, 16, 34

29 U.S.C. § 161 ................................................................... 5

29 U.S.C. § 164 ........................................................... 47, 49

42 U.S.C. § 2000bb-1 ......................................................... 52

42 U.S.C. § 2000bb-3 ......................................................... 51

**Regulations**

29 C.F.R. § 102.9 ................................................................. 6

29 C.F.R. § 102.10 ............................................................... 6

29 C.F.R. § 102.15 ............................................................... 6

29 C.F.R. § 102.46 ............................................................... 6

29 C.F.R. § 102.48 ............................................................... 6

29 C.F.R. § 103.1 ........................................................ 47-48, 49

29 C.F.R. § 103.2 ........................................................ 47-48, 49

29 C.F.R. § 103.3 ........................................................ 47-48, 49

**Other Authorities**

Catechism of the Catholic Church ........................................... 10

Saint Leo University, *Past Presidents* .................................... 12

United States Conference of Catholic Bishops,
    *Christian Initiation of Adults* ...................................... 10

United States Conference of Catholic Bishops,
    *What is Lent?* ....................................................... 11

## STATEMENT OF THE ISSUES

1. Whether the Board properly held that it lacks jurisdiction over Saint Leo University under *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979); *University of Great Falls v. NLRB*, 278 F.3d 1335 (D.C. Cir. 2002); and *Bethany College*, 369 NLRB No. 98 (June 10, 2020).

2. Whether subjecting Saint Leo University to the Board's jurisdiction would violate the First Amendment's Religion Clauses.

3. Whether subjecting Saint Leo University to the Board's jurisdiction would violate the Religious Freedom Restoration Act.

# STATEMENT OF THE CASE

## I.  Introduction

This case is about the proper separation of church and state. Over forty years ago, the Supreme Court recognized that forcing religious schools to bargain with their teachers under the National Labor Relations Act would intrude on church autonomy, create "entangling church-state relationships," and raise "serious First Amendment questions." *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 503-04 (1979). The Court therefore construed the Act to deny the National Labor Relations Board jurisdiction over teachers in religious schools. Ever since, federal courts have uniformly rejected attempts by the Board to assert jurisdiction over teachers in religious schools.

To determine which schools fall within the protection of *Catholic Bishop*, federal courts have adopted the three-part "*Great Falls* test." Under that test, the Board lacks jurisdiction over a religious school that (1) holds itself out to the public as a religious institution; (2) is non-profit; and (3) is religiously affiliated. *Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1343 (D.C. Cir. 2002).

Here, the Board correctly held that Saint Leo University—the oldest Catholic university in Florida—"clearly" satisfies the *Great Falls* test.

AR.3623.[1] Saint Leo "plainly holds itself out to students, faculty, and the community as providing a religious educational environment." AR.3624-25. It is non-profit. And it is obviously affiliated with the Benedictine Order and the Catholic Church. *Id.* The Board therefore properly declined jurisdiction over Saint Leo's relationship with its full-time faculty.

In this appeal, Petitioner United Faculty of Saint Leo doesn't seriously dispute that Saint Leo satisfies the *Great Falls* test. Instead, it asks this Court to adopt the so-called "*Pacific Lutheran* standard." Br. 24. That is a standard the Board employed briefly (from 2014-2020) until it was rejected by the D.C. Circuit as unconstitutionally "intrud[ing] into religious matters" and "entangling the government with the university's religious mission." *Duquesne Univ. of Holy Spirit v. NLRB*, 947 F.3d 824, 832, 834 (D.C. Cir. 2020). No federal court has ever adopted this standard. And this Court should not be the first. Indeed, doing so would create a split with the D.C. and First Circuits, sow chaos and confusion in labor relations nationwide, and trample on core First Amendment rights.

This Court should deny the Union's petition for review.

---

[1]    Record references in this brief are to the consecutively paginated Administrative Record on Appeal ("AR") filed with the Court on January 17, 2025. "Br." references are to the Union's opening brief.

## II. Factual Background

### A. Statutory Background

The National Labor Relations Act was enacted in 1935 to give additional legal protections to employees who organize into unions. 29 U.S.C. § 151 *et seq*. Employees who are covered by the NLRA have the right to form, join, or assist labor organizations, participate in collective bargaining, and engage in concerted activities to improve working conditions. 29 U.S.C. § 157.

The NLRA imposes a variety of legal obligations on covered employers. Most significantly, covered employers must bargain collectively with recognized unions about the terms and conditions of employment. *See* 29 U.S.C. §§ 158(a)(5), 159(a). The "mandatory subjects of bargaining" include not only obvious terms and conditions of employment, like wages and working hours, but also "nearly everything that goes on" in the workplace that could affect employees. *Catholic Bishop*, 440 U.S. at 503; *see* 29 U.S.C. § 158(d); *Ford Motor Co. v. NLRB*, 441 U.S. 488, 498 (1979) (must bargain over anything "germane to the working environment" (quotation marks omitted)). On all these matters, employers must negotiate with the union in good faith—that is, with an authentic desire to reach agreement. *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 488 (1960). And employers cannot alter any terms or conditions of employment without first bargaining about them with the union. *NLRB v. Katz*, 369 U.S. 736, 743 (1962).

Covered employers are also forbidden from interfering with employees who engage in concerted action to change their working conditions. 29 U.S.C. § 158(a)(1). For example, employers cannot discipline employees who act in concert to try to change employment-related policies and practices. *See NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 15-17 (1962). Nor can they interfere with employees who use political means to advocate for changes in working conditions. *See Eastex, Inc. v. NLRB*, 437 U.S. 556, 565-66 (1978).

Congress created the National Labor Relations Board to enforce the NLRA. The Board is composed of five members appointed by the President and confirmed by the Senate. 29 U.S.C. § 153(a). The Board is tasked with overseeing and enforcing the NLRA's provisions, including conducting elections for union representation and investigating unfair labor practices. 29 U.S.C. §§ 153, 159, 160. In carrying out these responsibilities, the Board has the authority to issue complaints, conduct hearings, compel the production of evidence, subpoena and examine witnesses, and make findings. 29 U.S.C. § 159(c), 160(b)-(c), 161.

Employers who violate the NLRA are subject to legal penalties, which employees and their representatives can initiate in several ways. If a collective bargaining agreement provides for arbitration, they may file internal grievances and demand arbitration. *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578 (1960). They may also file unfair labor practice charges with the Board, which can result

in a formal complaint issued by the Board and a hearing before an administrative law judge. 29 U.S.C. § 160(b); 29 C.F.R. §§ 102.9, 102.10, 102.15. Appeals of the ALJ's decision may be made to the Board and, eventually, to a federal court of appeals. 29 U.S.C. § 160(e), (f); 29 C.F.R. §§ 102.46, 102.48.

Penalties for noncompliance with the NLRA can include specific orders for employers to take certain actions, such as bargaining in good faith or ceasing and desisting from specific actions like maintaining particular employment policies. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 610-12 (1969); *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 898 (1984); 29 U.S.C. § 160(c). The Board can also order back pay and reinstatement for employees, among other remedies. 29 U.S.C. § 160(c).

## B. The Board's Jurisdiction

Given the Board's broad powers to intrude into the internal management of covered employers, the federal judiciary has issued several rulings recognizing constitutional limits on the Board's jurisdiction, particularly in cases involving religious secondary schools, colleges, and universities. In *NLRB v. Catholic Bishop*, the Supreme Court rejected the Board's attempt to assert jurisdiction over teachers at Catholic high schools. 440 U.S. 490 (1979). The Court explained that Board jurisdiction would raise "serious First Amendment questions" because the "religious character of … church-related schools gives rise to entangling church-

state relationships." *Id.* at 503-04. Collective bargaining over "nearly everything that goes on" in a religious school, the Court held, could lead to a "process of inquiry" that would "impinge on rights guaranteed by the Religion Clauses." *Id.* at 502-03.

Following *Catholic Bishop*, the First Circuit in *Universidad Central de Bayamon v. NLRB*, 793 F.2d 383 (1st Cir. 1985) (en banc), and the D.C. Circuit in a trio of decisions, *infra*, also rejected the Board's attempts to exercise jurisdiction over faculty at religious universities. Relying on *Catholic Bishop* and *Bayamon*, the D.C. Circuit adopted the three-part *Great Falls* test for determining when the Board lacks jurisdiction over a religious school. Specifically, it held that the Board lacks jurisdiction when a religious school: (1) holds itself out to the public as a religious institution; (2) is non-profit; and (3) is religiously affiliated. *Great Falls*, 278 F.3d at 1347.

The Board has formally adopted the *Great Falls* test as accurately interpreting *Catholic Bishop* and correctly delineating the boundaries of the Board's jurisdiction over teachers in religious schools. *Bethany Coll.*, 369 NLRB No. 98 (June 10, 2020); *see also* AR.3623 n.2 (declining to overrule *Bethany College*).

### C. Saint Leo University

Founded in 1889 by Benedictine monks, Saint Leo University is the oldest Catholic university in Florida. AR.920:23-921:7; 1811-13. The University was established in tandem with Saint Leo Abbey, a Benedictine

monastery and church that remains active at the center of campus to this day. *See* AR.2519, 2027. To show reverence for the Abbey Church as the house of God, no building on campus can be higher than the Abbey Church. AR.949:4-10. Both the Abbey and the University were named for Abbott-Bishop Leo Haid (their primary founder), for Pope Saint Leo the Great, and for Pope Leo XIII (who reigned when the college was founded). AR.2519.

For over 130 years, Saint Leo University has proudly remained "rooted in the Catholic faith and in the spirit of [its] Benedictine founders." AR.1818. Emblems of the University's faith appear prominently across campus. Catholic symbols and art—including crucifixes, Benedictine crosses, a statue of the Blessed Mother, and a stained-glass window depicting Saint Francis of Assisi, among other items—can be found throughout the grounds, classrooms, and other buildings. *See* AR.926:17-928:12; *see also* AR.2529 (describing the Saint Leo Abbey Grotto). Multiple buildings are named for Catholic saints. AR.927:9-11. And both Saint Leo Abbey and the smaller Saint Jude Chapel host Mass and prayer for members of the Saint Leo community. AR.927:4-7.

As a Catholic university, Saint Leo "supports what *Ex Corde Ecclesiae* terms the four essential characteristics of a Catholic University: Christian inspiration, faith reflection, fidelity to the Christian Message, [and]

service to church and humanity." AR.1818.[2] Saint Leo's Catholic identity is rooted in both Catholic social teaching, which affirms "the dignity of all human beings and demands social and economic justice for all," and "the Catholic Intellectual Tradition, which celebrates the compatibility of faith and reason." *Id.*; *see also* AR.1010:8-1011:3.

Saint Leo is also committed to six core values drawn from the 1,500-year-old Benedictine tradition: excellence, community, integrity, respect, personal development, and responsible stewardship. AR.116:25-117:6; 1818, 1938. These core values are woven throughout Saint Leo. They are displayed prominently on the walls of the University, including in the student residence hall and educational buildings, AR.255:2-258:13; infused into the content of each course, *see* AR.1582 (every syllabus is "[r]equired" to identify the "Core value(s) to be covered in this class that connects to the course content"); and integrated into other University programming. *See, e.g.*, AR.2539, 2017.

Consistent with its mission and the Catholic educational tradition, Saint Leo welcomes "learners of all faiths, and those with no religious affiliation." AR.1852; *see also* AR.952:19-953:17. It provides all its community members, whether Catholic or not, numerous opportunities to

---

[2]    *Ex Corde Ecclesiae* is an "apostolic constitution"—the most solemn form of legislation issued by the Pope to pronounce central Church teachings—and was promulgated by Pope Saint John Paul II in 1990 to guide Catholic higher education. *See* AR.574:11-22.

study and live the Catholic faith. For example, new student orientation includes multiple chances to attend Mass and other faith-focused events. *See* AR.2017-26. Throughout the year, students are invited to participate in faith-based student organizations, such as Voice of Christ (choir and band), Imago Dei (a pro-life group), and a Peer Ministry, in which students are selected and trained to serve as spiritual partners for their campus peers. AR.1852, 1981. The campus ministry offers regular Mass and confession, Eucharistic adoration,[3] men's and women's groups, service opportunities, and the Rite of Christian Initiation for Adults.[4] *See* AR.853:14-855:16, 1942, 1979-81.

Saint Leo lives out its Catholic faith in other ways, too. Campus events and meetings open with prayer. *See* AR.865:17-866:5, 867:14-868:13, 869:21-871:2, 953:22-956:25, 1700. Some faculty begin their classes with prayer. AR.949:11-951:13. Students are required to take at least two religion courses to earn their degree. AR.570:2-16. And Saint Leo adjusts class schedules to accommodate special university-wide Masses—such as

---

[3]   Eucharistic adoration is an ancient Catholic devotion during which the Eucharistic host, the Blessed Sacrament, is exposed, and worshipers may spend time praying and reflecting in the presence of Jesus Christ. *See* Catechism of the Catholic Church §§ 1378-79.

[4]   The Rite of Christian Initiation for Adults is the process through which non-baptized men and women enter the Catholic Church. It includes several stages marked by serious study, prayer, and rites at Mass. *See* AR.1981; United States Conference of Catholic Bishops, *Christian Initiation of Adults*, https://perma.cc/MYJ4-HBGZ.

the Mass of the Holy Spirit or the Feast of Saint Leo—and helps students and faculty observe Lent,[5] Christmas, and other significant religious occasions. AR.856:10-858:19, 929:10-19, 964:19-966:6. The university-wide Masses are held in the Abbey Church with an average of 200 students attending in person and many more viewing online. AR.858:12-860:4.

Saint Leo also communicates its Catholic identity publicly. Its Catholic Identity Statement, Core Values, religious history, and religious events are prominently displayed on the University website and in the undergraduate catalogue. AR.1818-20, 1831-49, 1954-57, 2002-05. Saint Leo's website highlights its Catholic Promise Scholarship, which is available only to Catholic students. AR.1822-24. Saint Leo's promotional videos and other materials are "replete with repeated references to the University's identity as Catholic/Benedictine." AR.3629, *see also, e.g.*, AR.2048, 2069. Its social media frequently features posts highlighting campus ministries and religious activities. *See* AR.2665-74. And it is a member of both the Association of Catholic Colleges and the Association of Benedictine Colleges and Universities. AR.11:23-12:3, 919:17-21.

Saint Leo's leadership further reflects its Catholic identity. Until the 1960s, Saint Leo Abbey controlled the University. AR.1027:4-11. When

---

[5]  Lent is a 40-day period of prayer, fasting, and almsgiving to prepare to celebrate the resurrection of Jesus Christ at Easter. United States Conference of Catholic Bishops, *What is Lent?*, https://perma.cc/7NCY-NCRS.

the University established its own board of trustees, it continued its affiliation with Saint Leo Abbey and with the Holy Name Monastery, a Benedictine convent associated with the Abbey. The University's bylaws require one member of the Abbey—typically the Abbot—and one member of the Monastery—typically the Prioress—to serve as members of the board of trustees. AR.2093. The Bishop of the Diocese of St. Petersburg also typically serves as a member of the board. AR.922:4-10. And the president of the University has always been Catholic—most often a priest or monk within the Order of Saint Benedict. AR.955:3-23, 1022:2-23; *see also* Saint Leo University, *Past Presidents*, https://perma.cc/B76K-YX2P. At President Senese's inauguration, for example, he took the Catholic Oath of Fidelity and gave the Catholic Profession of Faith. *See* AR.347:11-17, 1815-17. In doing so, he publicly affirmed his commitment both to the teachings of the Catholic Church and to exercising his office in light of the Catholic faith. *See* AR.540:17-541:5.

While Saint Leo does not require all faculty to be Catholic, it does require "that all Faculty members recognize, understand, and support the institution's mission, which is established through Roman Catholic Doctrine." AR.3141. This means that, while faculty have significant academic freedom in discussing their subjects, they cannot "serve as advocates for positions that are contrary to the teachings of the Catholic Church outside of their disciplinary and educational boundaries." AR.3142. Rather,

faculty are expected to integrate Saint Leo's core values into their curricula, AR.1582, serve both the University and the broader community, AR.1874, and support Saint Leo's religious mission, AR.3141.

### D. Saint Leo's relationship with the Union

The United Faculty of Saint Leo ("Union") was first certified as the collective-bargaining representative for Saint Leo's full-time faculty and librarians in 1976, AR.1704, and entered into several successive collective bargaining agreements until 2016. *See* AR.125:2-126:13. After that agreement expired, Saint Leo and the Union met many times for negotiations, but were unable to reach a new agreement. AR.3628.

On October 23, 2020, Saint Leo's Board of Trustees passed a resolution withdrawing recognition of the Union. AR.1443. Saint Leo explained that it made this decision to "help strengthen the university's commitment to its Benedictine Catholic identity, as well as to bolster the university's ability to innovate and act with agility." AR.2436; *see also* AR.1718 ("In keeping with our Benedictine Catholic identity, the board made this decision in the spirit of helping the university maintain our strong values-based community, innovate, and be more agile in the fast-moving world of higher education."). "Most importantly" for Saint Leo, the change would "help foster a stronger sense of community and unity amongst all Saint Leo University employees, helping to further strengthen [its] core values and Catholic identity." AR.1449.

In place of the collective bargaining agreement, Saint Leo established a new shared governance model with faculty. *See* AR.1718, 2436. This included creating a new faculty handbook that, with input from the faculty, modified some of the terms and conditions of employment. *See* AR.8:6-9, 1317-18. Saint Leo also created a new faculty senate, which would give faculty and staff new opportunities to be involved in decisions about academic standards, working conditions, compensation, benefits, and strategic planning. AR.1043:22-1045:14, 2436.

## III. Proceedings Below

On April 14, 2021, the Union filed charges with the Board, alleging that the withdrawal of the Union's recognition and changes to the terms of faculty employment violated the NLRA. *See* AR.1270-82. In response, Saint Leo argued that the Board lacked jurisdiction because Saint Leo is a religious institution under the three-part test adopted by the D.C. Circuit in *Great Falls* and by the Board in *Bethany College. See* AR.1325.[6]

On February 23, 2023, after conducting a hearing, the Administrative Law Judge agreed with Saint Leo. AR.3626-35. First, the ALJ found that Saint Leo is a nonprofit, which is undisputed. AR.3627. Second, the ALJ found that Saint Leo is religiously affiliated, as evidenced by the school's Benedictine ties; its Catholic identity statement; its statement of core

---

[6] Saint Leo also argued that its faculty are exempt from the NLRA because they are managerial employees. But because the Board did not reach that issue in its decision, it is not part of this appeal.

values; the significant presence of religion on campus; and the presence of religion in its public-facing website, social media, and promotional materials. AR.3628-29. Finally, based on many of the same facts, the ALJ concluded that Saint Leo "in many and highly visible ways, both on campus and online, regularly holds itself out to the public and to students as a religious institution guided by Catholic principles." AR.3631. Because Saint Leo satisfied all three parts of the *Great Falls* test, the ALJ concluded that Saint Leo "is exempt from the Board's jurisdiction as a religious institution." AR.3632.

On review, the Board unanimously agreed. AR.3623-26. The Board concluded that Saint Leo "plainly holds itself out to students, faculty, and the community as providing a religious educational environment." AR.3624-25. Among other things, the Board cited Saint Leo's Catholic identity statement, which publicly "describes the University as being a religious institution of higher learning in present-day terms, not merely having a connection with Catholicism as a vestige of its founding"; its "mission statement," which "applies to all of [its] employees"; the "numerous" "University Ministry programs"; the "numerous Catholic religious services and projects that take place on campus"; and the "substantial" "religious messaging" on its "website and marketing materials." *Id.* The Board further noted that the second and third elements of the *Great Falls* test—non-profit status and religious affiliation—were "no[t] dispute[d]"

and "effectively concede[d]." AR.3625. Accordingly, the Board concluded that it lacked jurisdiction and dismissed the complaint. AR.3626 & n.8.

The Union then petitioned this Court for review. ECF 1-2.

## IV. Standard of Review

This Court reviews "the Board's legal conclusions *de novo* and its factual findings for substantial evidence on the record as a whole." *NLRB v. ArrMaz Prods. Inc.*, 123 F.4th 1295, 1302 (11th Cir. 2024); *see also* 29 U.S.C. § 160(e). The "deferential standard" for factual determinations requires the Court to "accept the NLRB's factual findings … unless they are inherently unreasonable or self-contradictory." *Transit Connection, Inc. v. NLRB*, 887 F.3d 1097, 1102 (11th Cir. 2018) (internal quotation marks omitted). "Provided any inferences drawn from the record were plausible, this Court may not overturn the Board's determination even if it would make a different finding under a *de novo* review." *NLRB v. Contemp. Cars, Inc.*, 667 F.3d 1364, 1370 (11th Cir. 2012). This Court reviews "findings of 'constitutional facts,' as distinguished from ordinary historical facts" *de novo. Booth v. Pasco County*, 757 F.3d 1198, 1210 (11th Cir. 2014).

SUMMARY OF ARGUMENT

The Board cannot exercise jurisdiction over Saint Leo for multiple, independent reasons:

**I.** The Board correctly found that it lacks jurisdiction over Saint Leo under *Catholic Bishop* and *Great Falls*. In *Catholic Bishop*, the Supreme

Court held that the Board lacks jurisdiction over teachers in religious schools because requiring collective bargaining in that context "gives rise to entangling church-state relationships of the kind the Religion Clauses sought to avoid." And in *Great Falls*, the D.C. Circuit applied *Catholic Bishop* to hold that the Board must decline jurisdiction over a religious university that (1) holds itself out to the public as a religious institution, (2) is non-profit; and (3) is religiously affiliated. The Board correctly determined that Saint Leo meets all these requirements and is exempt from Board jurisdiction, and the Union offers no compelling reason to depart from that conclusion—or to split from the D.C. and First Circuits over the meaning of *Catholic Bishop*.

**II.** Even if *Catholic Bishop* did not govern this case, imposing Board jurisdiction here would violate the First Amendment in three independent respects.

**A.** First, subjecting Saint Leo to the Board's jurisdiction would violate the church autonomy doctrine, which guarantees religious institutions independence in matters of faith, doctrine, and internal governance. Here, requiring mandatory collective bargaining would force Saint Leo to compromise its religious mission and relocate authority over internal religious matters from Saint Leo to the Board and the Union.

**B.** Second, exercising Board jurisdiction would violate both Religion Clauses by unconstitutionally entangling church and state. Exercising jurisdiction would create substantive entanglement, requiring the Board

to question and make decisions about Saint Leo's Catholic religious beliefs, Benedictine values, and how it puts those values into practice. And it would also lead to procedural entanglement, both through interrogating the content of Saint Leo's religious beliefs and through pervasive monitoring of Saint Leo's operations.

**C.** Third, exercising Board jurisdiction would violate the Free Exercise Clause. The NLRA provides many categorical and individualized exemptions, under which millions of American employers are exempted from the NLRA's requirements. And the Board maintains significant discretion as to whether to enforce the NLRA—discretion that is essentially unreviewable by courts. That means the NLRA is not generally applicable under the Free Exercise Clause and is subject to strict scrutiny, which it fails.

**III.** Finally, subjecting Saint Leo to Board jurisdiction would violate the Religious Freedom Restoration Act. Saint Leo exercises religion by forming a religious educational community, including by selecting, employing, and creating a religious work environment for its teachers. Subjecting those decisions to the Board's jurisdiction would interfere with Saint Leo's ability to carry out its mission, substantially burdening its religious exercise and triggering strict scrutiny, which the NLRA fails.

## ARGUMENT

## I.  The Board correctly determined that it lacks jurisdiction.

The Board correctly determined that it lacks jurisdiction over Saint Leo under Supreme Court, circuit court, and Board precedent. In response, the Union doesn't seriously dispute that the Board correctly applied current precedent. *Cf.* Br. 37. Instead, it asks this Court to order the Board to "return" to the "*Pacific Lutheran* standard," Br. 24—a discredited standard rejected by both the Board and the D.C. Circuit. But the Union has offered no reason why this Court should reject the Board's ruling and create a circuit split. Nor should it. The Board correctly followed controlling precedent.

### A.  *Catholic Bishop* and its progeny limit the Board's jurisdiction over religious schools.

To understand the drastic nature of the Union's request, it is important to understand the historical back-and-forth between the Board and the federal judiciary regarding the Board's jurisdiction over religious schools. On five separate occasions, over the course of five decades, the Supreme Court and courts of appeals have rejected the Board's attempts to assert jurisdiction over religious schools. The resulting body of precedent illuminates why the Board lacks jurisdiction here.

***Catholic Bishop* (1979).** The leading Supreme Court case is *Catholic Bishop*. There, the Board ordered several Catholic high schools to bargain

collectively with their "lay teachers"—a bargaining unit defined to include non-ordained teachers of secular subjects, like "physical education," and to exclude "religious faculty" and administrators. *Catholic Bishop*, 440 U.S. at 493 n.5.

The Supreme Court rejected the Board's exercise of jurisdiction over teachers in religious schools because that would "present[] a significant risk that the First Amendment will be infringed." *Id.* at 502. As the Court explained, "[t]he substantial religious character of these church-related schools gives rise to entangling church-state relationships of the kind the Religion Clauses sought to avoid." *Id.* at 503. In particular, "nearly everything that goes on in the schools" would arguably be a "condition of employment" and thus subject to "mandatory bargaining." *Id.* This "necessarily represents an encroachment upon the former autonomous position" of the religious leadership of the school, opening the door to "conflicts between clergy-administrators and the Board." *Id.*

Beyond that, if a religious school is charged with an unfair labor practice, and "respond[s] that their challenged actions were mandated by their religious creeds," that would "necessarily involve [the Board in] inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission." *Id.* at 502. In such a case, the "very process of inquiry leading to findings and conclusions"—not to mention the Board's conclusions themselves—"may impinge on rights guaranteed by the Religion Clauses." *Id.* To avoid these

"serious First Amendment questions," the Court construed the Act to deny the Board jurisdiction over "teachers in church-operated schools." *Id.* at 504.

**Bayamon (1985).** Shortly after *Catholic Bishop*, the Board tried to assert jurisdiction over religious colleges and universities, claiming that *Catholic Bishop* was limited to K-12 schools. The First Circuit, however, refused to enforce the Board's orders.[7] Writing for half of the en banc court, then-Judge Breyer explained why *Catholic Bishop* applies not only to K-12 schools but also to religious colleges. First, "the language of *Catholic Bishop* itself does not distinguish colleges from primary and secondary schools." *Bayamon*, 793 F.2d at 401. Second, "the 'state/religion entanglement' problems" identified in *Catholic Bishop* are present at the university level "in full force"; if anything, "a university's secular mission may lead to more frequent, or more complex 'unfair labor charges,' requiring the Board to evaluate an allegedly religious motive." *Id.* at 401-02. Finally, refusing to apply *Catholic Bishop* to religious colleges would "undercut [*Catholic Bishop*'s] basic rationale and purpose"—which was to reduce the Board's "entanglement" in "religious affairs," and reduce "state interference through regulation." *Id.* at 402-03.

**Great Falls (2002).** Seventeen years after *Bayamon*, the Board tried again—attempting to assert jurisdiction over teachers in schools that the

---

[7]    Enforcement of the Board's orders requires a majority vote by a court of appeals; the en banc First Circuit, however, was evenly divided.

Board determined lacked a "substantial religious character." *Great Falls*, 278 F.3d at 1339. To make this determination, the Board said it would "consider, on a case-by-case basis, all aspects of a religious school's organization and function that [it deems] relevant"—including things like the "primary purpose" of the religious school, the "role of [teachers] in effectuating that purpose," and "the degree to which the school has a religious mission." *Id.* at 1339-1340 (emphasis omitted). Based on that approach, the Board determined that a Catholic university did not qualify for an exemption under *Catholic Bishop* and ordered it to bargain collectively with its faculty.

The D.C. Circuit unanimously rejected the Board's "substantial religious character" test. That test, the court explained, "creates the same constitutional concerns that led to the Supreme Court's decision in *Catholic Bishop*"—namely, "intrud[ing] upon the free exercise of religion" and entangling the Board in "intrusive inquiries into religious beliefs." *Id.* at 1341-44. The Board's inquiry essentially "boils down to 'is [the school] *sufficiently* religious?'"—which "would itself raise First Amendment concerns" by "discriminating between kinds of religious schools." *Id.* at 1342-43.

In place of the Board's intrusive test, the D.C. Circuit adopted what is now known as the *Great Falls* test, which is drawn from *Catholic Bishop* and then-Judge Breyer's controlling opinion in *Bayamon*: "in determining whether an institution is exempt from the NLRA under *Catholic*

*Bishop*, the Board should consider whether the institution (a) holds itself out to the public as a religious institution; (b) is non-profit; and (c) is religiously affiliated." *Id.* at 1347. "If so, then the Board must decline to exercise jurisdiction." *Id.*

The first prong of this test, which requires "public identification" as a religious institution, "comes at a cost," because it will "dissuade" at least "some students and faculty" who do not wish to be part of a religious institution. *Id.* at 1344. This serves as a "market check" on false claims to the *Catholic Bishop* exemption and "helps to ensure that only *bona fide* religious institutions are exempted." *Id.* The second prong, which requires non-profit status, "is consistent with the emphasis in *Catholic Bishop*" and other Supreme Court cases "on the distinction between non-profit institutions and profit-making businesses that may be owned by or affiliated with religious institutions." *Id.* And the third element, which requires that a school be "religiously affiliated," is taken directly from *Catholic Bishop*. *Id.* at 1344-45 (quoting *Catholic Bishop*).

These elements provide a "bright-line test" that allows the Board to "determine whether it has jurisdiction without delving into matters of religious doctrine or motive, and without coercing an educational institution into altering its religious mission to meet regulatory demands." *Id.* at 1345. The test also "provides reasonable assurance that the *Catholic Bishop* exemption will not be abused." *Id.*

***Carroll College* (2009).** After *Great Falls*, the Board issued several decisions assuming that the *Great Falls* test was controlling. *See Duquesne*, 947 F.3d at 831 (collecting examples). But when the Board returned to its "substantial religious character test" a few years later, the D.C. Circuit again unanimously rejected it, concluding that the Board "should have known immediately" that the religious college at issue was "patently beyond the NLRB's jurisdiction." *Carroll Coll., Inc. v. NLRB*, 558 F.3d 568, 574 (D.C. Cir. 2009).

***Duquesne* (2020).** Finally, in 2014, Board created another intrusive test for exercising jurisdiction over religious schools—the "*Pacific Lutheran*" test. Under this test, a school must first show, as in *Great Falls*, that it "holds itself out as providing a religious educational environment," *Pacific Lutheran Univ.*, 361 NLRB 1404, 1414 (2014). But beyond that, the school must also show that "it holds out the petitioned-for faculty members themselves as performing a specific role in creating or maintaining the college or university's religious educational environment, as demonstrated by its representations to current or potential students and faculty members, and the community at large." *Id.* Two Board members dissented, arguing that the new test "not only fails to avoid the First Amendment questions, it plows right into them at full tilt," and urging the Board to "simply embrace and apply the three-part test articulated by the D.C. Circuit in [*Great Falls*]." *Id.* at 1433-34 (Member Johnson, dissenting); *id.* at 1429 (Member Miscimarra, dissenting in part). After

the Board issued its ruling in *Pacific Lutheran*, the union withdrew its petition, insulating the Board's decision from judicial review. Withdrawal of Petition, *Pacific Lutheran Univ. & SEIU, Local 925,* No. 19-RC-102521 (NLRB Jan. 15, 2015).

When the *Pacific Lutheran* rule eventually came before the courts in another case, the D.C. Circuit rejected it, concluding that the Board's *Pacific Lutheran* test "impermissibly intrudes into religious matters." *Duquesne*, 947 F.3d at 834. First, the test "compels the Board (and federal courts)" to "'troll[] through the beliefs of the University'" to "mak[e] determinations" about a school's "religious mission" and about the "centrality" of certain teachers "to that mission." *Id.* at 830, 836-37. Second, "regardless of the roles played by the teachers involved in a case," allowing the Board to exercise jurisdiction would make "nearly everything that goes on in the school" a subject of "Board-mandated bargaining," "entangling the government with the university's religious mission." *Id.* at 834 (quoting *Bayamon*, 793 F.2d at 402-03 (op. of Breyer, J.)). Thus, the court reiterated that "[t]his case begins and ends" with *Great Falls*—which "followed directly from *Catholic Bishop*." *Id.* at 832, 834.

**Bethany College (2020).** Having been rebuffed by the federal judiciary five times—in *Catholic Bishop*, *Bayamon*, *Great Falls*, *Carroll College*, and *Duquesne*—the Board finally acquiesced in *Bethany College*, 369 NLRB No. 98 (June 10, 2020). There, the Board unanimously held that "*Pacific Lutheran* must be overruled" as "fatally flawed" and "inherently

inconsistent with the binding rationale of the Supreme Court in *Catholic Bishop*." *Id.* at 4-5. Instead, the Board said, "[i]t is clear to us that the [D.C. Circuit's] *Great Falls* decision correctly interpreted the Supreme Court's holding in [*Catholic Bishop*]." *Id.* at 1. Accordingly, the Board adopted "the D.C. Circuit's three-pronged standard announced in *Great Falls*." *Id.*

## B. The Board lacks jurisdiction under *Catholic Bishop* and *Great Falls*.

Here, the Board correctly determined that Saint Leo "[c]learly" satisfies the *Great Falls* test. AR.3623. Saint Leo meets the first prong of the test because it holds itself out to the public "as providing a religious educational environment." *Great Falls*, 278 F.3d at 1343. To assess this prong of the test, the D.C. Circuit has examined a school's representations in "its course catalogue, mission statement, student bulletin, and other public documents," *Great Falls*, 278 F.3d at 1345; its religious statement of purpose, *see Carroll Coll.*, 558 F.3d at 572-73; and whether it "provid[es] regular … religious services on campus, and encourag[es] students to participate in religious study groups, lectures, and projects." *Duquesne*, 947 F.3d at 833.

Considering these same characteristics, the Board here identified ample, "undisputed evidence" that Saint Leo "clearly" and "regularly" "holds itself out to the public and students as a religious institution." AR.3623-24. Saint Leo's "Catholic identity statement," which appears on its public

website and in its undergraduate catalog, describes Saint Leo as "a community rooted in the Catholic faith" and committed to "the four essential characteristics of a Catholic University" as set forth in *Ex Corde Ecclesiae*. AR.3624; *see also* AR.2004. Those characteristics, drawn from Catholic social teaching and the Catholic intellectual tradition, are "Christian inspiration," "Faith reflection," "Fidelity to the Christian message," and "Service to church and humanity." AR.1818.

Saint Leo's mission statement, which appears both on Saint Leo's public website and in its Policy Manual, further identifies Saint Leo as a "Catholic, liberal arts-based university serving people of all faiths. Rooted in the 1,500-year-old Benedictine tradition, Saint Leo seeks balanced growth in mind, body and spirit for all members of its community." AR.2804; AR.1938. And Saint Leo's core values—which appear in its governing documents, *see* AR.2804-05, undergraduate catalog, *see* AR.2002-04, and public website, *see, e.g.*, AR.1818—clearly identify the University's educational environment and approach as being built "on our Benedictine foundation" and "[a]nimated in the spirit of Jesus Christ." AR.1818; AR.2804.

While these public-facing statements alone satisfy the first prong, *see, e.g.*, *Carroll Coll.*, 558 F.3d at 572-73 (looking to similar "objective indicia" in Carroll College's governing documents, mission statement, and "Statement of Christian Purpose"), the Board correctly recognized that Saint Leo further satisfies this element because it encourages students

to participate in "numerous Catholic religious services and projects." AR.3624. These include regular Masses, confession, Eucharistic adoration, men's and women's groups to study Catholic doctrine, service opportunities, and the Rite of Christian Initiation for Adults for students who want to become Catholic. AR.853:14-855:16, 1942, 1979-81.

On certain Catholic feast days, such as the Special Mass of the Holy Spirit and the Feast of Saint Leo, the University holds university-wide masses for the community and adjusts class schedules so that students and faculty can participate. AR.856:10-858:19. Saint Leo also adjusts the foods offered in the dining hall during Lent to facilitate observance of that holy season. AR.964:19-965:13. And during Dr. Senese's inauguration as president of the University, he publicly took the Catholic Oath of Fidelity and gave the Catholic Profession of Faith. AR.347:11-17, 1815-17. All this is more than enough to show that Saint Leo holds itself out as a religious institution. *See, e.g.*, *Duquesne*, 947 F.3d at 833 ("Duquesne holds itself out as providing a religious educational environment by publicly identifying itself as a Catholic institution guided by Catholic principles, providing regular Catholic religious services on campus, and encouraging students to participate in religious study groups, lectures, and projects.").

The Board also correctly concluded that the second and third elements of the *Great Falls* test are undisputed and conceded here. Saint Leo is a 501(c)(3) nonprofit, as all parties admit. AR.11:15-18. And Saint Leo is

affiliated with the Catholic Church and the Benedictine Order, as was "effectively concede[d]" below, AR.3625, and the Union does not contest on appeal. Even if it had, the Board correctly determined that Saint Leo is religiously affiliated. *See* AR.3625-26. Saint Leo was founded by Benedictine monks, currently requires members of the Saint Leo Abbey and Holy Name Monastery to serve on its board, and is a member of both the Association of Catholic Colleges and Universities and the Association of Benedictine Colleges and Universities. AR.3625; *see also* AR.11:23-12:3, 919:17-21, 920:23-921:7, 2093. That amply demonstrates its affiliation with the Catholic Church and the Benedictine Order. *See Caroll Coll.*, 558 F.3d at 574 ("[O]ur test is met with affiliation alone" and does not require "ownership, operation, and control" by separate religious organization).

Because Saint Leo satisfies all three prongs of the *Great Falls* test, the Board correctly determined that it lacks jurisdiction over Saint Leo.

## C. The Union has offered no grounds for departing from *Great Falls* and creating a circuit split.

The Union does not seriously dispute that Saint Leo satisfies the *Great Falls* test, offering only a conclusory statement with no argument to the contrary. Br. 37. Instead, it asks this Court to order the Board to "return" to the "*Pacific Lutheran* standard" (Br. 24)—in direct conflict with the D.C. Circuit, which has rejected that standard, and the First Circuit, which has rejected Board jurisdiction over religious universities. But the

Union has offered no valid reason why this Court should create a circuit split.

First, the Union urges splitting because the Supreme Court has not yet applied *Catholic Bishop* to institutions of higher education, claiming there are "generally significant differences between the religious aspects of church-related institutions of higher learning and parochial elementary and secondary schools." Br.25-26 (quoting *Tilton v. Richardson*, 403 U.S. 672, 685 (1971)). But both the First and D.C. Circuits explained why this argument is wrong, noting that *Catholic Bishop*'s reasoning "applie[s] to colleges and universities no less than other schools." *Duquesne*, 947 F.3d at 830. As then-Judge Breyer said, "'[t]he language of *Catholic Bishop* itself does not distinguish colleges from primary and secondary schools,' and the risk of 'state/religion entanglement … would seem as great in colleges as in secondary schools.'" *Id.* (quoting *Bayamon*, 793 F.2d at 401 (op. of Breyer, J.)). Indeed, "[u]nfair labor practice charges would seem as likely; the Board's likely scrutiny would seem at least as intense; the necessary distinctions between religious and labor matters would seem no easier to make; and whether one could readily 'fence off' subjects of mandatory bargaining with a religious content would seem similarly in doubt." *Id.* (quoting *Bayamon*, 793 F.2d at 403 (op. of Breyer, J.)).

Next, the Union suggests that other circuits have employed an analysis similar to *Pacific Lutheran* by considering "the role of employees in a

religious institution's purpose or mission"—citing four mid-1980s cases that declined to extend *Catholic Bishop* to other types of organizations. Br.28 & n.6 (citing cases). But none of these cases involved religious *schools. Id.* at 28. *Catholic Bishop* made clear that it rested on the "critical and unique role" of teachers in religious schools. 440 U.S. at 501-04. In that context—which is the context here—*Catholic Bishop* is controlling.

Third, the Union argues that "*Pacific Lutheran*'s emphasis on looking at the actual duties of employees in the bargaining unit" is "similar" to how courts analyze the First Amendment's "ministerial exception"—so the D.C. Circuit was wrong to reject the *Pacific Lutheran* test. Br.29-31. But this argument ignores important differences between the NLRA, which inserts the government into "nearly everything that goes on" between a religious employer and entire classes of employees, *Catholic Bishop*, 440 U.S. at 503, and the ministerial exception, which addresses a single conflict with a single employee.

The ministerial exception is a First Amendment doctrine that arose in the context of employment-discrimination lawsuits—where a single employee alleges that his or her employer took an adverse employment action based on the employee's race, sex, age, or disability. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012) (teacher alleging disability discrimination). In that context, the Supreme Court recognized that resolving employment-discrimination suits by

"ministers"—defined broadly to include employees who carry out religious functions—would violate the First Amendment by depriving religious organizations of control over who will carry out their religious functions. *Id.* at 190. To determine whether the ministerial exception applies, courts must examine the employee's role within the religious organization to determine whether he or she is a minister. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 753-54 (2020). But even in that inquiry, they must "defer to the [church's] view that [an employee's] duties are, by nature, religious" to avoid "the entanglement concerns that undergird the ministerial exception." *Behrend v. San Francisco Zen Ctr., Inc.*, 108 F.4th 765, 770 n.3 (9th Cir. 2024) (quoting *Our Lady*, 591 U.S. at 757 ("[A] religious institution's explanation of the role of such employees in the life of the religion in question is important.")).

The NLRA, by contrast, has a much broader scope than a one-off employment-discrimination lawsuit. It addresses not just one conflict with one employee, but "nearly everything that goes on" between the employer and entire classes of employees. *Catholic Bishop*, 440 U.S. at 503. In that context—and particularly given unique role of teachers in fulfilling the mission of religious schools, *id.* at 501—the threat to church autonomy and the risk of entanglement are even greater. Accordingly, *Catholic Bishop* adopted a bright-line rule—no mandatory bargaining for "*all* teachers at church-operated schools"—dependent not on "the roles played" by specific teachers, but on the entanglement that would result

from regulating *every* aspect of the employment relationship for *all* teachers. *Duquesne*, 947 F.3d at 834. The *Pacific Lutheran* test—which would effectively limit *Catholic Bishop* to situations where all of the teachers in a bargaining unit are ministers—thus fails to provide adequate protection to church autonomy and "impermissibly intrudes into religious matters." *Id.* The D.C. Circuit correctly rejected it.

Accepting the Union's invitation to split with the D.C. and First Circuits would be particularly inappropriate here given the historical tug-of-war between the Board and the judiciary over teachers in religious schools. Over the last five decades, the Board has repeatedly chafed at judicially recognized limits on its jurisdiction, crafting various tests that would expand its authority over teachers in religious schools. *See supra* at 19-26. Federal courts have rejected those attempts every time. *Id.* In 2020, the Board finally acquiesced in those rulings, acknowledging that "the [D.C. Circuit's] *Great Falls* decision correctly interpreted the Supreme Court's holding in [*Catholic Bishop*]." *Bethany Coll.*, 369 NLRB No. 98, at 1 (June 10, 2020). This is what it should have done all along. *See Hi-Craft Clothing Co. v. NLRB*, 660 F.2d 910, 912 n.1 (3d Cir. 1981) ("[A] far better approach for [the Board] would be to accept the first ruling of a court of appeals on a particular point or else seek reversal in the Supreme Court or a statutory change by Congress"—not "[t]o shop in a number of courts of appeals in hopes of securing favorable decisions,"

which is "not only wasteful of overtaxed appellate resources but dissipates agency energies as well").

Yet splitting with the D.C. and First Circuits would send precisely the opposite message. It would *command* the Board to disregard contrary rulings from the D.C. and First Circuits and exercise authority those circuits held that it lacks. It would encourage further refusals by the Board to follow federal circuit rulings it disputes. And it would incentivize the same sort of forum shopping the Union is engaged in here. (The Union could have appealed to the D.C. Circuit, but would have lost under *Duquesne*; thus, it appealed here. *See* 29 U.S.C. § 160(f).)

Finally, splitting with the D.C. and First Circuits would make little sense given that the relevant precedents rest on questions of statutory interpretation. While *Catholic Bishop* reflects important constitutional considerations, its ruling ultimately relied on the canon of constitutional avoidance—under which the Court declined to interpret the NLRA to extend the Board's jurisdiction to religious schools. 440 U.S. at 504-07. The upshot of this is that at any time after *Catholic Bishop*, *Bayamon*, *Great Falls*, *Carroll College*, or *Duquesne*, Congress could have amended the NLRA to expressly cover teachers in religious schools. But it didn't. And as this Court has explained, "courts should not unnecessarily conflict on the application of regulatory laws," as Congress "can readily change the rules if interpreted wrongly." *State of Ga. Dep't of Med. Assistance v. Bowen*, 846 F.2d 708, 711 (11th Cir. 1988).

In short, the Union has offered no valid basis for splitting with the D.C. and First Circuits, both of which correctly apply binding Supreme Court precedent. No circuit has ever adopted the Union's position. And powerful prudential reasons further militate against creating a split here.

## II. Subjecting Saint Leo to the Board's jurisdiction would violate the Religion Clauses.

If this Court were to create a circuit split and construe the NLRA to grant the Board jurisdiction over Saint Leo, the Court would need to address the weighty constitutional questions reserved by the Supreme Court in *Catholic Bishop. Cf. Duquesne Univ. of Holy Spirit v. NLRB*, 975 F.3d 13, 17 (D.C. Cir. 2020) (Pillard, J., concurring in denial of rehearing en banc) ("[W]e should have identified and decided the constitutional question[.]"). As explained below, subjecting Saint Leo to the Board's jurisdiction would violate the Constitution in three separate respects: (1) it would interfere in Saint Leo's internal governance in violation of the church autonomy doctrine; (2) it would entangle civil courts in religious questions in violation of both Religion Clauses; and (3) it would burden Saint Leo's exercise of religion contrary to the Free Exercise Clause.

### A. Exercising Board jurisdiction would violate the church autonomy doctrine.

The church autonomy doctrine guarantees religious institutions "independence from secular control or manipulation" and "power to decide

for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). The Religion Clauses thus "protect [a religious organization's] autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady*, 591 U.S. at 746. Indeed, the Supreme Court has repeatedly held that "[t]he First Amendment outlaws" "any attempt by government to dictate or even to influence such matters." *Id.*; *see also Kedroff*, 344 U.S. at 115 (First Amendment bars interference with "questions of discipline, or of faith, or of ecclesiastical rule, custom, or law"); *Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*, 426 U.S. 696, 713-14 (1976) (barring state interference with "ecclesiastical government").

One "component of this autonomy" is the ministerial exception, which protects the institution's right to select its ministers. *Our Lady*, 591 U.S. at 746. But the ministerial exception "only continues a long-standing tradition that churches are to be free from government interference in matters of church governance and administration." *Gellington v. Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299, 1304 (11th Cir. 2000). The church autonomy doctrine "extends beyond the selection of clergy to other internal church matters," providing significant protections for reli-

gious institutions when it comes to managing their employment relationships. *Bryce v. Episcopal Church in Diocese of Colo.*, 289 F.3d 648, 656 (10th Cir. 2002).

These principles of autonomy were one motivating force behind the Supreme Court's decision in *Catholic Bishop*. There, the Court recognized that "nearly everything that goes on in the schools" could count as "a 'condition of employment,'" meaning that it would all be subject to mandatory bargaining and Board oversight. *Catholic Bishop*, 440 U.S. at 503. And "the effect of mandatory bargaining" would be to "encroach[] upon the former autonomous position of management" that a religious school held. *Id.*

This is because "the Board's inquiry will implicate sensitive issues that open the door to conflicts between clergy-administrators and the Board," which then sets up the Board as the ultimate authority on how the religious institution should manage its internal affairs. *Id.* This strips the religious institution of its ability to govern itself in matters of faith and doctrine. As the Seventh Circuit explained in *Catholic Bishop*, "the very threshold act of certification of the union necessarily alters and impinges upon the religious character" of a religious school because the school must "share 'some decision-making' with the union and, as a practical matter, must now consult the lay faculty's representative on all matters bearing upon the employment arrangement." *Catholic Bishop of Chi. v. NLRB,* 559 F.2d 1112, 1123 (7th Cir. 1977), *aff'd,* 440 U.S. 490 (1979).

This issue commonly arises in disciplinary matters, where the religious institution needs to be able to address conduct that violates its religious principles in a manner consistent with those religious tenets. For example, while Saint Leo affords its faculty significant flexibility in how they teach their subjects, it forbids faculty from "advocat[ing] for positions that are contrary to the teachings of the Catholic Church outside of their disciplinary and educational boundaries." AR.3142. Distinguishing between presenting controversial topics in class and advocating for anti-Catholic positions requires religious judgment. And if Saint Leo believes a faculty member has crossed that line, its religious judgment could be second-guessed and even overridden by the Board. *See, e.g.*, *Great Falls*, 278 F.3d at 394 (describing Board inquiry into whether a particular course was consistent with Catholic doctrine as "the *exact* kind of questioning into religious matters which *Catholic Bishop* specifically sought to avoid"); *see also* AR.458-461 (similar questioning regarding whether a Saint Leo professor was disciplined for teaching *The Handmaid's Tale*).

The same difficulty arises in tenure appointments. If a faculty member were to be denied tenure because Saint Leo, exercising its religious judgment, deemed the faculty member insufficiently supportive of "the institution's mission, which is established through Roman Catholic Doctrine," AR.3141, then that decision could also be challenged and undone by the Board. *Cf. Duquesne*, 947 F.3d at 836 ("*Pacific Lutheran* led the Board's Regional Director to ask exactly the impermissible question: Would a

'reasonable candidate' (in the Board's judgment, not Duquesne's) think an adjunct's responsibilities were sufficiently 'religious'?").

Forced collective bargaining about "mandatory subjects of bargaining," which encompass all "terms and conditions of employment," would also burden Saint Leo's autonomy in other ways. *Catholic Bishop,* 440 U.S. at 502-03; *see also* 29 U.S.C. § 158(d). For a university, mandatory subjects of bargaining are likely to "concern the whole of school life." *Bayamon*, 793 F.2d at 402 (op. of Breyer, J.). Saint Leo shifted to a shared governance model specifically to "help strengthen the university's commitment to its Benedictine Catholic identity" and fortify its religious community. AR.2436; *see also* AR.1449. That may well include related changes to the way Saint Leo wants its faculty to operate within its religious mission, including additional requirements to incorporate or alter religious content in the curriculum. *See, e.g.*, *Bayamon*, 793 F.2d at 402 (op. of Breyer, J.). Such changes, under a collective bargaining system, could be opposed and overridden by the Union and the Board. Subjecting Saint Leo to the Board's jurisdiction would thus deeply undermine Saint Leo's ability to implement the changes it thinks are necessary to support its religious mission. But the First Amendment reserves the power to make those religious decisions to Saint Leo, not to the Union or the Board.

**B. Exercising Board jurisdiction would unconstitutionally entangle church and state.**

Asserting jurisdiction over Saint Leo would also "raise serious concerns about state entanglement with religion," which both Religion Clauses forbid. *Carson v. Makin*, 596 U.S. 767, 787 (2022). One type of entanglement is substantive, such as when a court takes sides in a religious dispute, *Milivojevich*, 426 U.S. at 710 (courts cannot consider "controversies over religious doctrine and practice"); answers a religious question, *see Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449 (1969) (courts cannot "resolve ecclesiastical questions"); or interprets a theological doctrine or text, *see Thomas v. Review Board*, 450 U.S. 707, 716 (1981) (courts cannot be "arbiters of scriptural interpretation.").

Another type of entanglement is procedural. "It is well established ... that courts should refrain from trolling through a person's or institution's religious beliefs." *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality op.). This includes when the "ordinary discovery" process would intrude on a religious organization's "internal deliberations and decision-making." *Whole Woman's Health v. Smith*, 896 F.3d 362, 374 (5th Cir. 2018). It also occurs when the government engages in ongoing surveillance of a religious institution. *See Carroll Coll.*, 558 F.3d at 572 (Religion Clauses bar laws that "allow[] the [government] to consider all aspects of a religious [group's] organization and function that it deem[s] relevant"

(cleaned up)); *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) (warning about "questions of compliance" leading to "continued court surveillance of the church's policies and decisions" in the workplace); *Walz v. Tax Comm'n*, 397 U.S. 664, 674 (1970) ("continuing day-to-day relationship" between church and state can create "an excessive government entanglement with religion").[8]

Both types of entanglement—substantive and procedural—drove the Court's analysis in *Catholic Bishop*. The Court considered it inevitable that the NLRA's requirements would result in "entanglement with the religious mission of the school." 440 U.S. at 502. Substantively, the process of "mandatory collective bargaining" would "[i]nevitably" "implicate sensitive issues" and cause "conflicts between clergy-administrators and the Board[] or … negotiators for unions." *Id.* at 502-03. And procedurally, the Court warned that collective bargaining would place the Board in the position of overseeing "nearly everything that goes on in the schools." *Id.* at 503. In prior labor disputes, "schools had responded that their challenged actions were mandated by their religious creeds," which "necessarily" required the Board to "inquir[e] into the good faith of the position asserted by the clergy-administrators and its relationship to the school's

---

[8]    Entanglement was one prong of the now-"abrogated" tripartite test of *Lemon v. Kurtzman*, 403 U.S. 602 (1971). *Groff v. DeJoy*, 600 U.S. 447, 460 & n.7 (2023). However, the concept of entanglement predated *Lemon*, and survives *Lemon*'s demise.

religious mission." *Id.* at 502. That result was unacceptable, because "[i]t is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *Id.*

Here, permitting Board jurisdiction would create both substantive and procedural entanglement. As in *Catholic Bishop*, an unfair labor practice charge could force the Board to decide the "good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission." 440 U.S. at 502. In fact, at the hearing, the Union's counsel questioned whether Saint Leo's "core values" were "exactly the same" as "Benedictine values" or whether other "Benedictine Colleges" have different beliefs than Saint Leo. AR.1192-96. As Saint Leo's counsel noted, that testimony was elicited "to contradict … the values set forth by Saint Leo." AR 1194:15. In effect, the Union was seeking to have the government declare that Saint Leo's religious beliefs weren't sufficiently Benedictine as judged against other religious universities. But those types of religious judgments are reserved for religious bodies, not the government.

At other points in the hearing, the Board's General Counsel also attempted to have the government decide religious questions. The General Counsel noted that Saint Leo had a policy that financial investments had to be consistent with Catholic values. AR.1022:24-1023:6. So, the General Counsel repeatedly questioned Saint Leo officials about whether having

a Starbucks on campus was consistent with those values, given that Starbucks has previously donated to Planned Parenthood. *See* AR.1023:7-1025:19, 1101:13-25, 1131:10-1133:11. Again, the General Counsel's questioning was intended to sow doubt about how Saint Leo implements its Catholic, Benedictine values. But few things are more substantively entangling than having a governmental body second-guess how a religious institution lives out its faith.

Procedural entanglement would also follow were this Court to adopt the discredited *Pacific Lutheran* test. Procedural entanglement recognizes that "the very process of inquiry" can violate the Religion Clauses by subjecting religious institutions to a protracted legal process investigating their religious beliefs and judgments. *Catholic Bishop*, 440 U.S. at 502; *see also EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996) ("[T]he EEOC's two-year investigation of [the plaintiff's] claim, together with the extensive pre-trial inquiries and the trial itself, constituted an impermissible entanglement with judgments that fell within the exclusive province of" the religious institution.). The *Pacific Lutheran* test does just that.

For example, *Pacific Lutheran* held that if a religious school shares norms with wider society—like a "commitment to diversity and academic freedom"—then "requiring faculty members to comply with [those] norms … [would] not support a finding that faculty members are held out as performing any specific religious role." 361 NLRB at 1411-12. That's

because a university would have to show "that it holds its faculty out as performing a *specifically religious role*, not a role that they would be expected to fill at virtually all universities." *Id.* at 1412 (emphasis added). But religious beliefs often overlap with wider secular norms. That doesn't make them "any less religious." *Duquesne*, 947 F.3d at 835-36. To the contrary, a commitment to academic freedom can be "an 'essential component' of [religious schools'] religious identities, critical to their mission of 'freely searching for all truth.'" *Id.* But *Pacific Lutheran* invites the Board to scrutinize and "second-guess" a school's religious beliefs. *Id.*

That is unconstitutional. Time and again, the Supreme Court has explained that the "prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment." *New York v. Cathedral Acad.*, 434 U.S. 125, 133 (1977); *see also Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953) ("[I]t is no business of courts to say that what is a religious practice or activity for one group is not religion under the protection of the First Amendment."). Under *Pacific Lutheran*, the government would have to make intrusive inquiries into an institution's religious beliefs and weigh them against the government's own judgment about the religiosity of those beliefs. Under those circumstances, "an organization might understandably be concerned that [the government] would not understand its religious tenets and sense of mission." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 336 (1987). "Fear of potential

liability might affect the way an organization carried out what it understood to be its religious mission." *Id.*

The *Pacific Lutheran* test also requires "'pervasive monitoring' for 'the subtle or overt presence of religious matter.'" *Hernandez v. CIR*, 490 U.S. 680, 694 (1989); *see Widmar v. Vincent*, 454 U.S. 263, 272 n.11 (1981) (determining "which words and activities fall within 'religious worship and religious teaching' … could prove 'an impossible task'" and would create a "continuing need to monitor group meetings to ensure compliance"). And the same would be true were the Board to exercise jurisdiction and require collective bargaining, as "questions of compliance" would lead to "continued court surveillance of the [religious institution's] policies and decisions" in the workplace. *Rayburn*, 772 F.2d at 1171.

In short, there would be no way to avoid unconstitutional entanglement were the Board to exercise jurisdiction over Saint Leo. The Board correctly refused to enter this religious thicket.

## C. Exercising Board jurisdiction would violate the Free Exercise Clause under *Tandon* and *Fulton.*

Subjecting Saint Leo to the Board's jurisdiction would also violate the Free Exercise Clause in two separate respects. First, under *Tandon v. Newsom*, 593 U.S. 61, 62 (2021), a law is subject to strict scrutiny when it treats "comparable secular activity more favorably than religious exercise." The NLRA does this by categorically exempting broad swaths of the

secular labor market from the Board's jurisdiction, even when those secular employers implicate the government's interest in labor relations just as much or more than religious schools do. Second, under *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021), a law is subject to strict scrutiny when it creates "a mechanism for individualized exemptions." The NLRA does this by authorizing the Board to decline to assert jurisdiction over almost any labor dispute involving almost any class or category of employers for almost any reason. And the NLRA cannot come close to satisfying strict scrutiny.

***Comparable secular activity.*** First, "Supreme Court authority sets forth" the "bedrock requirement[]" that "the government may not 'treat … comparable secular activity more favorably than religious exercise.'" *Fellowship of Christian Athletes v. SJUSD*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc) (quoting *Tandon*, 593 U.S. at 62) ("*FCA*"). This Court's precedents have also long explained that "where a law fails to similarly regulate secular and religious conduct implicating the same government interests," strict scrutiny applies. *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1232 (11th Cir. 2004); *see also Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 83 F.4th 922, 928 (11th Cir. 2023) ("A government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.'")

Here, exercising Board jurisdiction would "fail[] to similarly regulate secular and religious conduct implicating the same government interests." *Midrash*, 366 F.3d at 1232. That's because the NLRA categorically exempts wide swaths of the U.S. labor market, including federal, state, and local employers; federal reserve banks; agricultural laborers; individuals employed by a parent or spouse; and domestic employees. 29 U.S.C. § 152(2)-(3). But regulating these industries would serve the same governmental interests as regulating Saint Leo. In other words, the NLRA is "riddled with exemptions," *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012), and therefore not generally applicable.

***Discretionary individualized exemptions.*** Second, a purported "'generally applicable' policy may not have 'a mechanism for individualized exemptions.'" *FCA*, 82 F.4th at 686 (quoting *Fulton*, 593 U.S. at 533). And here, the NLRA expressly provides such a statutory mechanism for exemptions.

29 U.S.C. § 164(c)(1) states that:

> The Board, *in its discretion*, may … decline to assert jurisdiction over any labor dispute involving any class or category of employers, where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction[.]

(emphasis added). Moreover, the Board has repeatedly exercised that discretion to decline jurisdiction over whole industries. *See, e.g.*, 29 C.F.R.

§ 103.1-3 (declining jurisdiction over certain nonprofit colleges and universities, symphony orchestras, and "the horseracing and dograacing industries"). In fact, for decades the Board declined jurisdiction over *all* nonprofit educational institutions, based on its determination that exercising jurisdiction "would not effectuate the purposes of the Act." *Catholic Bishop,* 440 U.S. at 497.

The Board's near-limitless discretion does not end there. It is also free under the NLRA to grant individualized exemptions on a case-by-case basis according to its views of "the policies of the Act," *NLRB v. Denver Bldg. & Constr. Trades Council*, 341 U.S. 675, 684 (1951), and the Board's decisions on such individualized exemptions are "essentially unreviewable." *Temple Univ. Hosp., Inc. v. NLRB*, 39 F.4th 743, 753 (D.C. Cir. 2022). The Board has also proven willing to grant these individualized requests, repeatedly declining jurisdiction over employers after articulating what it viewed as proper NLRA policy. *See, e.g.*, *Nw. Univ.*, 362 NLRB 1350, 1350, 1352 (2015) (declining jurisdiction over school's football players based on "the nature of sports leagues" and concerns about "stability in labor relations"); *Cont. Servs., Inc.*, 202 NLRB 862, 863-65 (1973) (declining jurisdiction over bus-transportation operator based on concerns about foreign affairs).

In short, the NLRA provides just "the kind of blanket discretionary mechanism" that requires strict scrutiny. *Thai Meditation*, 83 F.4th at 929 (citing *Fulton*, 593 U.S. at 535). And this is an even easier case than

*Fulton*, where the Supreme Court held that strict scrutiny is triggered by the mere *existence* of discretion to grant exemptions, no matter "whether any … have been given." *Fulton*, 593 U.S. at 537. Here, the Board has given many exemptions over decades, both categorically and on a case-by-case basis. The NLRA therefore fails general applicability. This means that, were the Board to exercise jurisdiction, it would have to satisfy strict scrutiny—"the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

**Strict scrutiny.** The Board would fail that test. That's because, at minimum, "a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993) (cleaned up); *see also Fulton*, 593 U.S. at 542 ("The creation of a system of exceptions … undermines the [Government's] contention" that its "policies can brook no departures.").

As already explained, the NLRA categorically exempts large categories of employees from its reach. 29 U.S.C. § 152(2)-(3). And it authorizes the Board to decline jurisdiction over whole industries in its discretion, *id.* § 164(c)(1), which the Board has done repeatedly. *See, e.g.,* 29 C.F.R. § 103.1-3. The Board even grants exemptions on a case-by-case basis, exercising discretion that is "essentially unreviewable." *Temple*, 39 F.4th at 753.

In short, these categorical and individualized exemptions, as well as the Board's near-limitless discretion, establish that there is no compelling interest in asserting Board jurisdiction over Saint Leo's relationship with its full-time faculty. *Fulton*, 593 U.S. at 542 (government must offer a "compelling reason why it has a particular interest in denying an exception … while making them available to others"). Indeed, forty years ago, then-Judge Breyer reached the same conclusion in *Bayamon*, explaining that "it is difficult to find any unusually strong interest arising out of the Labor Act itself that calls for jurisdiction here." *Bayamon*, 793 F.2d at 403. The same is true today.

Accordingly, asserting Board jurisdiction over Saint Leo would violate the Free Exercise Clause.

## III. Subjecting Saint Leo to the Board's jurisdiction would violate the Religious Freedom Restoration Act.

Constitutional concerns aside, subjecting Saint Leo to the Board's jurisdiction would also violate RFRA. "RFRA presents a separate inquiry from *Catholic Bishop*" and offers an alternative ground for denying the Union's petition for review. *Great Falls*, 278 F.3d at 1347; *see also Donawa v. U.S. Att'y Gen.*, 735 F.3d 1275, 1283 (11th Cir. 2013) ("[I]t is certainly within our discretion to reach this legal question even though the [administrative agency] did not."); *Waldman v. Conway*, 871 F.3d 1283, 1289 (11th Cir. 2017) ("We may affirm on any ground supported by

the record, regardless of whether that ground was relied upon or even considered below.").[9]

RFRA is "no ordinary statute." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013) (en banc), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). It "operates as a kind of super statute, displacing the normal operation of other federal laws." *Bostock v. Clayton County*, 590 U.S. 644, 682 (2020). It "applies to all Federal law, and the implementation of that law, whether statutory or otherwise"—including the NLRA. 42 U.S.C. § 2000bb-3(a). It "is both a rule of interpretation and an exercise of general legislative supervision over federal agencies," *Korte v. Sebelius*, 735 F.3d 654, 673 (7th Cir. 2013) (internal quotation marks omitted)—meaning that federal agencies must typically consider RFRA when acting or else "be susceptible to claims that [agency action is] arbitrary and capricious for failing to consider an important aspect of the problem," *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020).

---

[9] This Court also has discretion to consider a new argument raised on appeal where, as here, the RFRA issue presents a question of great public concern. *See, e.g.*, *Dean Witter Reynolds, Inc. v. Fernandez*, 741 F.2d 355, 361 (11th Cir. 1984) (considering new argument raised on appeal because it presented question of great public concern). Additionally, the question here is whether RFRA exempts Saint Leo's relationship with its faculty from NLRA coverage. That claim mirrors a claim under *Catholic Bishop*, which the D.C. Circuit has held can be decided even if the issue wasn't raised before the Board. *Carroll Coll.*, 558 F.3d at 574.

Under RFRA, the government cannot "substantially burden a person's exercise of religion" unless the government demonstrates that imposing the burden on that person "is the least restrictive means of furthering" a "compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b). Once a claimant shows a substantial burden on its sincere religious exercise, the government must demonstrate that its conduct survives strict scrutiny. *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 428-29 (2006).

Here, forcing Saint Leo to bargain collectively with its full-time faculty would substantially burden Saint Leo's religious exercise. Saint Leo exercises religion by forming an educational community rooted in the Catholic faith, Catholic social teaching, and the Catholic intellectual tradition. *See* AR.1818. A key component of how it forms that community is by selecting, employing, and guiding its teachers. Yet forcing Saint Leo to bargain with its teachers wrests control over a key component of its religious exercise and lodges it with the Union and the Board. Indeed, Saint Leo specifically declined to bargain with the Union here to "help foster a stronger sense of community and unity amongst all Saint Leo University employees, helping to further strengthen [its] core values and Catholic identity." AR.1449. Forcing it to bargain—on pain of unfair labor practice charges and sanctions—directly undermines that religious exercise. That is a substantial burden. *See Midrash*, 366 F.3d at 1227 ("[A] 'substantial burden' is akin to significant pressure which directly coerces the religious

adherent to conform his or her behavior accordingly."); *Great Falls*, 278 F.3d at 1347 (noting that RFRA applies "if remedying a particular NLRA violation would be a 'substantial burden'").

Because Saint Leo's religious exercise is substantially burdened, the Union must show that exercising Board jurisdiction would survive strict scrutiny. It cannot, as explained above. *See supra* at 49-50.

## CONCLUSION

The Union's petition for review should be denied.

Dated: May 13, 2025

Respectfully submitted,

*/s/ Luke W. Goodrich*

Scott T. Silverman
AKERMAN LLP
401 E. Jackson St.
  Suite 1700
Tampa, FL 33602

Amy Moor Gaylord
AKERMAN LLP
71 S. Wacker Dr.
  47th Floor
Chicago, IL 60606

Luke W. Goodrich
Eric C. Rassbach
Daniel L. Chen
Jordan T. Varberg
Benjamin A. Fleshman
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave, N.W.
  Suite 400
Washington, D.C. 20006
(202) 955-0095
lgoodrich@becketfund.org

*Counsel for Intervenor Saint Leo University*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4, this brief contains 11,877 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO in 14-point Century Schoolbook font.

*/s/ Luke W. Goodrich*
Luke W. Goodrich
*Counsel for Intervenor*
*Saint Leo University*


## CERTIFICATE OF SERVICE

I certify that on May 13, 2025, I electronically filed the foregoing motion to with the Clerk of Court via the Court's CM/ECF system. I further certify that all counsel of record are registered CM/ECF users and were served through the CM/ECF system.

*/s/ Luke W. Goodrich*
Luke W. Goodrich
*Counsel for Intervenor*
*Saint Leo University*