No. 24-13895

# In the United States Court of Appeals for the Eleventh Circuit

UNITED FACULTY OF SAINT LEO, NATIONAL EDUCATION
ASSOCIATION FLORIDA EDUCATION, AMERICAN FEDERATION
OF TEACHERS, AFL-CIO,

*Petitioner*,

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent*,

SAINT LEO UNIVERSITY, INC.,

*Intervenor*.

On Petition for Review from the National Labor Relations Board,
Case Nos. 12-CA-275612, 12-CA-275617, 12-CA-275639,
12-CA-275640, 12-CA-275641, 12-CA-275642, 12-CA-1275644,
12-CA275645, and 12-CA-284360

## BRIEF OF AMICUS CURIAE PROFESSOR DAVID F. FORTE IN SUPPORT OF INTERVENOR SAINT LEO UNIVERSITY, INC.

Lael Weinberger
  (*admission pending*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
lweinberger@gibsondunn.com

Blaine H. Evanson
  *Counsel of Record*
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612-4412
(949) 451-3800
bevanson@gibsondunn.com

*Counsel for Amicus Curiae Professor David F. Forte*

*(Additional Counsel Listed on Next Page)*

Branton J. Nestor
   (*admission pending*)
James R. Lee
   (*admission pending*)
Minsoo Kim
   (*admission pending*)
Varant Anmahouni
   (*admission pending*)
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612-4412
(949) 451-3800
bnestor@gibsondunn.com

*Counsel for Amicus Curiae Professor David F. Forte*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, the undersigned counsel of record certifies that, in addition to the parties listed on the parties' Certificates of Interested Persons, the following individuals, law firms, and entities have an interest in the outcome of this appeal.

- Evanson, Blaine E. (Counsel for Amicus Curiae)
- Forte, David F. (Amicus Curiae)
- Kim, Minsoo (Counsel for Amicus Curiae)
- Lee, James R. (Counsel for Amicus Curiae)
- Anmahouni, Varant (Counsel for Amicus Curiae)
- Nestor, Branton J. (Counsel for Amicus Curiae)
- Weinberger, Lael (Counsel for Amicus Curiae)

Pursuant to 11th Cir. R. 26.1-3(b), counsel certifies that no publicly traded corporation has an interest in this proceeding.

Dated: May 20, 2025

Respectfully submitted,

*/s/ Blaine H. Evanson*

Lael Weinberger
 *(admission pending)*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036-5306
(202) 955-8500
lweinberger@gibsondunn.com

Blaine H. Evanson
 *Counsel of Record*
Branton J. Nestor
 *(admission pending)*
James R. Lee
 *(admission pending)*
Minsoo Kim
 *(admission pending)*

iii

Varant Anmahouni
 *(admission pending)*
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612-4412
(949) 451-3800
bevanson@gibsondunn.com

*Counsel for Amicus Curiae David F. Forte*

# TABLE OF CONTENTS

**Page**

INTEREST OF AMICUS CURIAE.............................................................. 1

STATEMENT OF THE ISSUES................................................................. 2

SUMMARY OF THE ARGUMENT ........................................................... 3

I.    The Church Autonomy Doctrine Is Fundamental To Our
      Constitutional Structure................................................................ 5

      A.    The Church Autonomy Doctrine Is Deeply Rooted In
            Constitutional History and Tradition..................................... 6

      B.    The History and Tradition Protect Church Freedom
            Over Self-Government and Employment—Free From
            Government Interference or Oversight. ............................... 14

II.   The Church Autonomy Doctrine Supports Limiting NLRB
      Jurisdiction Over Church Matters................................................ 18

      A.    *Catholic Bishop* Implements The Church Autonomy
            Doctrine's Historical Protections. ...................................... 19

      B.    NLRB Intervention In Internal Religious Institutional
            Matters Raises Church Autonomy Problems. ..................... 25

CONCLUSION ...................................................................................... 29

CERTIFICATE OF COMPLIANCE....................................................... 31

CERTIFICATE OF SERVICE................................................................ 32

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bethany Coll.*,
369 NLRB 98 (2020) ............................................................... 2

*Cath. Bishop of Chi.* v. *NLRB*,
559 F.2d 1112 (7th Cir. 1977) ......................................... 15, 20, 21, 22

*Chase v. Cheney*,
58 Ill. 509 (1871) .................................................................. 18

*Colo. Christian Univ. v. Weaver*,
534 F.3d 1245 (10th Cir. 2008) .......................................... 18

*Corp. of Presiding Bishop of*
*Church of Jesus Christ of Latter-day Saints v. Amos*,
483 U.S. 327 (1987) .............................................................. 23

*Demkovich v. St. Andrew the Apostle Par., Calumet City*,
3 F.4th 968 (7th Cir. 2021) .................................................. 17

*Duquesne Univ. of the Holy Spirit v. NLRB*,
947 F.3d 824 (D.C. Cir. 2020) ............................................. 27

*Hosanna-Tabor Evangelical Lutheran*
*Church & Sch. v. EEOC*,
565 U.S. 171 (2012) .............................. 3, 8, 9, 10, 11, 12, 13, 15, 24, 25

*Huntsman v. Corp. of the President of*
*the Church of Jesus Christ of Latter-Day Saints*,
127 F.4th 784 (9th Cir. 2025) .............................................. 13

*Kedroff v. St. Nicholas Cathedral of*
*Russian Orthodox Church*,
344 U.S. 94 (1952) ................................................................ 27

*Kimble v. Marvel Ent., LLC*,
    576 U.S. 446 (2015) ................................................................ 30

*Larson v. Valente*,
    456 U.S. 228 (1982) ................................................................ 16

*McCormick v. Hirsch*,
    460 F. Supp. 1337 (M.D. Pa. 1978) ....................................... 27

*McRaney v. N. Am. Mission Bd. of S.*
    *Baptist Convention, Inc.*,
    980 F.3d 1066 (5th Cir. 2020) .................................. 6, 8, 11, 17, 18, 23

*Mitchell v. Helms*,
    530 U.S. 793 (2000) ........................................................... 23, 27

*NLRB v. Catholic Bishop of Chicago*,
    440 U.S. 490 (1979) ................. 2, 3, 4, 15, 18, 19, 21, 22, 23, 24, 25, 27

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    591 U.S. 732 (2020) ............................................ 3, 5, 16, 23, 24, 27, 28

*Pacific Lutheran Univ.*,
    361 NLRB 1404 (2014) ......................................................... 27

*Serbian E. Orthodox Diocese v. Milivojevich*,
    426 U.S. 696 (1976) ........................................................... 23, 27

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) .................................................................. 30

*Univ. of Great Falls v. NLRB*,
    278 F.3d 1335 (D.C. Cir. 2002) ................................... 2, 16, 29

*Watson v. Jones*,
    80 U.S. (13 Wall.) 679 (1872) ..................... 5, 15, 17, 18, 20, 22, 23, 24

*Widmar v. Vincent*,
    454 U.S. 263 (1981) ............................................................... 23

## Statutes

29 U.S.C. § 160(c) ............................................................26

29 U.S.C. § 160(e) ............................................................26

29 U.S.C. § 161(1) ............................................................26

## Other Authorities

22 Annals of Cong. 982–83 (1811) ..........................................12

Athanasius G. Sirilla, *The "Nonministerial" Exception*,
  99 Notre Dame L. Rev. 393 (2023) ......................................12

Branton Nestor, *Judicial Power and Church Autonomy*,
  100 Notre Dame L. Rev. (forthcoming 2025),
  available at https://tinyurl.com/5n9yr9rx ........................ 6, 16, 17, 20

Carl H. Esbeck, *Establishment Clause Limits on
  Governmental Interference with Religious Organizations*,
  41 Wash. & Lee L. Rev. 347 (1984) ......................................19

Douglas Laycock, *Church Autonomy Revisited*,
  7 Geo. J. L. & Pub. Pol'y 253 (2009) ......................................9

Douglas Laycock, *Towards a General Theory of the Religion
  Clauses: The Case of Church Labor Relations and the
  Right to Church Autonomy*,
  81 Colum. L. Rev. 1373 (1981) ......................................5, 16

Felix III, *Decretum*, *in* Jacques Paul Migne,
  58 *Patrologia Latina* ......................................................6

James Madison, *Memorial and Remonstrance Against
  Religious Assessments* (1785), *reprinted in*
  National Archives, Library of Congress, Founders Online,
  https://founders.archives.gov (last visited May 20, 2025)..................13

John Leland, *The Yankee Spy: Calculated for the Religious Meridian of Massachusetts, but Will Answer for New Hampshire, Connecticut, and Vermont, Without Any Material Alterations* (1794) .............................................. 11

John Locke, *First Letter Concerning Toleration* (William Popple trans., 1689) ..................................... 10

Lael Weinberger, *Is Church Autonomy Jurisdictional?*, 54 Loy. U. Chi. L.J. 471 (2022) ...................................... 6, 16

Lael Weinberger, *The Limits of Church Autonomy*, 98 Notre Dame L. Rev. 1253 (2023) ...................................... 6

Lael Weinberger, *The Origins of Church Autonomy: Religious Liberty After Disestablishment* (forthcoming 2025), available at https://tinyurl.com/4ts7c72s ........................... 6, 21

Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105 (2003) .................................... 8

Gelasius I, Epistle 8 (*Famuli vestrae pietatis*), *in* Migne 59 *Patrologia Latina* ............................................. 6

Nicholas Macri, Note, *Missing God in Some Things: The NLRB's Jurisdictional Test Fails to Grasp the Religious Nature of Catholic Colleges and Universities*, 55 B.C. L. Rev. 609 (2014) .................................... 30

44 *The Papers of Thomas Jefferson* 78 (James P. McClure ed., 2019) ........................................... 12

Paul Horwitz, *Churches as First Amendment Institutions: Of Sovereignty and Spheres*, 44 Harv. C.R.-C.L. L. Rev. 79 (2009) ............................... 5, 16

R.H. Helmholz, *The Church and Magna Carta*, 25 Wm. & Mary Bill of Rights J. 425 (2016). ....................... 7

R.H. Helmholz, *Magna Carta and the Ius Commune*,
66 U. Chi. L. Rev. 297 (1999)..................................................................7

Stephanie H. Barclay, *Untangling Entanglement*,
97 Wash. U.L. Rev. 1701, 1720–21 (2020) ..................................8, 9, 18

Susan J. Stabile, *Blame It on* Catholic Bishop*:
The Question of NLRB Jurisdiction over
Religious Colleges and Universities*,
39 Pepp. L. Rev. 1317 (2013) ...........................................................29

Thomas C. Berg et al., *Religious Freedom, Church-State
Separation, and the Ministerial Exception,*
106 Nw. U. L. Rev Colloquy 175 (2011).............................5, 11, 12, 16

## Constitutional Provisions

U.S. Const. amend. I .................. 1, 2, 3, 4, 9, 10, 16, 18, 19, 23, 24, 27, 28

## INTEREST OF AMICUS CURIAE

Amicus curiae David Forte is Emeritus Professor of Law at Cleveland State University, where he was the inaugural holder of the Charles R. Emrick, Jr.–Calfee Halter & Griswold Endowed Chair. He was also a Garwood Visiting Professor at Princeton University.

Professor Forte has studied and written extensively on constitutional law, including the Religion Clauses of the United States Constitution. He has an acute interest in the sound development of this field of law, including the church autonomy doctrine rooted in constitutional history and Supreme Court precedent. Professor Forte writes to aid this Court in interpreting and applying the constitutional protections afforded to religious institutions under our system of law laws.[1]

---

[1] No counsel for a party authored this brief in whole or in part, and no counsel or party contributed money intended to fund its preparation or submission. No person other than amici, their members, or their counsel contributed money intended to fund the preparation or submission of this brief. Respondent opposes the filing of this amicus brief. Intervenor consents. At the time of this filing, counsel for Petitioner has not responded whether Petitioner opposes the filing of this brief.

## STATEMENT OF THE ISSUES

1. Whether the Board properly held that it lacks jurisdiction over Saint Leo University under *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979); *University of Great Falls v. NLRB*, 278 F.3d 1335 (D.C. Cir. 2002); and *Bethany College*, 369 NLRB 98 (2020).

2. Whether subjecting Saint Leo University to the Board's jurisdiction would violate the First Amendment's Religion Clauses.

3. Whether subjecting Saint Leo University to the Board's jurisdiction would violate the Religious Freedom Restoration Act.

## SUMMARY OF THE ARGUMENT

The church autonomy doctrine is deeply rooted in the text of the Religion Clauses of the First Amendment and in our nation's history, and it is fundamental to the proper relationship between civil courts and religious institutions. *See*, *e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 182–85 (2012) (tracing the history); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 748–49 (2020) (same). The doctrine "protect[s] the right of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Our Lady*, 591 U.S. at 737 (cleaned up). Religious institutions—not civil government or federal bureaucrats—settle questions of church government, faith, and doctrine.

Consistent with the history and tradition of the church autonomy doctrine, the Supreme Court's landmark decision in *Catholic Bishop* held that the National Labor Relations Board lacked "jurisdiction" under the National Labor Relations Act over labor disputes involving teachers at church-operated schools. *NLRB v. Cath. Bishop of Chicago*, 440 U.S. 490, 507 (1979). That was so because the "Board's exercise of its jurisdiction" over disputes so closely entangled with internal church governance and employment decisions "would give rise to serious constitutional questions"—and nowhere had Congress provided the necessary "affirmative intention … clearly expressed" to require resolution of those weighty

First Amendment concerns. *Id.* at 501–07. As *Catholic Bishop* emphasized, "[i]t is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *Id.* at 502. There was "no escape from conflicts flowing from the Board's exercise of jurisdiction over teachers in church-operated schools and the consequent serious First Amendment questions." *Id.* at 504.

*Amicus curiae* Professor David F. Forte, Emeritus Professor of Law at the Cleveland State University College of Law, writes to underscore two points to aid this Court's adjudication of the present controversy. First, the church autonomy doctrine is deeply rooted and fundamental to our constitutional structure. It protects the autonomy of religious institutions over internal affairs—including questions of church government, faith, doctrine, discipline, and membership. And it prevents civil government from exercising jurisdiction over or inquiring into such internal decisions. Second, the Supreme Court's decision in *Catholic Bishop*—which affirmed that the very process of exercising jurisdiction over or inquiring into matters reserved to religious institutions would raise grave constitutional questions—is broadly consistent with the history and tradition of the church autonomy doctrine, and provides important principles that limit the power of federal bureaucrats over religious institutional affairs. The State cannot regulate the internal affairs of the Church, and the NLRB is no exception.

## ARGUMENT

## I.  The Church Autonomy Doctrine Is Fundamental To Our Constitutional Structure.

The church autonomy doctrine is deeply grounded in the Constitution, protecting "the right of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Our Lady*, 591 U.S. at 737. Over matters "strictly and purely ecclesiastical in [their] character"—such as matters of "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them"—the government historically "exercise[d] no jurisdiction." *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733 (1872).

Such limitations on civil authority—whether exercised by civil courts or bureaucratic agencies—over the policies and practices of religious institutions are fundamental in our constitutional tradition, and necessary to protect religious decisionmaking. *See, e.g.*, Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy,* 81 Colum. L. Rev. 1373, 1391–92 (1981); Thomas C. Berg et al., *Religious Freedom, Church-State Separation, and the Ministerial Exception,* 106 Nw. U. L. Rev. Colloquy 175, 177 (2011); Paul Horwitz, *Churches as First Amendment Institutions: Of Sovereignty and Spheres,* 44 Harv. C.R.-C.L. L. Rev.

79, 117–18 (2009); Branton Nestor, *Judicial Power and Church Autonomy,* 100 Notre Dame L. Rev. (forthcoming 2025), available at https://tinyurl.com/5n9yr9rx; Lael Weinberger, *The Limits of Church Autonomy,* 98 Notre Dame L. Rev. 1253, 1259 (2023); Lael Weinberger, *Is Church Autonomy Jurisdictional?,* 54 Loy. U. Chi. L.J. 471, 502–03 (2022); Lael Weinberger, *The Origins of Church Autonomy: Religious Liberty After Disestablishment* available at https://tinyurl.com/4ts7c72s.

## A. The Church Autonomy Doctrine Is Deeply Rooted In Constitutional History and Tradition.

The church autonomy doctrine—and the "line prohibiting civil [authorities] from intruding on ecclesiastical matters"—is "ancient." *McRaney v. N. Am. Mission Bd. of S. Baptist Convention, Inc.*, 980 F.3d 1066, 1077 (5th Cir. 2020) (Oldham, J., dissental); Nestor, *supra*, at 7–51; Weinberger, *Origins of Church Autonomy*, *supra*, at 12–39. This ancient line separating church and state has long provided a structural protection for religious entities to make their own decisions about their doctrines, policies, and self-governance—free from state interference.

1. Church autonomy emerged as a legal principle in antiquity and the Middle Ages. In their fifth-century letters to the Emperor, Pope Felix III and Pope Gelasius I emphasized the independence of the bishops from civil authority. *See* Felix III, *Decretum*, *in* Jacques Paul Migne, 58 *Patrologia Latina* at 977; Gelasius I, Epistle 8 (*Famuli vestrae pietatis*), *in* Migne 59 *Patrologia Latina* at 42–47. This teaching passed into formal

6

canon law, incorporated into Gratian's twelfth-century compilation of legal authorities.  *See Concordance of Discordant Canons*, dist. 10, c. 3. During that century, the *libertas ecclesiae*—the freedom of the Church— became a rallying cry of religious leaders like Thomas Becket, who sought to maintain the Church's liberty to select its own leaders, free from secular political influence.  *See* R.H. Helmholz, *Magna Carta and the Ius Commune*, 66 U. Chi. L. Rev. 297, 313–14 (1999).  Canon law declared that statutes in violation of this liberty were void.  *See id.* at 313.

2.   The Magna Carta of 1215 "enacted this part of the canon law." Helmholz, *supra*, at 314.  There, the Crown agreed that "the English church shall be free, and shall have its rights undiminished and its liberties unimpaired," and recognized "the freedom of the Church's elections—a right reckoned to be of the greatest necessity and importance." J.C. Holt, Magna Carta App. IV, p. 317, cl. 1 (1965); *see also* Helmholz, *supra*, at 314 (Magna Carta enshrined "the freedom of the clergy to elect their leaders").  The guarantee was also used as a remedy against "those who had invoked the aid of secular courts to prevent what the clergy considered the rightful exercise of canonical jurisdiction."  R.H. Helmholz, *The Church and Magna Carta*, 25 Wm. & Mary Bill of Rights J. 425, 433 (2016).

While "[t]hat freedom in many cases may have been more theoretical than real," *Hosanna-Tabor*, 565 U.S. at 182, and the "precise con-

tours" of the church-state boundary "changed over time," the "jurisdictional line prohibiting civil courts from intruding on ecclesiastical matters" remained significant in the English common law tradition, *McRaney*, 980 F.3d at 1076–77 (Oldham, J., dissental).

3. "Established religion came to these shores with the earliest colonists." Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2115 (2003). One common feature of colonial and state religious establishments was "governmental control over the doctrines, structure, and personnel of the state church." *Id.* at 2131 (cleaned up). State intermeddling in religious affairs generated strife—with "continual conflicts between clergymen, royal governors, local gentry, towns, and congregants over the qualifications and discipline of ministers." *Id.* at 2137. And colonists were not shy in voicing their discontent over the "government," especially through its influence on organized churches, "intermeddling with religious practices and the conscience of individuals." Stephanie H. Barclay, *Untangling Entanglement*, 97 Wash. U.L. Rev. 1701, 1720–21 (2020).

John Adams, for example, "condemned the English tradition of allowing Parliament to 'entangle [its] constitution[] with spiritual lords,' who then subjected adherents of other religious groups to 'the utmost artifices of bigotry.'" *Id.* at 1720–21 (quoting John Adams, *Defence of the Constitutions of Government of the United States of America, in* 6 The

Works of John Adams, Second President of the United States: With a Life of the Author, Notes and Illustrations 3, 119 (Charles Francis Adams ed., 1851) (alterations in the original). And "early clergy ... demand[ed] that the government allow them to 'stand on even ground,' as well as to 'equally enjoy their religious opinions," "without molestation, or being exposed to fines and forfeitures or to any temporal disadvantages.'" *Id.* at 1720–21 (quoting Henry Cumings, A Sermon Preached at Billerica December 15, 1796, Being the Day Appointed by Authority, to Be Observed Throughout the Commonwealth of Massachusetts as a Day of Public Praise and Thanksgiving 13 (Dec. 15, 1796)).

4. "It was against this background that the First Amendment was adopted." *Hosanna-Tabor*, 565 U.S. at 183. "Familiar with life under the established Church of England" and other establishments in early America, the "founding generation sought to foreclose the possibility of a national church." *Id.* In the Anglican Church, the King appointed clergy. Act in Restraint of Annates, 25 Hen. 8, c. 20 (1534), *reprinted in* 3 The Statutes of the Realm 739 (1819). "In the established Congregational churches in New England," the voters directly elected clergy. Douglas Laycock, *Church Autonomy Revisited*, 7 Geo. J. L. & Pub. Pol'y 253, 262 (2009). "So government-appointed clergy were a symptom of the established church, and judicial orders reinstating clergy are a form of government-appointed clergy." *Id.*

"By forbidding the 'establishment of religion' and guaranteeing the 'free exercise thereof,' the Religion Clauses ensured that the new Federal Government—unlike the English Crown—would have no role in filling ecclesiastical offices." *Hosanna-Tabor*, 565 U.S. at 184. "The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own." *Id.*

The ancient concept of the liberty of the church from government interference in internal matters flourished in the philosophical debate that influenced the Founders. Thinkers such as John Locke reiterated the importance of church autonomy. McConnell, *supra*, at 2127, 2191. In Locke's view, it was necessary "to distinguish exactly the business of civil government from that of religion, and to settle the just bounds that lie between the one and the other." John Locke, *First Letter Concerning Toleration* 22–23 (William Popple trans., 1689). It was "the duty of the civil magistrate, by the impartial execution of equal laws, to secure unto all the people in general, and to every one of his subjects in particular, the just possession of these things belonging to this life." *Id.* But the "jurisdiction of the magistrate reaches only to these civil concernments ... it neither can nor ought in any manner to be extended to the salvation of souls." *Id.*

Americans made "almost verbatim Lockean arguments," opining that "'[t]he rights of conscience should always be considered inalienable—

religious opinions are not the objects of civil government, *nor any way under its jurisdiction.*'" *McRaney*, 980 F.3d at 1078 (Oldham, J., dissental) (cleaned up) (emphasis added) (quoting John Leland, *The Yankee Spy: Calculated for the Religious Meridian of Massachusetts, but Will Answer for New Hampshire, Connecticut, and Vermont, Without Any Material Alterations* (1794), *reprinted in* The Writings of the Late Elder John Leland 213, 228 (1845)).  Locke's views on church autonomy were "foundational to the original public understanding of church autonomy in America." *Id.* (also noting that Americans even went further than Locke in protecting religious freedom).

Early American political practice and thought confirmed that civil authorities generally lacked power over matters of church government, faith, and doctrine—as reflected by several founding-era "episode[s]." *See Hosanna-Tabor*, 565 U.S. at 184; *see also* Berg et al., *supra*, at 181.

First, James Madison refused to answer Bishop Carroll's inquiry regarding who should direct the Catholic Church's affairs in the Louisiana territory because the "'scrupulous policy of the Constitution in guarding against a political interference in religious affairs'" prevented the government from even opining on the "'selection of ecclesiastical individuals.'"  Berg et al., *supra*, at 181 (quoting Letter from James Madison to Bishop John Carroll (Nov. 20, 1806), *in* 20 *Records of the American Catholic Historical Society of Philadelphia* 63–64 (1909)); *see also Hosanna-Tabor*, 565 U.S. at 184.

Second, President Madison vetoed a bill incorporating the Protestant Episcopal Church in the District of Columbia because it "exceeds the rightful authority to which Governments are limited, by the essential distinction between civil and religious functions, and violates, in particular, the … Constitution of the United States." *Hosanna-Tabor*, 565 U.S. at 184–85 (quoting 22 Annals of Cong. 982–83 (1811)).

Third, President Jefferson provided assurance to the Ursuline Sisters of New Orleans that the "principles of the Constitution and government of the United States are a sure guarantee … [that their] institution will be permitted to govern itself according to it[]s own voluntary rules, without interference from the civil authority." Athanasius G. Sirilla, *The "Nonministerial" Exception*, 99 Notre Dame L. Rev. 393, 397–98 (2023) (quoting Letter from Thomas Jefferson to the Ursuline Nuns of New Orleans (July 13, 1804), *in* 44 *The Papers of Thomas Jefferson* 78, 78–79 (James P. McClure ed., 2019)). This response "clarified that … the state recognized [the institution's] autonomy." *Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 127 F.4th 784, 809 (9th Cir. 2025) (Bumatay, J., concurring).

Through "these acts, American officials refused to tread into the forbidden sphere of church faith and doctrine." *Id.* These events thus confirmed the principle that it was not "permissible for the government to contradict a church's determination of who can act as its ministers." *Hosanna-Tabor*, 565 U.S. at 185. They also confirmed, more broadly,

that civil government generally lacked power over "internal church deci-sion[s] that affect[] the faith and mission of the church." *Id.* at 190.

As James Madison explained in his *Memorial and Remonstrance Against Religious Assessments*, "[b]ecause Religion [is] exempt from the authority of the Society at large," it cannot be "subject to [the authority] of the Legislative Body." *Huntsman*, 127 F.4th at 807 (Bumatay, J., con-curring) (alterations in original) (quoting James Madison, *Memorial and Remonstrance Against Religious Assessments* (1785), *reprinted* in 5 The Founders' Constitution 82 (Philip B. Kurland & Ralph Lerner eds., 1987)). This is so because "'jurisdiction' of the legislature 'is both deriva-tive and limited ... with regard to the constituents," and so "must not 'overleap the great Barrier which defends the rights of the people' to prac-tice their religion." *Id.* To protect the free exercise of religion, it is there-fore necessary that, "in matters of Religion, no man's right" to worship "is abridged by the institution of Civil Society." James Madison, Memo-rial and Remonstrance Against Religious Assessments (1785), *in* Na-tional Archives, Library of Congress, Founders Online, https://found-ers.archives.gov (last visited May 20, 2025). And any law authorizing the government to be the "Judge of Religious Truth" or to "employ Religion as an engine of Civil policy" is thus immoral and unlawful. *Id.*

13

### B.    The History and Tradition Protect Church Freedom Over Self-Government and Employment—Free From Government Interference or Oversight.

History and tradition teach that church autonomy has long been understood as a structural barrier to government intervention in, or jurisdiction over, religious institutions' internal affairs.  That historical protection prevents the government (including through bureaucratic agencies) from interfering with a religious university's right to establish its own terms and conditions of employment.

*Amicus* writes to emphasize the following historical and doctrinal points: (1) church autonomy historically protected matters of church government, discipline, and membership (and other internal decisions) by religious institutions, and imposed these protections to safeguard both free exercise and nonestablishment principles, and (2) these protections extended to prevent civil authorities from even exercising jurisdiction over or inquiring into such internal decisions reserved to religious authorities.  *See Cath. Bishop*, 440 U.S. at 502 (preventing the "very process of inquiry" by civil authorities).

1.    The historical church autonomy doctrine—like contemporary doctrine—safeguarded the freedom of religious authorities to decide matters regarding the governance of religious institutions without improper interference or oversight by civil authorities.  Such ecclesiastical or religious autonomy matters included, among other things, questions of (1)

14

religious faith and doctrine (e.g., what is the religious mission of the religious entity?); and (2) religious governance, discipline, leadership, and teaching (e.g., who should lead or speak on behalf of the religious entity, or work to inculcate the religious entity's faith in others?).  *See*, *e.g.*, *Hosanna-Tabor*, 565 U.S. at 181–85; *Watson*, 80 U.S. at 727–34 (collecting early cases); *Cath. Bishop*, 440 U.S. at 501–03.

These protections reflected important constitutional principles. The historic church autonomy doctrine required that religious institutions' internal matters be handled by competent religious authorities, rather than civil government for at least two reasons: first, civil authorities lack the requisite power and competence over such ecclesiastical matters (a nonestablishment principle); second, religious institutions must have the freedom to determine their faith, doctrine, government, and discipline (a free exercise principle).  In doing so, the doctrine—combining both pieces of the Religion Clauses—has long preserved an important sphere for religious decisionmaking.  *See* Laycock, *Towards a General Theory of the Religion Clauses*, *supra*, at 1403; Berg et al., *supra*, at 175–76; Horwitz, *supra*, at 118; Nestor, *supra*, at 54–55; Weinberger, *Is Church Autonomy Jurisdictional?*, *supra*, at 489.

That protection for religious institutions is not easily circumvented. At least two points warrant emphasis.

15

First, that a religious school might be described as "ecumenical and open-minded ... does not make it any less religious, nor NLRB interference any less a potential infringement of religious liberty." *Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1346 (D.C. Cir. 2002). After all, the pursuit of knowledge—secular and religious alike—is itself a tenet of many religions and church-run universities. *See Our Lady*, 591 U.S. at 756. And the Founding generation "emphatically disclaimed" the authority of government to exercise jurisdiction over, much less directly restrict, a religious organization's right manage its mission, membership, and governance in order "to exercise and propagate its beliefs." *Larson v. Valente*, 456 U.S. 228, 244–45 (1982).

Second, that religious institutional decisions may sound in secular terms—such as whether to fire a teacher (for poor performance) or whether to require teachers to continue their education (to increase their teaching abilities)—does not bring the matter outside of the church autonomy doctrine. The church autonomy doctrine provides religious institutions with freedom over membership and employment (who should carry its mission?), what standards and discipline to require of its agents (what must they do to be prepared to carry on its mission?), and related matters—particularly because "personnel is policy." *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 979 (7th Cir. 2021).

2. The historical church autonomy doctrine not only limited the government's substantive power, but it prohibited civil government from

exercising jurisdiction over or inquiring into church matters reserved to church authorities. *See* Nestor, *supra*, at 33; *id.* at 13–55; *see also McRaney*, 980 F.3d at 1081 (Oldham, J., dissental).

The leading historical example is *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1872). There, the Court held that religious organizations, rather than civil courts, must have the final say over matters of "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required." *Id.* at 732–33. Under *Watson*, civil courts lack jurisdiction over "questions of discipline, or of faith, or ecclesiastical rule, custom, or law [that] have been decided by … church judicatories." *Id.* at 727, 733; *see also McRaney*, 980 F.3d at 1080–81 (Oldham, J., dissental) (analyzing *Watson*). They also lack jurisdiction to even "examin[e]" or "inquire" whether a religious entity is acting "in accordance with" its religious precepts. *Watson*, 80 U.S. at 731. Otherwise, the government would be able to use its oversight authority "to become [the] *de facto* head[] of the church." *Chase v. Cheney*, 58 Ill. 509, 535 (1871). To prevent that from happening, courts have long recognized the right of each religious entity to "guard its own fold; enact and construe its own laws; enforce its own discipline; and … maintain[n] the boundary between the temporal and spiritual power." *Id.*

These "First Amendment problems" also arise when government agencies—including federal labor commissions—attempt to exercise jurisdiction over religious entities. *Cath. Bishop*, 440 U.S. at 496. After

17

all, as the Founding generation learned centuries ago, no government ap-
pointee will ever be as "zealous" in promoting the interests of a religious
body than that body's clergy, teachers, and congregants.  McConnell, *su-
pra*, at 2141.  For this reason (and others), the Founders ratified the Es-
tablishment Clause—to prevent the government from violating religious
autonomy by interfering with the practices and policies of religious enti-
ties, including interference by monitoring or second-guessing the reli-
gious institution's self-governance.  *Colorado Christian Univ. v. Weaver*,
534 F.3d 1245, 1265 (10th Cir. 2008); Barclay, *supra*, at 1721; Carl H.
Esbeck, *Establishment Clause Limits on Governmental Interference with
Religious Organizations*, 41 Wash. & Lee L. Rev. 347, 397 (1984).

## II.    The Church Autonomy Doctrine Supports Limiting NLRB Jurisdiction Over Church Matters.

The church autonomy doctrine limits civil power over the self-gov-
ernance of religious institutions, a matter reserved to the religious au-
thorities.  That principle protects the free exercise of religious institu-
tions and prevents non-establishment violations by civil authorities.  And
it applies with full force to administrative powers employed by bureau-
cratic agencies—which wield far greater (and far more intrusive) powers
than those contemplated by the Framers.  The Supreme Court's seminal
decision in *Catholic Bishop*—which is binding on this Court and con-
sistent  with  the  history  of  the  Constitution—expressly  considered

18

whether permitting the NLRB to exercise its jurisdiction over labor disputes involving teachers at church-operated schools would cause "serious constitutional questions." *Cath. Bishop*, 440 U.S. at 501. And it found "no escape from conflicts flowing from the Board's exercise of jurisdiction over teachers in church-operated schools and the consequence serious First Amendment questions that would follow." *Id.* at 504. *Amicus* writes to explain why *Catholic Bishop*'s central lessons are consistent with the history and tradition of the church autonomy doctrine.

### A. *Catholic Bishop* Implements The Church Autonomy Doctrine's Historical Protections.

The central holding of *Catholic Bishop* and its progeny is that the NLRB lacks jurisdiction over important categories of church-employment disputes because (a) the NLRB's "exercise of its jurisdiction" would present "serious constitutional questions," and (b) Congress has nowhere "clearly expressed" authorization for such jurisdiction by the NLRB. *Cath. Bishop*, 440 U.S. at 501–504.

*Catholic Bishop*—including its protections for religious authorities and its limitations on bureaucratic agencies—is part-and-parcel of the broader history and tradition of the church autonomy doctrine, which has long instructed that free-exercise and non-establishment principles protect against civil authorities exercising jurisdiction over or inquiring into church matters reserved to church authorities.

19

1. *Catholic Bishop* respects the church autonomy doctrine's procedural protections. History and tradition teach that over matters "strictly and purely ecclesiastical in character"—such as "matter[s] which concern[] theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them"—the civil authorities "exercise no jurisdiction." *Watson*, 80 U.S. at 733; *id.* at 728–33 (collecting cases); *see also* Nestor, *supra*, 13–18 (collecting cases prohibiting "jurisdiction" or "inquiry" by civil courts into church matters); Weinberger, *Is Church Autonomy Jurisdictional?*, *supra*, at 487–93 (church autonomy limits the "conceptual jurisdiction" of civil government). *Catholic Bishop*'s rule is consistent with that history and tradition. *See* 440 U.S. at 501–04.

*Catholic Bishop* offered several interrelated reasons for why the very exercise of "jurisdiction" by the NLRB—in that case, to "cease … unfair labor practices" and to order church-operated schools to "bargain collectively" with teacher unions—would raise "serious constitutional questions." *Id.* at 494, 501–02.

As an initial matter, if the Board were to exercise its jurisdiction to define "what are 'terms and conditions of employment' and therefore mandatory subjects of bargaining," it would "implicate sensitive issues that open the door to conflicts between clergy-administrators and the Board." *Id.* at 502-03. *Catholic Bishop* explains that the "terms and conditions of employment" is a capacious concept, and that because "nearly

20

everything that goes on in the schools affects teachers and is therefore arguably a 'condition of employment.'" *Id.* The broad sweep where Board supervision may be invoked—potentially encompassing "nearly everything" in the school (*id.* at 503)—only illustrate the problems with civil government superintendence of the functions of a church-operated school. Such supervision, whether expressed in terms of "entanglement" or simply "superintendence," raises grave constitutional concerns by imposing the "supervisory power of … civil tribunals" over church-operated institutions. *Watson*, 80 U.S. at 731 (collecting cases).

Moreover, if the Board were to exercise such jurisdiction, it could not avoid entanglement and conflicts with the "religious mission of the school in the setting of mandatory collective bargaining" and related Board intervention. *Cath. Bishop*, 440 U.S. at 502. If, for example, the Board exercised jurisdiction over "an unfair labor practice charge followed [by] the dismissal of a teacher" for a religious reason, it "would necessarily have to concern itself with whether the real cause for discharge was that stated" or "merely a pretextual reason given to cover a discharge actually directed at union activity." *Cath. Bishop of Chi.* v. *NLRB*, 559 F.2d 1112, 1125 (7th Cir. 1977). And if that reason was the teacher's lack of "conformity ... to the standard of morals required," *Watson*, 80 U.S. at 733, the Board would have to "inquir[e] into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission," *Cath. Bishop*, 440 U.S. at 502. Such

21

inquiry—which, where matters of church government, faith, and doctrine (e.g., employment of teachers at a church-operated school) are implicated—would similarly raise grave constitutional concerns by inviting (and sometimes requiring) civil authorities to trudge through religious doctrine, test religious decisionmaking, and involve the very "inquir[y]" and "examin[ation]" that the historic church autonomy doctrine limited. *See Watson*, 80 U.S. at 727-35 (collecting cases).

Because "the very process of inquiry" to answer those questions can lead to First Amendment violations, the religious autonomy doctrine prevents the Board from exercising jurisdiction to decide, monitor, or examine the employment practices and policies that a religious school claims are compelled by its creed. *Cath. Bishop*, 440 U.S. at 502; *see also Serbian E. Orthodox Diocese for U. S. of Am. & Canada v. Milivojevich,* 426 U.S. 696, 713 (1976) (describing such process as "exactly the inquiry that the First Amendment prohibits"); *Widmar v. Vincent*, 454 U.S. 263, 272 n.11 (1981) (monitoring universities' attempts to differentiate between secular and religious messages and objections could not only "prove an impossible task," but also risks violating the Establishment Clause (cleaned up)); *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion) (the government "should refrain from trolling through a person's or institution's religious beliefs"); *Our Lady*, 591 U.S. at 761 (deciding whether an employee is a "co-religionist" with a religious university "would risk judicial entanglement in religious issues"); *Corp. of Presiding Bishop of*

*Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 336 (1987) ("it is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious"); *McRaney*, 980 F.3d at 1074 (Ho, J., dissental) ("forcing religious institutions to defend themselves on matters of internal governance is itself a tax on religious liberty" (collecting cases)).

2. Next take the church autonomy doctrine's substantive protections, which *Catholic Bishop* respects.  Under the church autonomy doctrine, a civil authority (whether a court or an agency) cannot reverse a church decision on a church matter (e.g., whether to fire a minister, how to structure religious education, what liturgical or religious requirements to demand of church members and leaders). Churches (not agencies) must have the final word on church matters.  *See*, *e.g.*, *Watson*, 80 U.S. at 728–29.  And that is true as a matter of both free-exercise (which protects church decisionmaking) and non-establishment (which keeps secular authorities out).  *See*, *e.g.*, *Hosanna-Tabor*, 565 U.S. at 188; *Our Lady*, 591 U.S. at 746.

These principles are particularly applicable in the context of teachers in church-operated schools.  After all, teachers play an "unique role" in "fulfilling the mission of a church-operated school," one that, despite that school's provision of public services or acceptance of secular principles, "necessarily pervades the school system" as a whole.  *Id.* at 501.  And

23

because "religious doctrine[s]" are often intertwined with "secular" things—e.g., the seemingly secular subject of physics is taught in a way that embraces or at least does not discredit creationism—the NLRB lacks authority to decide who religious schools hire or second-guess their assertions that even seemingly secular employment policies are "mandated by their religious creeds" without violating their religious autonomy. *Id.* at 501, 503.

*Catholic Bishop* respects such substantive protections by keeping civil authorities away from second-guessing church authorities on church matters.  As an initial matter, the exercise of NLRB jurisdiction—for example, if an unfair employment practice were alleged—would often require the NLRB to evaluate the church-operated school's religious rationale and decide the "good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission." *Catholic Bishop*, 440 U.S. at 502.  But such jurisdiction, with a civil bureaucrat tasked to "probe the real reason" for the church's action, would require "mak[ing] a judgment about church doctrine"—and with a "civil factfinder sitting in ultimate judgment of what the accused church really believes, and how important that belief is to the church's overall mission." *Hosanna-Tabor*, 565 U.S. at 205-06 (Alito, J., concurring).  The "very process of inquiry leading to [such] findings and conclusions is bad enough," but were a civil agency to overrule a church's decision on a church matter, the constitutional injury is all the more palpable.  *Catholic Bishop*, 440

U.S. at 501-04.  Such religious decisionmaking by civil authorities is tolerated by neither *Catholic Bishop* nor the history and tradition of the church autonomy doctrine.

### B.     NLRB Intervention In Internal Religious Institutional Matters Raises Church Autonomy Problems.

Subjecting religious schools to standard NLRB regulation to religious schools would intrude into areas that the First Amendment's church autonomy doctrine is supposed to protect.  Additionally, adopting the test advocated by the Appellants would introduce an additional layer of government scrutiny of religion.

1.  The NLRA gives the NLRB broad authority over regulated employers.  It starts with authority to investigate a school's employment practices based on allegations of unfair labor practices.  When conducting an investigation, the Board "shall at all reasonable times have access to, for the purpose of examination, and the right to copy any evidence of any person being investigated."  29 U.S.C. § 161(1).  The NLRB then has power to order remedies for NLRA violations.  It can order the employer to take a wide variety of measures to address the employment practices at issue.  29 U.S.C. § 160(c).  And the NLRB can enforce those orders against the employer in court.  29 U.S.C. § 160(e).  In sum, the NLRB "would have the authority to inspect and analyze financial data of the [religious institution], to compel disclosure of similar data in the course

of collective bargaining, to investigate and analyze the motivations of religious personnel in connection with terminations, hirings, discipline, and other allegedly discriminating actions taken by them." *McCormick v. Hirsch*, 460 F. Supp. 1337, 1358 (M.D. Pa. 1978).

Employing this investigatory authority against a religious institution's decisions about how to structure its self-governance poses serious church autonomy dangers. Church autonomy protects "the right of religious institutions to decide for themselves, free from state interference, matters of church government." *Our Lady*, 591 U.S. at 737 (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116 (1952)). Likewise, the Supreme Court recognized—in *Catholic Bishop* and elsewhere—that the "very process of inquiry" can itself "impinge on rights guaranteed by the Religion Clauses." *Catholic Bishop*, 440 U.S. at 502; *Milivojevich*, 426 U.S. at 718 ("detailed review" of church policy was "impermissible"); *Mitchell*, 530 U.S. at 828 (plurality opinion) ("It is well established ... that courts should refrain from trolling through a person's or institution's religious beliefs.").

2. The Appellants in this case argue that the Board should be able to apply the NLRA against religiously identified educational institutions by using the less protective standard from *Pacific Lutheran University*, 361 NLRB 1404, 1414 (2014) , a test briefly employed by the NLRB before it was held unconstitutional in *Duquesne University of the Holy Spirit v.*

*NLRB*, 947 F.3d 824, 832, 834 (D.C. Cir. 2020). Under this test, Appellants would have the NLRB analyze faculty members on a role-by-role basis to determine if they are religious enough. Appellants suggest that, under their preferred analysis, "general statements that faculty support the school's mission would be inadequate." Br. at 22.

But the *Pacific Lutheran* standard misses a fundamental aspect of the church autonomy doctrine. It focuses narrowly on individual employees while ignoring organizational governance issues more broadly. Of course, it is true that the First Amendment guards against interference with religious institutions' employment of those with religious roles. But that employment relationship is not the only way in which church autonomy principles are implicated here. Instead, as the history of the church autonomy doctrine has demonstrated, the First Amendment protects "internal management decisions that are essential" to a religious "institution's central mission." *Our Lady*, 591 U.S. at 746. Permitting the NLRB to regulate labor at a concededly religious institution whenever it could find some set of employees who are not religious enough would lead to dramatic increase in interference with the internal affairs of the organization.

In order to apply *Pacific Lutheran*, institutions that openly proclaim their religious identity will be subject to extensive and potentially intrusive questioning about the religious roles of employees. The NLRB would—on the Appellant's view—have to parse statements by faculty

27

about the school's mission and religious beliefs.  If a statement of "support" for the religious beliefs and mission is inadequate, as Appellants suggest (Br. at 22), then the NLRB will need to make determinations about what is a sufficiently strong affirmation of religious mission and calling to count as religious.  This in turn could easily travel down the slippery slope toward the NLRB making determinations about matters of faith and doctrine, deciding what kinds of affirmations as to employees are sufficiently religious to warrant protection.

Years earlier, the NLRB engaged in a holistic evaluation to determine when schools were religious enough—an evaluation that was rightfully abandoned as unconstitutional long ago.  *Great Falls*, 278 F.3d at 1347.  The *Pacific Lutheran* test (especially with Appellant's gloss) promises to bring back in a new holistic analysis—this time, focused on what the institution says about the teachers, which are to be judged as to whether the statements are religious enough.  In the past, the NLRB sometimes failed to recognize Catholic schools as religious when the school provided academic freedom and permitted non-believers to participate on campus.  But the NLRB missed that many Catholic universities believe that "[i]nter-faith dialogue" and an inclusive campus culture fulfill their important religious mission to "engage the world."  *See, e.g.*, Susan J. Stabile, *Blame It on* Catholic Bishop*: The Question of NLRB Jurisdiction over Religious Colleges and Universities*, 39 Pepp. L. Rev. 1317, 1327–28 (2013) (quoting John Paul II, Apostolic Constitution Ex Corde

Ecclesiae ¶ 43 (1990)); Nicholas Macri, Note, *Missing God in Some Things: The NLRB's Jurisdictional Test Fails to Grasp the Religious Nature of Catholic Colleges and Universities*, 55 B.C. L. Rev. 609, 612 (2014) (collecting citations). If the Appellant's version of *Pacific Lutheran* were adopted, the NLRB would be back in the position of judging religious commitments. That is perilous territory for a government actor.

*     *     *

*Catholic Bishop*—and its holding that the NLRB lacks jurisdiction over important categories of church employment disputes—should control this case for many reasons. *Catholic Bishop* is the command of the Supreme Court—and binding on this Court. *See*, *e.g.*, *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (vertical stare decisis). *Catholic Bishop* is also a decades-old interpretation of an Act of Congress—and entitled to great precedential weight. *See, e.g.*, *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456 (2015) (statutory stare decisis). *Amicus* adds one more reason to that list: *Catholic Bishop*'s central lesson is broadly consistent with the historical protections for religious institutions entrenched by the church autonomy doctrine.

## CONCLUSION

The Court should deny the Union's petition for review.

Dated: May 20, 2025

Lael Weinberger
  (*admission pending*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
lweinberger@gibsondunn.com

Respectfully submitted,

*/s/ Blaine H. Evanson*

Blaine H. Evanson
  *Counsel of Record*
Branton J. Nestor
  (*admission pending*)
James R. Lee
  (*admission pending*)
Minsoo Kim
  (*admission pending*)
Varant Anmahouni
  (*admission pending*)
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612-4412
(949) 451-3800
bevanson@gibsondunn.com

*Counsel for Amicus Curiae Professor David F. Forte*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4, this brief contains 6494 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO in 14-point Century Schoolbook font.

*/s/ Blaine H. Evanson*
Blaine H. Evanson
*Counsel for Amicus Curiae*
*Professor David F. Forte*

## CERTIFICATE OF SERVICE

I certify that on May 20, 2025, I electronically filed the foregoing motion to with the Clerk of Court via the Court's CM/ECF system. I further certify that all counsel of record are registered CM/ECF users and were served through the CM/ECF system.

*/s/ Blaine H. Evanson*

Blaine H. Evanson
*Counsel for Amicus Curiae*
*Professor David F. Forte*